

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **EDWARD MANDEL** | § | |
| | § | **CASE NO. 10-40219** |
| **DEBTOR.** | § | |
| | § | |
| **Edward Mandel,** | § | |
| *Objector* | § | |
| **v.** | § | ***Contested Matter*** |
| **Steven Thrasher,** | § | ***Claims Objection*** |
| *Claimant* | § | |
| | § | |
| **Edward Mandel,** | § | |
| *Objector* | § | |
| **v.** | § | ***Contested Matter*** |
| **Jason Coleman,** | § | ***Claims Objection*** |
| *Claimant* | § | |
| | § | |
| **Edward Mandel,** | § | |
| *Objector* | § | |
| **v.** | § | ***Contested Matter*** |
| **White Nile Software, Inc.,** | § | ***Claims Objection*** |
| *Claimant* | § | |
| | § | |

**JOINT PRE-TRIAL ORDER
DEBTOR'S OBJECTIONS TO CLAIMS NOS. 20, 32, AND 26**

Pursuant to the directions of the Court and the Court's Scheduling Order [docket no. 439], the parties submit this Joint final Pre-Trial Order for the hearing on the Debtor's Objections to the Claim of Steven Thrasher (Claim No. 20) [docket no. 281] ("Thrasher") and the Debtor's Objection to the Claim of Jason Coleman (Claim No. 32) [docket no. 282] ("Coleman"), and the Debtor's Objection to the Claim of White Nile Software, Inc. (Claim No. 26) [docket no. 283]***to the extent that Claim No. 26 is duplicate of, and included***

*within, Claim no. 20 filed by Thrasher.*[1]

## A.    COUNSEL FOR THE PARTIES

*Debtor:*

Edward Mandel:

I. Richard Levy
I. Richard Levy, P.C.
17304 Preston Road, Suite 800
P. O. Box 796935
Dallas, Texas 75379

Christopher M. McNeill, P.C.
Block & Garden, LLP
5459 Sherry Lane, Suite 900
Dallas, Texas 75225

*Claimants:*

Steven Thrasher, individually, and derivatively on behalf of White Nile Software, Inc.:

Mitchell Madden
Thomas V. Murto III
MaddenSewell, LLP
1755 Wittington Place, Suite 300
Dallas, Texas 75234

E. P. Keiffer
Wright Ginsbert Brusilow P.C.
325 North St. Paul Street, Suite 4150
Dallas, Texas 75201

Jason Coleman:

Elvin E. Smith, III
Law Offices of Elvin E. Smith
307 Dartbrook
Rockwall, Texas 75087

## B.    STATEMENT OF JURISDICTION

---

1 Thrasher did not elect to individually compensate the Receiver Rosa Orenstein and accordingly pursuant to the Court's order she has not participated herein.

The Court has jurisdiction over the Debtor's claims objections under 28 U.S.C. § 1334 and 28 U.S.C. §§157(b)(2)(B), (C) & (O). Venue is proper in this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## 1. Thrasher/Coleman Contentions.

*Claimants' Reservation of Rights*

The Claimants believe that the Court does not have jurisdiction over all the causes of action asserted by Thrasher, individually and derivatively on behalf of White Nile, or by Coleman. For example, the Court does not have jurisdiction over claims asserted by Thrasher and by Coleman against nondebtor co-defendants, White Nile Software, Inc. ("White Nile"), Paul Williams ("Williams"), Skinner Layne ("Layne"), Eddy Layne and Ellen Layne ("E. Layne"), Dan S. Boyd ("Boyd"), The Boyd Law Firm, P.C., Hughes-Roth Capital Markets, Inc., Hughes-Roth Financial Group, Inc., Nexplore Corporation ("Nexplore"), Terry L. Ferrell, Robert Byron and Joseph Savard. Also among the issues this Court does not have jurisdiction over is the dispute between Thrasher, individually, and Coleman on the one hand and White Nile as to current ownership of certain trade secrets and intellectual property.[2] The jurisdiction, if any, of the federal courts to determine those issues is under the federal court's removal jurisdiction, 28 U.S.C. §1452 and supplemental jurisdiction 28 U.S.C. § 1441(c). These claims are also subject to requests for jury trial, which the parties do not waive, and therefore require that such issues be directed to district court for adjudication.

Moreover, the dispute between the creditors, Thrasher, individually, and Coleman on the one hand and White Nile on the other hand, need to be adjudicated before the bulk of

---

2 See Section C2 below for a detailed description of the nature of the alleged trade secrets and intellectual property.

the claims objections can be determined. That dispute cannot be adjudicated in this proceeding. Not only is it outside the scope of a "claims objection" determination, but there no one to represent White Nile's interest with respect to that dispute in these proceedings because the court has excused the Receiver from participating in these proceedings. Until those disputes are adjudicated, the court cannot determine what is the proper amount of any claim against the debtor that involves the disputed trade secrets/intellectual property. For example, each of the three has claims that the Debtor, individually and in conspiracy with non-debtor co-defendants misappropriated trade secrets belonging to them and violated the Texas Theft Liability Act. Assuming the Court finds that the Debtor did commit these wrongful acts, the Court must determine how much each individual creditor is entitled to with respect to his or its individual claim. Nor is the impact of this issue limited solely to the misappropriation of trade secrets or claims. The claimants' causes of action for claims for breach of contract with respect to nondisclosure agreements ("NDA") and breaches of fiduciary duty similarly require a determination of which claimant actually owns the claim.

Furthermore, the determination as to which party owns the intellectual property also affects the scope of some of the specific claims such as the breach of fiduciary duty claims by Thrasher and by White Nile. There is applicable Texas case law that indicates that majority shareholders owe a formal fiduciary duties to their corporations.[3] This case law supports a claim by White Nile that Mandel as its majority shareholder still owed fiduciary duties to it at the time he filed a grievance with the patent office in May or June of 2009 attacking the second patent issued to Thrasher and also when Mandel caused Nexplore to initiate in August of 2009 re-exams of the first patent issued to Thrasher and appeal of that

---

3 See for example, *Hoggett v. Brown*, 971 S.W.2d 472, 488 [citing *Schauttett v. Chester State Bank,* 707 F. Supp. 885, 889 (E.D. Tex. 1988).]

re-exam if, in fact, such rights had not reverted to Thrasher in 2006. However, it is undisputed that the joint venture under which Thrasher asserts his individual breach of fiduciary duty claims against Mandel had terminated prior to 2009, and therefore, such conduct would not constitute a breach of that specific fiduciary duty to Thrasher or the joint venture.

## 2.    Debtor's Response

Without reference to particular points made in their "reservation of rights" set forth above, the jurisdictional points are certain and clear: Claimants have invoked this Court's core-jurisdiction by filing their proofs of claims. They have waived their rights to trial by jury on issues they claim to reserve, and they have submitted to this court's determination of any and all legal and factual issues necessary to adjudicate the allowance or disallowance of their claims. See 11 U.S.C. §§ 501 and 502. This Court has jurisdiction to determine any and all of the issues raised in these claims because their sole basis is the reassertion of each and every claim from the adversary proceeding[4] based on each and every factual allegation therein. This Court's jurisdiction to determine these matters is undisputed under 28 U.S.C. §§ 1334 and 157, as cited above, but also as discussed in U.S. Supreme Court decisions such as *Katchen v. Landy*, 382 U.S. 323 (1966), *Granfinanciria, S.A. v. Nordberg*, 492 U.S. 33 (1989), and *Langenkamp v. Kulp*, 498 U.S. 42 (1990). Further, the filing of the respective proofs of claim by Thrasher and Coleman represent a knowing and voluntary waiver of a right to trial by jury of the claims and circumstances set forth in their respective proofs of claim.

Claimants' further statement that this Court cannot reach a determination of rights

---

4 *See* Thrasher's Sixth Amended Counterclaim and Third Party Petition; Coleman's Second Amended Petition in Intervention and Answer to Plaintiff's Second Amended Petition and Request for Injunctive

between them and White Nile is simply wrong. First, White Nile asserts as its sole and singular grounds the very same allegations of Thrasher as set forth in his proof of claim. White Nile has invoked this Court's equitable jurisdiction with respect to claims by filing them. Further, Thrasher asserts the right to bring derivative claims on behalf of White Nile and therefore those matters are joined for decision in this proceeding. Finally, Mandel raises defenses and offsets in a personal capacity and derivatively through White Nile. All of these are within this Court's core jurisdiction to determine claims. *See In re Jensen*, 946 F.2d 369, 374 (5th Cir. 1991). Additionally, under Texas law, claims brought by a shareholder in a closely held corporation may be treated by the courts as a direct action brought by the shareholder for the shareholder's own benefit. *See* Texas Business Organizations Code § 21.563(c) (formerly Article 5.14(L) of the Texas Business Corporation Act).

The Claimants assert that the ownership of certain alleged intellectual property by Thrasher and/or Coleman or by White Nile is critical to this Court's determination of these claims. The Debtor agrees. However, the Debtor disagrees with the Claimants' contention that this Court cannot decide those ownership issues. In fact, this Court, through the equitable process of the claims determination, may indeed decide on all legal and factual issues necessary to determine the claims. *See, e.g., In re Century Operating Co. of Texas, Inc.*, 273 B.R. 514, 523 (Bankr.S.D.Tex. 2002). Although the other parties mentioned by the Claimants are not participants in this proceeding, this Court's equitable jurisdiction to determine the claims is not impaired despite the fact that the Claimants' rights against those parties may be negatively affected as a result of this Court's findings and determinations in this proceeding. *See Id.*

Relief.

## C.    NATURE OF ACTION[5]

### 1.    Thrasher and Coleman's summary of the claims.

In essence, by his claims in the adversary proceeding,[6] Thrasher contends that he developed valuable intellectual property and related trade secrets and entered into a joint venture agreement with Mandel to exploit same.  As part of that joint venture agreement, Thrasher acquiesced in the formation and the structuring of a Texas corporation named White Nile Software, Inc. and as a result of what he now believes to be misrepresentations; lack of candor full disclosure; and/or out right fraud on the part of Mandel and the others, he assigned his interest in the trade secrets and intellectual property to White Nile only to be wrongfully ousted from the management of White Nile.  Thereafter, Thrasher contends that Mandel in concert with Williams, Eddy Layne and his son, Skinner Layne, formed a new entity, Nexplore Corporation, which was designed and calculated to be White Nile without Thrasher.  In other words, Mandel and his co-conspirators concocted and implemented an elaborate plan or scheme to trap Thrasher's valuable intellectual property and trade secrets, use and exploit those assets and the opportunities and investors attracted by those assets in a new company without the burden of Thrasher's interest in those assets and properties.  Thrasher contends that in so doing, Mandel and others not only wrongfully induced Thrasher to participate in White Nile but thereafter abused the corporate formalities and Mandel and his co-conspirators' obligations to both White Nile and Thrasher, breached

---

5 The Debtor understands that the active pleadings of the Claimants that were referenced in their claims and in supplements to the claims are Thrasher's Sixth Amended Counterclaim and Third Party Petition, as supplemented; Coleman's Second Amended Petition in Intervention and Answer to Plaintiff's Second Amended Petition and Request for Injunctive Relief, as supplemented. The Debtor's and White Nile's responses to such pleadings are Mandel's Third Amended Answer; Mandel's First Amended Answer to Second Supplement to Intervenor Jason Coleman's Second Amended Plea in Intervention; and White Nile's Second Amended Petition and Request for Injunctive and Declaratory Relief.
6 Adversary No. 10-04133, *White Nile Software, Inc. v. Steven Thrasher v. Skinner Layne, Edward Mandel, and Paul Williams, and Nexplore Corporation, Intervenor, and Jason Coleman, Intervenor.*

fiduciary duties owed Thrasher and White Nile, all to Thrasher's and White Nile's damage. In addition, Thrasher alleges and contends that not only did Mandel and his co-conspirators misappropriate or steal trade secrets and breach their fiduciary duties, they also implemented and maintained, through their conduct and the conduct of their counsel of their choice, the corporate form of White Nile to provide a vehicle to attack Thrasher individually and shield their own wrongful activities.[7] Ultimately, the abuse inherent in the utilization of the corporate form in this fashion and the conflicts of interest of Mandel, his co-conspirators and their counsel resulted in the appointment of a receiver over White Nile. These actions acted to prevent Thrasher from any efforts he may have otherwise undertaken to realize his value from inventions.

For his part Coleman alleges that he was induced by Mandel into expending his time, effort and contributions to the development of the intellectual property and trade secrets, initially conceived of by Thrasher and that, consistent with the plan and scheme deployed against Thrasher and his interests either in White Nile or the trade secrets and intellectual property, he too, was targeted by Mandel and his co-conspirators in an effort to deprive him of intellectual property or compensation for his work.

### 2. Thrasher and Coleman's Claims Asserted.

Thrasher, individually and derivatively for White Nile asserts causes of action against Mandel and the nondebtor co-defendants for injunctive relief[8] to enjoin Mandel and the nondebtor co-defendants from taking actions to disclosure, sell, assign, develop, transfer or negotiate the disclosure, sell, assignment or transfer of intellectual property and trade

---

7 These actions were contrary to claims that White Nile was "defunct" all the while shielding Mandel's exploitation._
8 Debtor notes that this request for injunctive relief does not limit itself to Debtor, nor is the request for injunctive relief a valid basis for a claim unless it can be monetized.

secrets. Thrasher alleges: (1) that Mandel and nondebtor's Williams, Layne, E. Layne and Nexplore misappropriated intellectual property/trade secrets owned by him or owned by White Nile, and likewise violated the Texas Theft Liability Act, Tex. Civ. Prac. & Rem. Code § 134.001 et seq. as defined in the Texas Penal Code § 31.05; (2) that Mandel breached nondisclosure agreements with both Thrasher, individually, and White Nile and that Mandel breached agreements with Thrasher and White Nile as to his financial contribution to his joint venture with Thrasher and his contribution to White Nile for the stock he was issued; (3) that Mandel and nondebtor co-defendant, Williams, Layne, E. Layne, Nexplore and the Hughes-Roth entities breached a settlement agreement of the removed case that was reached in October 2007; (4) that Mandel breached fiduciary duties that he owed to Thrasher, individually, and/or to White Nile: (a) specifically, the duty of good faith, fairness and honesty; (b) the duty of full disclosure; (c) the duty to refrain from competition; (d) the duty not to usurp White Nile's corporate opportunities for personal gain; (e) the duty of utmost good faith; and (f) the duty of loyalty; (5) that Mandel defrauded or fraudulently induced Thrasher, individually, or derivatively on behalf of White Nile to obtain Thrasher's participation in the joint venture, and ownership of White Nile, and in order to effectuate a misappropriation or conversion of White Nile and/or Thrasher's intellectual property and to wrongfully remove Thrasher from his position as an officer or director with White Nile and to advance the usurpation of corporate opportunities of White Nile; (6) that Mandel, and nondebtor co-defendants Williams, Layne, E. Layne, Hughes-Roth entities, Nexplore and Boyd made false representations or concealed material information to induce Thrasher to enter into the settlement agreement in October 2007; (7) that Mandel conspired with Williams, Layne and E. Layne to commit the misrepresentations, misappropriation,

fraud, breaches of fiduciary duty; Thrasher also seeks a declaratory judgment[9] (1) a declaratory judgment with respect to the ownership and right to control White Nile and whether the acts taken by Mandel, Williams or Layne purportedly as officers or directors for White Nile at any time since January 1, 2006 are void or voidable; and (2) with respect to ownership interest in trade secrets and intellectual property including, provisional patents, trade secrets, trademarks, confidential and proprietary ideas and concepts, as well as confidential proprietary business and marketing plans. Thrasher, also claims individually, against Mandel and nondebtor co-defendants, Williams, Layne and E. Layne, that they engaged in oppression of his shareholder rights in White Nile. Thrasher, individually and derivatively on behalf of White Nile asserts a claim against Mandel and nondebtor co-defendants, Williams, Layne, and E. Layne for exemplary damages; (13) a claim by Thrasher, individually, against Mandel and non-debtor co-defendants, White Nile, Layne, Williams, E. Layne and Nexplore for attorneys' fees; (14) a request by Thrasher that the court impose a constructive trust on intellectual property owned or controlled by Nexplore developed from the intellectual property of Thrasher, Coleman or White Nile with respect to, including but not limited to certain patent or patent applications.

Coleman asserts similar claims for (1) injunctive relief[10]; (2) misappropriation of trade secrets including violations of the Texas Theft Liability Act; (3) breach of contract claims against Mandel and nondebtor co-defendants, Williams, Layne and E. Layne for breach of contractual obligations and not to disclose the intellectual property or trade secrets; (4) conspiracy against Mandel and nondebtor co-defendants, Williams, Layne and E. Layne;

9 The Debtor notes that the relief of "declaratory" judgment is not available to Claimant, although the Debtor agrees that this Court may make findings concerning ownership of assets of White Nile as necessary to determination of the claims and Mandel's offsets and defenses.
10 Debtor notes that this request for injunctive relief does not limit itself to Debtor, nor is the request for

Coleman also seeks a declaratory judgment[11] that Coleman owns legal and equitable title to certain intellectual property and that Mandel and nondebtor co-defendants Williams, Layne, E. Layne, Nexplore and the alleged inventor defendants have no rights to the intellectual property identified in the third provisional patent filed by Thrasher on Thrasher and Coleman's behalf; (6) a claim against Mandel and nondebtor co-defendants, Williams, Layne, E. Layne, Nexplore and the Hughes-Roth entities for breach of the settlement agreement reached in October 2007; (7) fraud and fraud in the inducement or negligent misrepresentation against Mandel, and nondebtor co-defendants Williams, Layne, E. Layne, Nexplore, Hughes-Roth entities and Boyd for false statements to induce Coleman to enter into the settlement agreement; (8) Coleman seeks exemplary damages against Mandel and nondebtor co-defendants Williams, Layne, E. Layne and Nexplore; (9) a claim for attorneys' fees against Mandel and nondebtor co-defendants Williams, Layne, E. Layne; (10) a constructive trust over intellectual property now owned or controlled by Nexplore from the intellectual property of Thrasher, Coleman or White Nile, including but not limited to certain identified patent or patent applications.

### 3.    Summary of Mandel's Objections and Defenses

The Debtor is a foreign-born U.S. citizen who immigrated to the United States from the Ukraine at the age of 18, obtained an education, and has been an entrepreneur in various business activities throughout his career. Claimant Thrasher is a licensed attorney in the State of Texas, and prior to the events of the claims, served as legal counsel to Debtor and/or certain of Debtor's business ventures.

---

injunctive relief a valid basis for a claim unless it can be monetized.
11 The Debtor notes that the relief of "declaratory" judgment is not available to Claimant, although the Debtor agrees that this Court may make findings concerning ownership of assets of White Nile as necessary to determination of the claims and Mandel's offsets and defenses.

The foundation of the disputes between the Claimants and the Debtor relate to Thrasher and Mandel cooperating to create a concept for an Internet search engine in late spring of 2005, which led to the formation of a Texas corporation, White Nile Software, Inc. ("White Nile"), in July 2005 to pursue the development of the concept. The entire project lasted only six or so months before it fell apart due to lack of funding. Claimant Thrasher initially held 50% of the capital stock of White Nile, and served as its Chief Executive Officer, General Counsel and was one of the two members of its initial Board of Directors. The Debtor initially held the remaining 50% of the capital stock of White Nile, and served as its President and the other member of its initial Board of Directors. Except for loans from Mandel, and pie in the sky dreams of Thrasher, only one other person invested in White Nile. The investor, Eddy Layne, received stock as did an investment advisor, Paul Williams, thus breaking the 50/50% shareholder tie between Claimant Thrasher and the Debtor. Claimant Coleman was retained as a contractor of White Nile during the second half of 2005 to pursue the graphic representation of what the Internet search engine concept might look like. Thrasher was a poor manager, blamed others for his mistakes, and was negligent in documenting matters for White Nile. In fact, Claimant Thrasher himself drafted the contracts which he now claims have been breached by the Debtor, but any alleged breaches of contracts by the Debtor are in fact excused by Claimant Thrasher's own prior and incurable breaches of his contracts with White Nile.

By late December 2005 or early January 2006, there was a complete falling out between Claimant Thrasher and Debtor. This falling out was due in large part to misconduct on the part of Claimant Thrasher. Thrasher secretly acted with Rod Martin to attempt to remove Mandel from the company and retained legal counsel to take action for such

purpose using White Nile's own funds. Debtor and the other members of White Nile's Board of Directors took action in January 2006 to resolve such quagmire in order to resolve employee concerns, return the lone investor's money (who specifically threatened legal action so long as Thrasher and Martin were associated with White Nile), and so that all of the Company's stakeholders could pursue other opportunities free of any existing obligations to the now defunct White Nile. However, the board resolutions required that all obligations to assign intellectual property by employees and contractors remain in place.

In February 2006, the Debtor and certain other individuals, included persons who had been associated with White Nile either as shareholders, directors, contractors or advisors, formed a new company (which became Nexplore Corporation) to pursue an Internet search engine concept with an entirely different web-based interface. Thrasher, in the meantime, unilaterally continued dealings with respect to White Nile's intellectual property, filing new patent applications alleging his (and/or his and Coleman's) sole ownership and with no intention of assigning such patent rights to White Nile. The foundational disputes between the Claimants and the Debtor relate to the ownership of any intellectual property relating to White Nile, and the Debtor's alleged transfer of certain of such intellectual property to Nexplore Corporation.

Thrasher's injuries, if any, were caused by his own actions, and not by any actions taken by the Debtor, whether alone or in any alleged conspiracy or combination with other persons. Thrasher's actions as an officer, director, shareholder and General Counsel of White Nile were negligent, intentionally self-dealing, or make with reckless disregard to the company's Bylaws and corporate procedures. Claimant Coleman does not have standing to

assert any claims as a third-party beneficiary, and the remainder of his claims are without merit.

### 4. Summary of Debtor's Contentions

The Debtor has asserted general denials, specific denials, special exceptions and affirmative defenses to all of the Claimants' causes of action, as set forth in the Debtor's Third Amended Answer filed in the state court proceedings on June 5, 2009 and the Debtor's First Amended Answer to Second Supplement to Intervenor Jason Coleman's Second Amended Plea in Intervention as filed in the state court proceedings on June 5, 2009. The Debtor further asserts such denials, exceptions and defenses. The Debtor contends that the Claimants will be unable to prove the facts that support their case and that the burden of proof on the salient facts rests on the Claimants. The evidence will show that (1) neither Claimant is entitled to any intellectual property rights relating to the White Nile search engine concept, since each of the Claimants contractually agreed to assign any intellectual property created by them to White Nile and either must assign such rights or has breached his contractual obligation to do so; (**2**) neither of the Claimants nor White Nile owned any intellectual property which constituted a trade secret as such term is defined by Texas law for a number of factual reasons; (3) the Debtor did not transfer any trade secrets, whether they belonged to either of the Claimants or White Nile, to Nexplore Corporation; (4) the Debtor, together with all other persons associated with White Nile, were released of all obligations to White Nile, including confidentiality and non-competition obligations (except that obligations to assign existing intellectual property remained in place), by action taken by White Nile's duly elected Board of Directors; (5) at a minimum, a bona fide dispute exists with respect to the ownership of any intellectual property owned by

White Nile, which precludes the Debtor's liability for theft as a matter of law; (6) the Non-Disclosure Agreement between Claimant Thrasher and the Debtor was subsumed by the incorporation of White Nile and the entry by the parties into contractual relationships with White Nile; furthermore, such Non-Disclosure Agreement was drafted by Thrasher to his own benefit, and as an attorney for White Nile and Mandel he is not entitled to rely on or benefit from the terms of such agreement; (7) any purported joint venture between Claimant Thrasher and the Debtor with respect to the White Nile Internet search engine concept was subsumed by the incorporation of White Nile, and no joint venture in fact ever existed because the parties always anticipated the business to be formalized as a corporation, limited liability company or limited partnership, and such formalization in fact incurred by the execution of the documents incorporating and structuring White Nile which Thrasher executed and in part drafted; (8) the Debtor did not breach the Non-Disclosure Agreement with Claimant Thrasher; (9) the Debtor did not breach his Consulting Agreement with White Nile; (10) in the alternative, any breaches by the Debtor of the Non-Disclosure Agreement or the Consulting Agreement were excused by Claimant Thrasher's bad acts; (11) in the alternative, any breaches by the Debtor of the Non-Disclosure Agreement or the Consulting Agreement were legally excused by release; (12) the Debtor fulfilled all obligations with respect to the consideration due for his capital stock in White Nile; (13) in the alternative, if the Debtor has not fulfilled all of his obligations with respect to the consideration due for his capital stock in White Nile, then Claimant Thrasher has likewise not fulfilled all of his obligations with respect to the consideration due for his capital stock in White Nile; (14) the Debtor did not breach his fiduciary duties to White Nile by usurping a corporate opportunity, because under applicable law  by the time the Nexplore Internet

search engine opportunity arose, White Nile had abandoned its pursuit of its Internet search engine concept and was financially unable to pursue the Nexplore Internet search engine opportunity; (15) the Nexplore Internet search engine does not use any intellectual property belonging to or otherwise used by White Nile, other than information already in the public domain; (16) the Debtor did not commit any acts of fraud, fraudulent inducement or negligent misrepresentation with respect to either Claimant Thrasher or White Nile; (17) the Debtor did not conspire with any other persons to commit any unlawful acts against either of the Claimants or White Nile; (18) Claimant Thrasher's shareholder rights with respect to White Nile were not oppressed by the Debtor; (19) the Claimants' claims are barred by their own misconduct and unclean hands; and (20) Claimant Coleman has no standing with respect to the causes of action he brings as a purported third-party beneficiary.

The Debtor asserts derivatively as defenses and in way of offset against any liability which he may ultimately be found to have to Claimant Thrasher, whether directly or derivatively through White Nile, the following causes of action against Claimant Thrasher, derivatively as a shareholder in a closely held corporation (as such term is defined in Section 21.563 of the Texas Business Organizations Code) on behalf of White Nile: (1) breach by Claimant Thrasher of his fiduciary duties to White Nile; (2) tortious interference with prospective business relationships; (3) conversion and civil theft; (4) breach of contract; (5) legal malpractice; (6) civil conspiracy; and (7) copyright infringement. Such causes of action are set forth in White Nile's Second Amended Petition and Request for Injunctive and Declaratory Relief as filed in the state court proceedings on or about September 17, 2008.

The Debtor asserts derivatively as defenses and in way of offset against any liability

which he may ultimately be found to have to Claimant Coleman, whether directly or otherwise, the following causes of action against Claimant Coleman, derivatively as a shareholder in a closely held corporation (as such term is defined in Section 21.563 of the Texas Business Organizations Code) on behalf of White Nile: (1) breach of contract; and (2) copyright infringement.

Claimant Thrasher asserted causes of action against the Debtor in his Sixth Amended Counterclaim and Third Party Petition for breach of contract and fraud, fraudulent inducement and negligent misrepresentation with respect to a settlement agreement entered into between the Claimants and the Debtor, among others, during the course of the state court proceedings; however, such causes of action are moot since the state court ruled that such settlement agreement was null and void. Since such claims have been ruled upon by the state court, Thrasher is bound by estoppel grounds and the law of the case.

Claimant Coleman also brought causes of action against the Debtor in his Second Amended Petition in Intervention and Answer to Plaintiff's Second Amended Petition and Request for Injunctive Relief for breach of contract and fraud, fraudulent inducement and negligent misrepresentation with respect to a settlement agreement entered into between the Claimants and the Debtor, among others, during the course of the state court proceedings; however, such causes of action are moot since the state court ruled that such settlement agreement was null and void. Since such claims have been ruled upon by the state court, Thrasher is bound by estoppel grounds and the law of the case.

**D. CONTENTIONS OF THE PARTIES AS TO SPECIFIC CLAIMS ON COUNTS ALLEGED BY THRASHER AND/OR COLEMAN IN ADVERSARY NO. 10-04133, *WHITE NILE SOFTWARE, INC., v. STEVEN THRASHER v. SKINNER LAYNE, EDWARD MANDEL, AND PAUL WILLIAMS, and NEXPLORE CORPORATION, INTERVENOR, and JASON COLEMAN, INTERVENOR*[12]**

The parties are not including contentions with respect to claims for injunctive relief, most of the declaratory judgment relief and the constructive trust relief because they believe that these causes of action do not come within the scope of a "claim" as defined by 11 U.S.C. § 101(5). If the Court determines that these matters do come within the scope of the objection to claims proceedings, the parties will provide a supplement to the Pretrial Order to cover these areas.

The Debtor contends that it may be necessary or appropriate for this Court to determine certain facts raised in certain of these Claimants' causes of action, for example whether or not there were any trade secrets, and that the alleged intellectual property or trade secrets which are the heart of the Claimants' claims are owned by Claimants or White Nile; however, it is not appropriate for these matters to be determined as a declaratory action or in the form of injunctive relief, and Mandel holds no property to place into constructive trust.

*Misappropriation or Theft of Trade Secrets*.

**a. Thrasher and Coleman's Contentions Regarding the Ownership of Trade Secrets and Intellectual Property.**

Thrasher and Coleman contend that the trade secrets and or intellectual property which is the subject of their claim is as identified and set forth on **Exhibit A**, attached hereto.

---

[12] The claims which are the subject of Debtor's objection are formed by the live pleadings and orders in the adversary proceedings.

For his part, Thrasher contends that he developed or participated in the development of all of the intellectual property set forth in **Exhibit A**, and to the extent related to patentable inventions was the inventor or the co-inventor along with Coleman of all such property. Thrasher conceived that, subject to his claim of fraud and fraud in the inducement, that in or about October of 2005 Thrasher intended to assign his title and interest in trade secrets and intellectual property to White Nile Corporation, subject to rights of reversion. Thrasher contends that due to the failure of White Nile, then under the control of Mandel and his co-conspirators, to prosecute the intellectual property and in particular, the failure to file utility patents to preserve the viability of the claims set forth in the provisional patents in 2005 by late 2006, all of the intellectual property he had assigned and conveyed to White Nile reverted to and since that time has been owned by him (and/or Coleman to the extent of Coleman's claim of interest in such intellectual property.

Coleman contends that he invented, co-invented, developed, or co-developed, along with Steven Thrasher the elements of the intellectual property/trade secrets set forth in **Exhibit A** except:

    A:      U.S. Patent Number 7797299;

    B.      Provisional applications 60/696,180, and 60/712,191; and

    C.      The names "White Nile" or "White Nile Software."

(the "Coleman IP").

Coleman contends that this information was disclosed to While Nile pursuant to confidentiality or non-disclosure agreements, but that while they were the subject of potential assignment Coleman always maintained his ownership interest in the Coleman IP.

Coleman contends that whatever interest White Nile had in and to the Coleman IP were

induced by misrepresentations and or a fraud of Mandel individually and on behalf of White Nile.

Moreover, Coleman alleges that White Nile failed and refused to provide Coleman with the consideration required by his agreement including stock warrants in White Nile. Accordingly, for the purposes of this proceeding Coleman contends that he and not White Nile is the owner of the Coleman IP.

Thrasher, in the alternative and subject to the matters referenced in the jurisdictional section hereinabove, asserts that to the extent that White Nile has a continuing interest in the intellectual property which he claims reverted to him in late 2006 or in Coleman's IP that he is maintaining claims derivatively on behalf of White Nile against Mandel and other non-debtors with respect thereto.

### a.    Thrasher's contention.

Thrasher contends that he developed numerous trade secrets with respect to an internet search engine including a graphic user interface designed to allow the user to graphically interact with search terms, suggestions generated by the search engine, search results in advertisements and as more fully described in **Exhibit A**.  He contends that this intellectual property constituted a trade secret and that it was proprietary information that he had formulated for use in a proprietary business venture which would give such a venture a competitive edge over business competitors without that information.   He contends that he took extensive measures through the use of confidentiality agreements, nondisclosure and nonuse agreements, the filing or provisional patents and like to prevent such trade secrets from becoming public.   He assigned his ownership interest in this intellectual property to White Nile but the assignment had a proviso that the rights and

ownership interest would revert to him if White Nile failed to prosecute the patent applications. White Nile, while under the control of Mandel, Williams and Layne, failed to prosecute the patent right and the rights in the intellectual property reverted to Thrasher. He contends that Mandel, Williams, Layne and E. Layne obtained access to these trade secrets through Mandel's participation in the joint venture with Thrasher and Mandel, Williams, Layne and E. Layne's relationship with White Nile. Mandel, Williams, Layne and E. Layne were required by their fiduciary relationship with him and/or White Nile and by nondisclosure agreements not to disclose such information to anyone other than White Nile or those specifically designated by Thrasher. Rather than keeping the trade secrets secret, Mandel directly or in conspiracy with Williams, Layne and E. Layne, disclosed Thrasher's trade secrets to Nexplore and/or its agents or employees. Additionally, Mandel in combination with Layne and Williams purported to act for White Nile to release themselves and third parties from non-disclosure agreements with White Nile so that they could thereafter join Nexplore or other Mandel affiliated entities. Thrasher contends that such actions were interested transactions not authorized by the Bylaws of White Nile, were ultra vires because none of them was disinterested and/or constituted a breach of fiduciary duty and therefore are void or voidable and do not operate as a consent of use or disclosure. Moreover, Mandel, Williams and Layne had no authority to speak for Thrasher. Furthermore, at Mandel's direction, Nexplore used Thrasher's trade secrets for development of its own internet product and patents, which has caused him injury.

     **c.    Coleman's contention.**

Coleman contends that after he became a consultant to White Nile, he was the co-inventor with Thrasher of the trade secrets and intellectual property, which was identified in

part in the third provisional patent application filed by Thrasher on behalf of Thrasher and Coleman as is more fully described in Section C.3 above. Coleman also was the inventor or creator of a number of other confidential documents referred to as the SAQQARA documents. Under his consulting agreement, Coleman agreed that in exchange for the promised consideration, he would assign his rights to the intellectual property that he developed. Prior to the time he would be obligated to assign his rights, however, White Nile had breached its contract with him by failing to issue/grant the warrants it had contracted to issue in lieu of cash salary for his work. Therefore, he contends that he and Thrasher are the owners of the intellectual property that he developed. He similarly contends that the intellectual property to which he has an ownership interest was a trade secret. He contends that Mandel, Williams, Layne and E. Layne were required to keep the trade secrets confidential as a result of their relationship and contractual agreements with himself, Thrasher and White Nile. However, Mandel individually or in conspiracy with Williams, Layne, E. Layne and others, disclosed the trade secrets to Nexplore and consultants or employees of Nexplore and that the information was then used commercially by Nexplore and its agents or constituents. He contends that this is an actionable common law tort under Texas law as well as a violation of the Texas Theft Liability Act resulting in his injuries.

> **d.** **White Nile's contention through Claimants.**

Thrasher on behalf of White Nile contends that White Nile had an ownership interest in the trade secrets or intellectual property developed by Thrasher from approximately October of 2005 through the time of reversion in 2006. Alternatively, Thrasher on behalf of White Nile contends that if it is determined that intellectual property developed by him has

not reverted and/or that White Nile owns the Coleman IP then the claims asserted by Thrasher and Coleman belong to it. Otherwise, Thrasher on behalf of White Nile adopts all of Thrasher's contentions that Mandel directly or in conspiracy with the nondebtor co-defendants disclosed and/or used the trade secrets, and intellectual property damaging White Nile and obtaining value for themselves.

### e. Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that he did not breach any fiduciary duties and that the release by White Nile's Board of Directors was valid under Texas law because it was approved by all of the members of the Board of Directors, who also constituted the holders of a majority of White Nile's stock, and because such action was fair in that it released all company stakeholders (including Claimants Thrasher and Coleman). The Debtor contends that Claimant Thrasher never held any trade secrets, as any information or ideas disclosed by Claimant Thrasher to the Debtor were not secret, but were generally known or readily available to the public. The Debtor contends that any information or ideas disclosed by Claimant Thrasher to the Debtor were not only everyday knowledge, but were also abstract ideas, methodologies and general skills which do not qualify as trade secrets. The Debtor contends that any information or ideas disclosed by Claimant Thrasher were merely accumulations of information in the public domain that are not protectable as trade secrets. The Debtor contends that Claimant Thrasher never implemented any ideas, methodologies or techniques in a manner sufficient to qualify for trade secret protection. The Debtor contends that any intellectual property developed by Claimant Thrasher was co-developed and thus co-owned by the Debtor. Further, the White Nile Internet search engine concept, whether or

not such intellectual property qualifies as a trade secret, was to be assigned to White Nile pursuant to a Consulting Agreement between Claimant Thrasher and White Nile dated August 1, 2005. The Debtor contends that none of such intellectual property reverted to Claimant Thrasher, and that the reversion clause must be interpreted strictly against its drafter, Thrasher. The Debtor contends that if Claimant Thrasher failed to assign his intellectual property to White Nile as required by his Consulting Agreement, then there is a failure of consideration for Claimant Thrasher's stock in White Nile. The Debtor contends that even if Claimant Thrasher did own any trade secrets, the Debtor did not unlawfully steal such trade secrets, copy such trade secrets, or communicate or transmit such trade secrets. The Debtor contends that even if Claimant Thrasher did own any trade secrets, the Debtor did not unlawfully misappropriate such trade secrets without Claimant Thrasher's consent. The Debtor contends that even if Claimant Thrasher did own any trade secrets, the Debtor did not appropriate such trade secrets with the intent to deprive Claimant Thrasher of such trade secrets. The Debtor contends that since Claimant Thrasher owned no trade secrets, there can be no damages. The Debtor contends that even if Claimant Thrasher did own any trade secrets, the Debtor did not misappropriate such trade secrets. The Debtor contends that even if Claimant Thrasher did own any trade secrets, the Debtor did not convert such trade secrets.

Similarly, the Debtor contends that White Nile never held any trade secrets, as any information or ideas disclosed by White Nile to the Debtor were not secret, but were generally known or readily available to the public. The Debtor contends that any information or ideas disclosed by White Nile to the Debtor were not only everyday knowledge, but were also abstract ideas, methodologies and general skills which do not qualify as trade secrets.

The Debtor contends that any information or ideas disclosed by White Nile were merely accumulations of information in the public domain that are not protectable as trade secrets. The Debtor contends that White Nile never implemented any ideas, methodologies or techniques in a manner sufficient to qualify for trade secret protection. The Debtor contends that he was released from any confidentiality, non-competition or other obligations to White Nile, other than his obligation to assign certain existing intellectual property to White Nile, which release constituted effective consent. The Debtor contends that even if White Nile did own any trade secrets, the Debtor did not unlawfully steal such trade secrets, copy such trade secrets, or communicate or transmit such trade secrets. The Debtor contends that even if White Nile did own any trade secrets, the Debtor did not unlawfully misappropriate such trade secrets without White Nile's consent. The Debtor contends that even if White Nile did own any trade secrets, the Debtor did not appropriate such trade secrets with the intent to deprive White Nile of such trade secrets. The Debtor contends that since White Nile owned no trade secrets, there can be no damages. The Debtor contends that even if White Nile did own any trade secrets, the Debtor did not misappropriate such trade secrets. The Debtor contends that even if White Nile did own any trade secrets, the Debtor did not misappropriate such trade secrets. The Debtor contends that even if White Nile did own any trade secrets, the Debtor did not convert such trade secrets.

Similarly, the Debtor contends that Claimant Coleman never held any trade secrets, as any information or ideas disclosed by Claimant Coleman to the Debtor were not secret, but were generally known or readily available to the public. The Debtor contends that any information or ideas disclosed by Claimant Coleman to the Debtor were not only everyday knowledge, but were also abstract ideas, methodologies and general skills which do not

qualify as trade secrets. The Debtor contends that any information or ideas disclosed by Claimant Coleman were merely accumulations of information in the public domain that are not protectable as trade secrets. The Debtor contends that Claimant Coleman never implemented any ideas, methodologies or techniques in a manner sufficient to qualify for trade secret protection. The Debtor contends that any intellectual property developed by Claimant Coleman with respect to the White Nile Internet search engine concept, whether or not such intellectual property qualifies as a trade secret, was assigned to White Nile pursuant to a Consulting Agreement between Claimant Coleman and White Nile. The Debtor contends that Claimant Coleman worked for White Nile, and that any intellectual property created by him in the performance of such services constituted a work for hire which belongs to White Nile. The Debtor contends that even if Claimant Coleman did own any trade secrets, the Debtor did not unlawfully steal such trade secrets, copy such trade secrets, or communicate or transmit such trade secrets. The Debtor contends that even if Claimant Coleman did own any trade secrets, the Debtor did not unlawfully misappropriate such trade secrets without Claimant Coleman's consent. The Debtor contends that even if Claimant Coleman did own any trade secrets, the Debtor did not appropriate such trade secrets with the intent to deprive Claimant Coleman of such trade secrets. The Debtor contends that since Claimant Coleman owned no trade secrets, there can be no damages. The Debtor contends that even if Claimant Coleman did own any trade secrets, the Debtor did not misappropriate such trade secrets. The Debtor contends that even if Claimant Coleman did own any trade secrets, the Debtor did not convert such trade secrets.

### *Breach of Fiduciary Duty.*

    **a.**       **Thrasher's contention.**

Thrasher contends that he and Mandel entered into a joint venture to develop and financially exploit Thrasher's invention. He further contends that the joint venture continued at least through February of 2006. He further contends that Mandel breached his fiduciary duties to Thrasher of utmost good faith, fairness and honesty in dealing on matters pertaining to the intellectual property developed by Thrasher and White Nile, the duty of full disclosure on all matters affecting the joint venture, including the intellectual property and White Nile, the duty to refrain from competition with Thrasher and the duty of loyalty to Thrasher, resulting in injury to Thrasher and benefit to Mandel.

**b.      Coleman's contention.**

None.

**c.      White Nile's contention through Claimants.**

Thrasher on behalf of White Nile contends that Mandel, Williams and Layne owed fiduciary duties to it as officers and/or directors and that Mandel also owed fiduciary duties to White Nile as a controlling majority shareholder. Thrasher on behalf of White Nile contends that Mandel and the others breached their duties of good faith, fairness and honesty, candor, non-competition, loyalty and by usurping corporate opportunities for their own profit, resulting in injury to White Nile and benefit to themselves.

**d.      Mandel's contentions.**

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that no joint venture existed between him and Claimant Thrasher, or, in the alternative, that any such joint venture was subsumed by the incorporation of White Nile. The Debtor contends that he did not breach any fiduciary duties owed by him to either Claimant Thrasher or White Nile. The Debtor contends that White Nile did not have a

legitimate interest or expectancy in the Nexplore Internet search engine opportunity, because at the time such opportunity arose White Nile had abandoned its business plan, was essentially defunct and did not have the financial ability to pursue such opportunity. The Debtor contends that he did not misappropriate or usurp any corporate opportunity of White Nile.

### *Breach of Contract.*

#### a.    Thrasher's contention.

Mandel executed a nondisclosure, nonuse agreement (the "Non-Disclosure Agreement") with Thrasher which prohibited him from using or disclosing the confidential information regarding the intellectual property Thrasher had developed for an internet project.  Thrasher complied with his obligations under that agreement.  Mandel violated the agreement by disclosing confidential intellectual property containing or developed from Thrasher's ideas to Nexplore and its agents or employees, thereby damaging Thrasher. Mandel also entered into a joint venture with Thrasher.   Mandel committed to provide $300,000 in cash funding to that joint venture.   Mandel breached his obligation thereby damaging Thrasher.

In addition, Thrasher was a third party beneficiary of the nondisclosure agreement that Mandel made with White Nile.  Mandel breached the nondisclosure agreement by disclosing confidential intellectual property belonging to Thrasher to Nexplore and its officers or agents thereby injuring Thrasher.

#### b.    Coleman's contention.

Coleman contends that he was a third party beneficiary of Mandel's nondisclosure agreement with White Nile.  Mandel breached that agreement by disclosing to Nexplore

and its officers or agents confidential intellectual property that Coleman owns and had developed for White Nile, thereby injuring Coleman.

### c.  White Nile's contention through Claimants.

Mandel had executed a nondisclosure agreement with White Nile as part of his consulting agreement.  He was obligated under the agreement not to disclose confidential information obtained from White Nile to third parties.  Mandel breached that agreement by providing confidential information obtained from White Nile to Nexplore or its employees or agents, thereby injuring White Nile.

### d.  Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that he did not breach the Non-Disclosure Agreement. The Debtor contends that the Non-Disclosure Agreement was expressly executed to benefit White Nile and not Claimant Thrasher, and that if Claimant Thrasher understood the Non-Disclosure Agreement to be for his own personal benefit, Claimant Thrasher should have informed the Debtor of that fact as his attorney or as attorney for White Nile. The Debtor contends that he did not breach obligations pursuant to his Consulting Agreement with White Nile. The Debtor contends that he was released from his obligations under such Consulting Agreement, other than the obligation to assign certain existing intellectual property which he did assign. The Debtor contends there was no joint venture between him and Claimant Thrasher or, in the alternative, that any purported joint venture between Claimant Thrasher and the Debtor with respect to the White Nile Internet search engine concept was subsumed by the incorporation of White Nile, and that he did not breach any obligations to Thrasher related to such purported joint venture. The Debtor contends that neither

Claimant Thrasher nor Claimant Coleman has any standing to assert claims as a third-party beneficiary with respect to the Debtor's contracts with White Nile.

### Breach of Settlement Agreement.

**a.    Thrasher's contention.**

In open court on October 17, and 19, 2007, Mandel, Williams, Layne, E. Layne, Nexplore and Hughes-Roth entities entered into a settlement agreement with Thrasher and Coleman that settled all the claims involved in the litigation between the parties (now removed to this Court under adversary no. 10-04133). Mandel and the nondebtor co-defendants breached the settlement agreement causing damages to Thrasher.

**b.    Coleman's contention.**

Same as Thrasher's contention.

**c.    White Nile's contention through Claimants.**

None.

**d.    Mandel's contention**

The Debtor denies the Claimants' and White Nile's contentions. These contentions have been decided by summary judgment orders of the state court determining that there was no enforceable settlement agreement. The Debtor contends that the settlement agreement was rendered null and void by order of the state court, and thus there can be no liability or damages for breach thereof. Since such claims have been ruled upon by the state court, the Claimants are bound by estoppel grounds and the law of the case.

### Fraud/Fraud in the Inducement/Negligent Misrepresentation.

**a.    Thrasher's contention.**

Thrasher contends that Mandel made misrepresentations of material facts and failed

to disclose for concealed material information for the purpose of inducing Thrasher into entering into the joint venture agreement with him and to obtain access to the intellectual property being invented and developed by Thrasher. Mandel knew the representations were false at the time he made them and he made them for the purpose of inducing Thrasher to enter into these agreements and to effectuate a misappropriation of Thrasher's intellectual property for the benefit of himself, Williams, Layne, and E. Layne through their new venture, Nexplore. Thrasher justifiably relied upon Mandel's false representations resulting in damage to Thrasher.

### b. Coleman's contention.

Coleman's contends that Mandel made false representations regarding his (Mandel's) personal expertise relevant to the internet project being pursued by White Nile, his (Mandel's) personal financial contribution to White Nile and a purported million dollar investment being held in escrow in the Philippines for White Nile, a team of qualified programmers in place in the Philippines working on the internet project for White Nile, Paul Williams and other Financial Advisors of White Nile had concurred that the "pre-dilution" model would likely be acceptable to investors, White Nile already had a business plan, White Nile already had pro-forma financial projections, the former CMO of PayPal had agreed to work with White Nile, the local firm that was hired to create system documents was going to be paid in cash, and that Rod Martin, Rory Dohorty and Paul Williams were involved with White Nile on a full time basis. Mandel knew that these representations were false when made but intended them to entice Coleman to becoming a consultant for White Nile and performing work for White Nile for warrants in lieu of a monetary salary. Coleman justifiably relied on these false statements resulting in his damages.

### c.     White Nile's contention through Claimants.

Mandel fraudulently represented to White Nile that he had obtained an investor in the Philippines who had placed $2 million in escrow to capitalize White Nile's development of the intellectual property invented by Thrasher and that there was a team of 20 experienced, highly qualified programmer/developers assembled in the Philippines already working on programs to develop the back end of Thrasher's invention.  In reliance upon these representations, White Nile dropped negotiations with a local company to develop the back end programming of the intellectual property and provided Mandel access to the intellectual property and trade secrets being developed for it by Thrasher and Coleman. Mandel, Williams and Layne made further misrepresentations regarding Thrasher's conduct and their own conduct or failed to disclose material information regarding their own conduct with reference to the management of White Nile in order to allow them to gain control of White Nile and to effectuate misappropriation and conversion of the intellectual property for their own benefit by usurping corporate opportunities by White Nile in favor of their new venture, Nexplore.  White Nile or its shareholders or directors acting on its behalf justifiably relied on these fable statements or material non-disclosures, resulting in damages to White Nile.

### d.     Mandel's contentions.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that at all times Claimant Thrasher was updated, had access to the purported Philippines investor, was involved in the negotiations, communications and issues related to the purported Philippines investor, and had a duty to investigate the facts relating thereto. The Debtor contends that he did not make any statement not verifiable by Claimant

Thrasher himself by exercise of simple means and at any time. The Debtor contends that he did not make any false, material representations to Claimant Thrasher. The Debtor contends that if he did make any representations to Claimant Thrasher that were false and material, that he did not either know they were false when made or make them recklessly, as a positive assertion, and without knowledge of their truth. The Debtor contends that if he did make any material, false representations, he did not make them with the intent that Claimant Thrasher act on them, nor can Claimant Thrasher proof such intent. The Debtor contends that if he did make any material, false representations, Claimant Thrasher did not justifiably rely on them. The Debtor contends that if he did make any material, false representations, Claimant Thrasher was not injured thereby. The Debtor contends that he did not supply false information for Claimant Thrasher's guidance, and that any notion that the Debtor would provide guidance to Claimant Thrasher on legal matters is ludicrous. The Debtor contends that if he did supply false information for Claimant Thrasher's guidance, he exercised reasonable care or competence in obtaining or communicating the information. The Debtor contends that if he did supply false information for Claimant Thrasher's guidance, that Claimant did not justifiably rely on the representation. The Debtor contends that if he did supply false information for Claimant Thrasher's guidance, that such representation did not proximately cause Claimant Thrasher injury.

The Debtor contends that he did not make any material, false representations to White Nile. The Debtor contends that if he did make any material, false representations to White Nile, that he did not either know they were false when made or make them recklessly, as a positive assertion, and without knowledge of their truth. The Debtor contends that if he did make any material, false representations, he did not make them with

the intent that White Nile act on them, nor can Claimants proof such intent. The Debtor contends that if he did make any material, false representations, White Nile did not justifiably rely on them. The Debtor contends that if he did make any material, false representations, White Nile was not injured thereby. The Debtor contends that he did not supply false information for White Nile's guidance. The Debtor contends that if he did supply false information for White Nile's guidance, he exercised reasonable care or competence in obtaining or communicating the information. The Debtor contends that if he did supply false information for White Nile's guidance, that Claimant did not justifiably rely on the representation. The Debtor contends that if he did supply false information for White Nile's guidance, that such representation did not proximately cause White Nile injury.

The Debtor contends that he did not make any material, false representations to Claimant Coleman. The Debtor contends that if he did make any material, false representations to Claimant Coleman, that he did not either know they were false when made or make them recklessly, as a positive assertion, and without knowledge of their truth. The Debtor contends that if he did make any material, false representations, he did not make them with the intent that Claimant Coleman act on them, nor can Claimant Coleman proof such intent. The Debtor contends that if he did make any material, false representations, Claimant Coleman did not justifiably rely on them. The Debtor contends that if he did make any material, false representations, Claimant Coleman was not injured thereby. The Debtor contends that he did not supply false information for Claimant Coleman's guidance. The Debtor contends that if he did supply false information for Claimant Coleman's guidance, he exercised reasonable care or competence in obtaining or communicating the information. The Debtor contends that if he did supply false information

for Claimant Coleman's guidance, that Claimant did not justifiably rely on the representation. The Debtor contends that if he did supply false information for Claimant Coleman's guidance, that such representation did not proximately cause Claimant Coleman injury.

### *Fraud/Fraudulent Inducement/Negligent Misrepresentation in the Settlement Agreement.*

**a.    Thrasher's contentions.**

Thrasher contends that Mandel and nondebtor co-defendants Williams, Layne, E. Layne, Hughes-Roth entities, Nexplore and Boyd made false representations of material facts and failed to disclose material information for the purpose of inducing Thrasher and Coleman to enter into the settlement agreement knowing that the representations were false.  Thrasher and Coleman reasonably relied upon those representations and omissions and as a result suffered injury.  In the alternative, such false representations were made by Mandel and the nondebtor co-defendant with respect to a financial transaction which they had a financial interest or in their course of business and they did not exercise reasonable care in obtaining or communicating the information.  Mandel's conduct, along with that of Williams, Layne, E. Layne, Nexplore, Hughes-Roth entities, and Boyd were part of deliberate course of trickery and deceit in an attempt to further Mandel, Williams and Layne unlawful appropriation and conversion of the intellectual property for Nexplore and an attempt to avoid the consequences of their nonperformance of their contractual obligations to White Nile.  Thrasher justifiably relied upon these misrepresentations or omissions to his detriment.  As a result, Thrasher and Coleman suffered damages.

**b.    Coleman's contention.**

Coleman contends that Mandel and nondebtor co-defendants Williams, Layne, E.

Layne, Hughes-Roth entities, Nexplore and Boyd made false representations of material facts and failed to disclose material information for the purpose of inducing Thrasher and Coleman to enter into the settlement agreement knowing that the representations were false. Thrasher and Coleman reasonably relied upon those representations and omissions and as a result suffered injury. In the alternative, such false representations were made by Mandel and the nondebtor co-defendant with respect to a financial transaction which they had a financial interest or in their course of business and they did not exercise reasonable care in obtaining or communicating the information. Mandel's conduct, along with that of Williams, Layne, E. Layne, Nexplore, Hughes-Roth entities, and Boyd were part of deliberate course of trickery and deceit in an attempt to further Mandel, Williams and Layne unlawful appropriation and conversion of the intellectual property for Nexplore and an attempt to avoid the consequences of their nonperformance of their contractual obligations to White Nile. Thrasher justifiably relied upon these misrepresentations or omissions to his detriment. As a result, Thrasher and Coleman suffered damages.

### c. White Nile's contention through Claimants.

None

### d. Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. These contentions have been decided by summary judgment orders of the state court determining that there was no enforceable settlement agreement. The Debtor contends that the settlement agreement was rendered null and void by order of the state court, and thus there can be no liability or damages for breach thereof. Since such claims have been ruled upon by the state court, the Claimants are bound by estoppel grounds and the law of the case.

### *Declaratory Judgment.*

**a.    Thrasher's contention.**

Mandel's shares in White Nile failed for a lack of failure of consideration because he did not perform the obligations required for his consideration for his stock.   Thrasher requests that the Court issue a declaratory judgment establishing Mandel's right as a shareholder of White Nile in particular that his shares that he obtained directly to him or through Williams failed for lack of, or failure of, consideration.

**b.    Coleman's contention.**

None.

**c.    White Nile's contention through Claimants.**

None.

**d.    Mandel's contention.**

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that all consideration required by the board resolution authorizing the issuance of his shares of capital stock of White Nile, and by White Nile's Bylaws, has been tendered by him to White Nile. The Debtor contends that Claimant Thrasher, as secretary of White Nile, issued a stock certificate which constitutes a binding admission that White Nile had received all consideration due from the Debtor for his shares. The Debtor contends that, to the extent the Court finds that the Debtor did not contribute all of the required consideration for his stock, then in like manner Claimant Thrasher never fulfilled his obligations with respect to the consideration due for his capital stock in White Nile, because he failed to assign his interests in the intellectual property to White Nile. The Debtor contends that Claimant Coleman does not have standing to assert such claims as a third-party

beneficiary. The Debtor contends that there never was a statement of work to be attached to the organizational board consent for White Nile, and that the statement of work attached to the version of such organizational board consent proffered by Claimant Thrasher is forged or fraudulent. Further, the Debtor's performance was excused by circumstances and actions, breaches and estoppel on Thrasher's part.

### *Conspiracy.*

**a.      Thrasher's contention.**

Mandel, Williams, Layne and E. Layne entered into a course of action designed to: (1) misappropriate and use Thrasher's intellectual property at a competitor of White Nile and Thrasher, which is owned and operated by Mandel, Williams, Layne and E. Layne. (i.e., Nexplore); (2) an attempt to deprive Thrasher of the opportunity to profit from his own inventions by wrongfully removing him as an officer of White Nile; and (3) to avoid Thrasher's approximate 48% ownership in White Nile by their aggressive and vexatious conduct against Thrasher or by destroying White Nile and forming a competing entity based upon the intellectual property in which Thrasher and/or White Nile owned and in support of the fraudulent conduct listed above.  This plan contemplated not only an unlawful purpose but also an unlawful means to commission of the torts set forth above including conversion, misrepresentation and breach of fiduciary duties, thereby causing damage to Thrasher.

**b.      Coleman's contention.**

Mandel conspired with Williams, Layne and E. Layne to misappropriate trade secrets confidential intellectual property he owns.  One or more, misappropriated Coleman's trade secrets/confidential intellectual property to Coleman's injury.

### c. White Nile's contention through Claimants.

Mandel conspired with Williams, Layne and E. Layne and others (including consultants of White Nile) to misappropriate trade secrets, confidential intellectual property it owns. One or more, misappropriated White Nile's trade secrets/confidential intellectual property to White Nile's injury. Mandel also conspired with Williams and Layne and attorneys hired to represented White Nile in litigation with Thrasher and Coleman to breach fiduciary duties they collectively and each of them owed White Nile. Additionally, Mandel conspired with Layne, Eddy Layne, Williams and others to utilize the corporate structure of White Nile to wrongfully oust Thrasher as an officer and director and to utilize White Nile as a shield or litigation tool to prevent development of the Intellectual Property by White Nile or Thrasher and facilitate its exploitation by Nexplore.

### d. Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that he was not a member of a combination of two or more persons with an object to accomplish either an unlawful purpose or a lawful purpose by unlawful means. The Debtor contends that he did not have a meeting of the minds with any other persons on any object to accomplish either an unlawful purpose or a lawful purpose by unlawful means. The Debtor contends that he was not a member of a combination of two or more persons, one of whom committed an unlawful, overt act to further any object to accomplish either an unlawful purpose or a lawful purpose by unlawful means. The Debtor contends that neither Claimant Thrasher, Claimant Coleman nor White Nile suffered any injury as a proximate result of any such alleged conspiracy to which the Debtor was a party.

### *Exemplary damages.*

### a.     Thrasher's contention.

Thrasher contends that Mandel's conduct amounts to fraud, malice or gross negligence as described in Section 41.001 of the Texas Civil Practice and Remedies Code and entitles him to exemplary damages against such people under the provisions of Section 41.003.

### b.     Coleman's contention.

Same as Thrasher's contention above.

### c.     White Nile's contention through Claimants.

Same as Thrasher's contention above.

### d.     Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that the Claimants and White Nile are not entitled to exemplary damages. The Debtor contends that his actions do not warrant exemplary damages, and are excused or mitigated by Claimants' own misconduct.

### *Attorneys' Fees.*

### a.     Thrasher's contention.

Thrasher contends that he is entitled to an award of attorneys' fees under the provisions of Section 37.009, 38.001 and 134.005 of the Texas Civil Practice and Remedies Code and Article 5.114(J) of the Texas Business Corporations Act.

### b.     Coleman's contention.

Same as Thrasher's contention above.

### c.     White Nile's contention through Claimants.

Same as Thrasher's contention above.

### d. Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that the Claimants and White Nile are not entitled to an award of attorneys' fees, including but not limited to because declaratory relief is not available in the claims proceeding (Section 37.009), the damages asserted are not based on a contract (e.g., joint venture fraud) (Section 38.001), and that Section 134.005 is inapplicable as no "theft" occurred. Further, no substantial benefit to a corporation has been accomplished by this action that might entitle derivative claimants to fees. (Section 5.114(J)).

### *Allocation of Cost of Receiver.*

### a. Thrasher's contention.

Because of the conflict of interest between White Nile and Thrasher with respect to the ownership of some of the intellectual property and because of the conflict between White Nile and Mandel, Williams and S. Layne, because of all the other causes of action that White Nile has against Mandel and the nondebtor co-defendants, the state court appointed Rosa Orenstein as the Receiver of White Nile in this litigation. In its interim order the state court apportioned the periodic payments between Thrasher and Mandel on the basis of their ownership of White Nile, with such costs being subject to award as costs to the prevailing party in the litigation. Thrasher contends that all the costs of the Receiver should be awarded against Mandel as the result of this litigation.

### b. Coleman's contention.

Not applicable.

### c. White Nile's contention through Claimants.

Not applicable.

### d. Mandel's contention.

The Debtor denies the Claimants' and White Nile's contentions. The Debtor contends that the costs of the Receiver should remain unpaid, should be allocated solely to Thrasher, or alternatively must be paid solely out of White Nile's assets under state law.

### D. CONTENTIONS OF THE PARTIES AS TO SPECIFIC CLAIMS ON COUNTS ALLEGED BY WHITE NILE AGAINST THRASHER AND COLEMAN IN ADVERSARY NO. 10-04133, *WHITE NILE SOFTWARE, INC., v. STEVEN THRASHER v. SKINNER LAYNE, EDWARD MANDEL, AND PAUL WILLIAMS, and NEXPLORE CORPORATION, INTERVENOR, and JASON COLEMAN, INTERVENOR*[13]

> **1.     Thrasher and Coleman's general contention with respect to Mandel's contention that he is entitled to an offset for the value of the claims White Nile may have against Thrasher and Coleman.**

As is set forth in detail above and as evidenced by the Scheduling Order with respect to this proceeding, while the claim asserted by White Nile against Mandel is a subject of this proceeding, the Receiver for White Nile has been excused from participation herein. For his part, at no time, has Mandel asserted derivative claims on behalf of White Nile against Thrasher or Coleman. Instead, utilizing his majority controlling position of White Nile, Mandel has orchestrated White Nile's bringing of its claims directly against Thrasher or Coleman in the underlying adversary litigation. Mandel has alleged no claims in his bankruptcy against either Thrasher or Coleman individually. Such claims should have been identified as an asset of the bankruptcy estate. Moreover, Mandel has asserted that any interest he may have in White Nile is valued at zero. Any interest that Mandel would have in claims asserted by White Nile in the adversary against Thrasher and Coleman would be indirect and therefore, would not entitle to him a liquidatable claim to offset against the claims of either Thrasher, Coleman or White Nile in this proceeding.

Furthermore, Mandel did not assert a claim of offset as a basis for his objections to the claims of Thrasher and Coleman.

## 2. Debtor's Response

The claims raised by the Debtor are pending in the adversary proceeding, and may act as defenses and offsets to the Debtor's liability to White Nile and/or Claimants. The Debtor's liability to White Nile and/or the Claimants may be limited, for example, to the extent Claimant Thrasher is found to have "unclean" hands or to have breached his fiduciary duties to White Nile. The Debtor may assert those claims already asserted by White Nile in the state court proceedings defensively and for his own benefit under Section 21.563 of the Texas Business Organizations Code.

### *Breach of Fiduciary Duty*

### a. Mandel's Contention.

The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile, including but not limited to violating his duty of loyalty by intentionally or negligently drafting contracts with terms that favored Thrasher over the Debtor and White Nile as counsel and general counsel for White Nile, and by drafting and executing fraudulent documents with respect to White Nile and causing others to participate; and violating fiduciary duty of obedience to White Nile by committing ultra vires acts and damaging White Nile by failing to comply with the terms of his contracts with White Nile. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by drafting and executing contracts on behalf of White Nile without the knowledge or approval of White Nile or any of its other officers, directors or shareholders any in

---

13 The claims which are the subject of Debtor's objection are formed by the live pleadings and orders in the adversary proceedings.

violation of White Nile's standard practices. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by placing his personal interests ahead of the interests of White Nile and its shareholders. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by creating fraudulent documents to obtain access to White Nile's corporate funds. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by withdrawing money from company accounts without prior authorization. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by failing to file and/or transfer patent applications in the name of White Nile. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by inciting employees or contractors to leave and bring claims against White Nile. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by failing to discharge his duties to White Nile in good faith. The Debtor contends that Claimant Thrasher breached his fiduciary duties to White Nile by refusing to meet with White Nile's other officer, directors and shareholders at a critical time regarding these contentions.

**b.      Thrasher's Contention.**

**Thrasher denies breaching his fiduciary duties.**

**c.      Coleman's Contention.**

None.

***Tortious Interference with Prospective Business Relationships***

**a.      Mandel's Contention.**

The Debtor contends that there was a reasonable probability that White Nile would have entered into a business relationship with one or more third persons, that

Claimant Thrasher intentionally interfered with such relationship and had knowledge of such relationships, that Claimant Thrasher's conduct was independently tortious or unlawful, that Claimant Thrasher's interference proximately caused White Nile injury, and that White Nile suffered actual damage or loss on account thereon.

**b.     Thrasher's Contention.**

**Thrasher denies that he interfered viable relationships.  Moreover, his actions for White Nile do not give rise to a tortuous interference claim under Texas law.**

**c.     Coleman's Contention.**

None.

### *Conversion and Civil Theft*

**a.     Mandel's Contention.**

The Debtor contends that White Nile owned, possessed or had the right to immediate possession of certain personal property, that Claimant Thrasher wrongfully exercised dominion or control over such property, and that White Nile suffered injury. The Debtor contends that White Nile had possessory right to certain property, that Claimant Thrasher unlawfully appropriated such property by taking it without White Nile's effective consent, that Claimant Thrasher appropriated such property with the intent to deprive White Nile of such property, and that White Nile sustained damages as a result of such theft.

**b.     Thrasher's Contention.**

**See Thrasher's contention about IP ownership above.**

**c.     Coleman's Contention.**

None.

### Breach of Contract

**a.      Mandel's Contention.**

The Debtor contends that there were one or more valid, enforceable contracts between Claimant Thrasher and White Nile, that White Nile performed, tendered performance of, or was excused from performing its contractual obligations under such contracts, that Claimant Thrasher breached such contracts, and that Claimant Thrasher's breaches caused White Nile injury. The Debtor contends that there were one or more valid, enforceable contracts between Claimant Coleman and White Nile, that White Nile performed, tendered performance of, or was excused from performing its contractual obligations under such contracts, that Claimant Coleman breached such contracts, and that Claimant Coleman's breaches caused White Nile injury.

**b.      Thrasher's Contention.**

Thrasher denies that he breached any contract with White Nile.  Any action he took which might have arisen to a breach was excused because it occurred after White Nile under the control of Mandel, Williams and Layne breached its obligations to Thrasher.

**c.      Coleman's Contention.**

Coleman did not breach any obligation to White Nile because White Nile had already breached its contractual obligation with him.

### Legal Malpractice

The Debtor contends that, as White Nile's legal counsel, Claimant Thrasher did not exercise the degree of care, skill, or diligence that an attorney of ordinary skill and

knowledge commonly possesses. The Debtor contends that Claimant Thrasher breached a contractual duty to White Nile while serving as White Nile's legal counsel. The Debtor contends that Claimant Thrasher obtained an improper benefit from representing White Nile as its legal counsel. The Debtor contends that Claimant Thrasher, while serving as White Nile's legal counsel, engaged in self-dealing, deception, and/or misrepresentations. The Debtor contends that Claimant Thrasher, while serving as White Nile's legal counsel, failed to disclose information about his services known at the time of one or more transactions in order to induce White Nile into such transactions which White Nile would not otherwise have entered. The Debtor contends that Claimant Thrasher, while serving as White Nile's legal counsel, engaged in unconscionable actions or courses of action against White Nile and others to whom he had fiduciary and professional duties. T

**b.      Thrasher's Contention.**

Thrasher denies that he committed such actions.  Moreover, the allegations do not support the legal malpractice.  Moreover, these allegations have been the subject of two separate grievance proceedings instituted by Mandel, Williams and Layne against Thrasher.  Both of these proceedings have been dismissed as lacking any foundation.

**c.      Coleman's Contention.**

None.

*Conspiracy*

**a.      Mandel's Contention.**

The Debtor contends that Claimant Thrasher was a member of a combination of two or more persons (including Rod Martin and Claimant Coleman), the object of the

combination was to accomplish either an unlawful purpose or a lawful purpose by unlawful means, the members had a meeting of the minds on the object or course of action, one of the members committed an unlawful, overt act to further the object or course of action, and White Nile suffered injury as a proximate result of the wrongful act.

**b.      Thrasher's Contention.**

Thrasher denies each aspect of this claim.

**c.      Coleman's Contention.**

To the extent Mandel implies that Coleman was a member of a conspiracy against White Nile, Coleman denies that he was part of any such conspiracy.

### *Copyright Infringement*

The Debtor contends that White Nile owns a valid copyright, and that Claimant Thrasher committed actionable copying by of constituent elements of the work that are original and has also asserted property rights therein in denigration to the rights of White Nile. The Debtor contends that White Nile owns a valid copyright, and that Claimant Coleman committed actionable copying by of constituent elements of the work that are original and has also asserted property rights therein in denigration to the rights of White Nile.

**b.      Thrasher's Contention.**

Not applicable.

**c.      Coleman's Contention.**

See Coleman's allegations with respect to the ownership of the Intellectual Property set forth above.

The White Nile copyright reflects Coleman's intellectual property.  Coleman's work

did not constitute a work made for hire and Coleman was excused from, and, in fact, never did assign his work to White Nile.  Accordingly, Coleman is the true owner of the work depicted in the White Nile copyright registration.

## E.  CONTESTED ISSUES OF FACT AND LAW

### 1.  Misappropriation or Theft of Trade Secrets.

#### a.  Disputed Issues of Facts for Thrasher and Coleman Claims

(1)  Whether Thrasher and/or Coleman own trade secrets?

(2)  Whether Thrasher and/or Coleman owned proprietary information:

(i)  such as a formula, pattern, device or compilation of information which had a modicum of originality separated from everyday knowledge, including business methods, computer programs, customer information and lists, marketing information, product design, technical information, technical drawings or similar to the proprietary information that was used in trade or business;

(ii)  that the plaintiff had the right to use the information;

(iii)  that the proprietary information would give the owner a competitive advantage for those who did not know or use it;

(iv)  that the information was secret, including measures taken to ensure secrecy of the information?

(3)  Whether Mandel used or disclosed trade secret(s) of Thrasher and/or Coleman:

(i)  whether Mandel, individually or in conspiracy with Williams, Layne, or E. Layne, disclosed the trade secret to Nexplore

and/or its agents or employees;

(ii)     whether Mandel used or caused Nexplore to use the plaintiff's trade secrets?

(iii)     whether Mandel allowed or facilitated White Nile consultants to disclose or use trade secrets of Thrasher and/or Coleman?

(4)     Whether such disclosure(s) or use(s) was in violation of a confidential or contractual relationship with Thrasher and/or Coleman?

(5)     Whether such use(s) or disclosure(s) by Mandel or others at the direction or control of Mandel came after acquiring the trade secret by improper means such as conduct that falls below the generally accepted standards of commercial morality and reasonable conduct, inducing the owner to disclose the trade secret by feigning an interest in buying the business?

(6)     Whether the use or disclosure occurred after a third party acting at the direction or behest of Mandel learned of the secrets from Mandel or others conspiring with Mandel and knew or reasonably should have known that Mandel or others conspiring with Mandel disclosed the secret by mistake, breached a duty to the trade secret owner not to disclose or improperly acquire or discover the secret?

(7)     Did Thrasher and/or Coleman suffer an injury resulting from Mandel's conduct?

(8)     What value did Thrasher lose as a result of a misappropriation?

(9)     What value did Coleman lose as a result of a misappropriation?

(10)     What value did Mandel and others conspiring with Mandel gain as a result of the misappropriation?

(11)     Did Thrasher and/or Coleman own a trade secret within the meaning of Section 31.005 of the Penal Code, that is the whole or any part of any scientific or technical information, designed, processed, procedure or formula or improvement that has value and the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes?

(12)     Did Mandel, without the effective consent of Thrasher and Coleman, knowingly:

      (i)     steal a trade secret?

      (ii)     make a copy of an article representing a trade secret?

      (iii)     communicate or transmit a trade secret?

(13)     What amount of actual damages did Thrasher suffer as a result of such theft?

(14)     What amount of actual damages did Coleman suffer as a result of such theft?

(15)     Was Mandel a co-owner of any such trade secrets?

**b.     White Nile's Disputed Issues of Fact for White Nile's Claim of Theft or Misappropriation of Trade Secrets**

(1)     Whether White Nile owned trade secrets?

(2)     Whether White Nile owned proprietary information:

      (i)     such as a formula, pattern, device or compilation of information which had a modicum of originality separated from everyday

knowledge, including business methods, computer programs, customer information and lists, marketing information, product design, technical information, technical drawings or similar to the proprietary information that was used in trade or business;

(ii)     that White Nile had the right to use the information;

(iii)    that the proprietary information would give the owner a competitive advantage for those who did not know or use it;

(iv)    that the information was secret, including measures taken to ensure secrecy of the information?

(3)     The Defendant used or disclosed the trade secret(s) of Thrasher and/or Coleman:

(i)      whether Mandel, individually or in conspiracy with Williams, Layne, or E. Layne, disclosed the trade secret to Nexplore and/or its agents or employees;

(ii)     whether Mandel used or caused Nexplore to use the plaintiff's trade secrets?

(iii)    whether Mandel allowed or facilitated White Nile consultants to disclose or use trade secrets of Thrasher and/or Coleman.

(4)     Whether such disclosure(s) or use(s) was in violation of a confidential or contractual relationship with White Nile?

(5)     Whether such use(s) or disclosure(s) or others at the direction or control of Mandel came after acquiring the trade secret by improper means such as means that fall below the generally accepted standards of

commercial morality and reasonable conduct, such as inducing the owner to disclose the trade secret by feigning an interest in buying the business?

(6)     Whether the use or disclosure occurred after a third party acting at the direction or behest of Mandel learned of the secret from Mandel or others conspiring with Mandel and knew or reasonably should have known that the Mandel or others conspiring with Mandel disclosed the secret by mistake, breached a duty to the trade secret owner not to disclose or improperly acquire or discover the secret?

(7)     Did White Nile suffer an injury resulting from Mandel's conduct?

(8)     What value did White Nile lose as a result of a misappropriation?

(9)     What value did Mandel gain as a result of the misappropriation?

(10)    Did White Nile own a trade secret within the meaning of Section 31.005 of the Penal Code, that is the whole or any part of any scientific or technical information, designed, processed, procedure or formula or improvement that has value and the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes?

(11)    Did Mandel, without the effective consent of White Nile, knowingly:

      (i)     steal a trade secret?

      (ii)    make a copy of an article representing a trade secret? or

      (iii)   communicate or transmit a trade secret?

(12)    What amount of actual damages did White Nile suffer as a result of

such theft?

(13)    Whether a bona fide dispute existed about the ownership of the intellectual property, which dispute precludes as a matter of law the Debtor's liability for theft.

(14)    Was Mandel a co-owner of any such trade secrets?

**Issues of Law.**

1.      Did Thrasher's filing provisional patent applications disqualify the information contained therein from trade secret protection?

2.      Did the issuance of patents to Thrasher or Thrasher and Coleman terminate the misappropriate claims for intellectual property that was no longer?

3.      Did Mandel's causing White Nile to copyright to SAQQARA documents preempt the trade secret misappropriation claims?

4.      Should any ambiguities in Claimant Thrasher's consulting agreement or assignment with White Nile be resolved in favor of White Nile since Claimant Thrasher is both a party to such contracts and the attorney who drafted them on behalf of the counterparty—his client, White Nile?

5.      Were the actions of Mandel, Williams and Layne allegedly as the sole directors of White Nile, as reflected in the Board of Directors Minutes dated January 16, 2006 unauthorized in violation of the Bylaws of White Nile, ultra vires or a breach of fiduciary duty?

6.      Was the action of White Nile's Board of Directors dated January 16, 2006, releasing all White Nile stakeholders from certain obligations to White Nile, a valid and proper exercise of authority by White Nile's Board of Directors?

7.     Can an act of the directors of White Nile which is either in violation or unauthorized by the Bylaws, ultra vire, or in breach of fiduciary duties constitute effective consent for the disclosure or use of White Nile trade secrets or a release of contractual rights prohibiting disclosure of such trade secrets.

## F.     BREACH OF FIDUCIARY DUTY

### 1.     Breach of fiduciary duty to White Nile

#### a.     Issues of fact

(1)     Did Mandel directly or in conspiracy with Williams, Layne, E. Layne, and Hughes-Roth entities usurp corporate opportunities with respect to:

       (i)      developing, selling, or marketing intellectual property or trade secrets;

       (ii)     investors;

       (iii)    money raisers (i.e, persons who could locate and persuade others to invest);

       (iv)     consultants working on intellectual property;

       (v)      hardware and software;

       (vi)     domain names (i.e., Nexplore); or

       (vii)    commercial implementation of the intellectual property or trade secrets

(2)     Did Mandel, individually or in conspiracy with others breach his fiduciary duties to White Nile by failing to prosecute its intellectual property? That is, taking the appropriate required steps in the patent office to continue the rights obtained by the provisional patents that had been filed?

(3)     Did  Mandel breach fiduciary duties to White Nile by failing to protect White Nile's intellectual property from misappropriation by Williams, or Layne the E. Layne or Nexplore and its employees, agents or consultants?

(4)     Did Mandel breach his fiduciary duties to White Nile by failing to have White Nile issue warrants to Coleman so as to require Coleman to assign ownership of the intellectual property he had developed to White Nile?

(5)     Did Thrasher breach his fiduciary duties to White Nile by failing to have White Nile issue warrants to Coleman so as to require Coleman to assign ownership of the intellectual property he had developed to White Nile?

(6)     Did Mandel breach his fiduciary duties to White Nile by acting in concert with Williams and Layne in January 2006 to release all officers and employees of White Nile from their obligations under nondisclosure agreements with White Nile?

(7)     Did Mandel breach his fiduciary duties to White Nile by acting with Williams and Layne to release all obligations that each of them had to White Nile in January 2006?

(8)     Did Mandel breach his fiduciary duties by taking the actions referred to in the January 16, 2006 Board of Directors Minutes?

(9)     Did Mandel breach his fiduciary duties by unilaterially transferring funds from White Nile operation account?

(10)    Did Mandel breach his fiduciary duties to White Nile by forming Nexplore with Williams and Layne and becoming a majority owner, director and officer of Nexplore?

(11)   Did Mandel breach his fiduciary duty to White Nile by acting with Williams and Layne to return to the E. Laynes approximately $200,000 of the money they had previously invested in White Nile so that E. Layne could invest that money in Nexplore?

(12)   Did Mandel individually or in conspiracy with Williams, and Layne breach his fiduciary duties to White Nile by diverting funds in escrow for investment in White Nile with Relevant Search Partners, LLC to Nexplore?

(13)   Did Mandel breach his fiduciary duties to White Nile by competing with White Nile through Nexplore?

(14)   Did Mandel breach his fiduciary duties to White Nile by providing access to White Nile's intellectual property/trade secrets to third-parties who were not acting for White Nile?

(15)   Did Mandel breach his fiduciary by retaining former consultants of white Nile who owed White Nile a duty of nondisclosure to work for Nexplore or in competition with White Nile.

(16)   Did Mandel breach his fiduciary duty of candor to White Nile?

(17)   Did Mandel breach his fiduciary duty of full disclosure by failing to disclose to White Nile the formation of Nexplore or what Nexplore did or was planning to do as it related to corporate opportunities of White Nile?

(18)   Did Mandel breach his fiduciary duties to White Nile by filing a bankruptcy petition for White Nile?

(19)   Did Mandel breach his fiduciary duties to White Nile by borrowing $60,000 from Lance Barron, a stockholder of Nexplore, to file the bankruptcy

petition and securing such loan with White Nile's intellectual property?

(20)    Assuming the intellectual property invented by Thrasher and/or Coleman belonged to White Nile rather than Thrasher and/or Coleman in 2009, did Mandel breach fiduciary duties to White Nile by attacking the patents at the United States Patent and Trade Office by: (i) filing a grievance against the first patent issued by the patent office to Thrasher; or (ii) by causing Nexplore to file for a reexamination and subsequently an appeal against the second patent to be issued to Thrasher?

(21)    Did Mandel breach his fiduciary duties to White Nile by directing counsel hired to represent White Nile to act contrary to White Nile's interests in connection with: (a) the January 16, 2006 White Nile board resolution to release certain directors from certain of their obligations to White Nile; (b) the generation and execution of corporate documents of White Nile; (c) the decision to return Eddy Layne's investment in White Nile and step taken to effect that decision; (d) White Nile's interest in and the value of the intellectual property alleged in the White Nile lawsuits against Steve Thrasher or Jason Coleman; (e) the decision not to file utility patents which related back to the White Nile provisional patent applications filed by Thrasher in 2005; (f) potential claims of White Nile against Nexplore, Mandel, Williams or Skinner Layne or Eddy Layne or any entity owned or controlled by them; (g) Thrasher's request for appointment of Receiver; (h) the October 17, 2007 and October 19, 2007 court proceeding in the White Nile litigation; (i) Thrasher's request for appointment of a Receiver; (j) the decision to have

White Nile file for bankruptcy protection; (k) the Lance Barron security interest in certain White Nile intellectual property; or (l) copyright filings in the name of White Nile?

(22)    Did Mandel breach his fiduciary duties to White Nile by disclosing or disseminating its intellectual property?

(23)    Did Mandel breach his fiduciary duties to White Nile by a lack of candor to White Nile?

(24)    Did Mandel breach his fiduciary duties to White Nile by failing to provide full disclosure with respect to the competition being provided by Nexplore?

(25)    Did Mandel's breach(es) of fiduciary duty(ies) to White Nile result in injury to White Nile?

(26)    Did Mandel's breach(es) of fiduciary duty(ies) to White Nile benefit or result in benefit to Mandel?

(27)    Did Mandel's breach(es) of fiduciary duty(ies) to White Nile result in injury to White Nile, if so what amount?

(28)    Did Mandel's breach of fiduciary duty to White Nile benefit or result in benefit to Mandel, if so what amount?

(29)    Had White Nile abandoned its business plan prior to the time when the Nexplore business opportunity arose?

(30)    If White Nile abandoned its business plan; did it do so through the actions of Mandel, Williams and Layne?

(31)    At the time the Nexplore business opportunity arose, did White Nile

have the financial ability to pursue such opportunity?

(32)   If White Nile lacked the financial ability to pursue such opportunities, was its lack caused by Mandel, Williams, Layne and Eddy Layne?

**b.      Issues of Law.**

1.      After Mandel resigned as an officer and director of White Nile, did he still owe fiduciary duties to White Nile as its majority stockholder?

2.      Was the action of White Nile's Board of Directors dated January 16, 2006, releasing all White Nile stakeholders from certain obligations to White Nile, a valid and proper exercise of authority by White Nile's Board of Directors?

**2.      Breach of Fiduciary Duty to Thrasher.**

**a.      Issues of fact**

(1)      Did Thrasher and Mandel enter into a joint venture?

(a)      Did Thrasher and Mandel:

(i)      have an express or implied agreement, or

(ii)      to develop and exploit Thrasher's internet IP invention?

(b)      Did Thrasher and Mandel have a community of pecuniary interest in that purpose?

(c)      Did Thrasher and Mandel have an equal right to direct and control the enterprise?

(d)      Was any such joint venture subsumed by the incorporation of White Nile?

(2)      Did Mandel directly or in conspiracy with Williams, Layne, E. Layne, and Hughes-Roth entities usurp joint venture opportunities with respect to:

(i)     developing, selling, or marketing intellectual property or trade secrets;

(ii)    investors;

(iii)   money raisers (i.e, persons who could locate and persuade others to invest);

(iv)    consultants working on intellectual property;

(v)     hardware and software;

(vi)    domain names (i.e., Nexplore); or

(vii)   commercial implementation of the intellectual property or trade secrets?

(3)     Did Mandel, individually or in conspiracy with others breach his fiduciary duties to Thrasher by failing to prosecute the patent rights, that is, taking the appropriate required steps in the patent office to continue the rights obtained by the provisional patents that had been filed?

(4)     Did  Mandel breach fiduciary duties to Thrasher by failing to protect Thrasher and/or Coleman's intellectual property from misappropriation by Williams, or Layne or E. Layne?

(5)     Did Mandel breach his fiduciary duties to Thrasher by failing to have White Nile issue warrants to Coleman so as to require Coleman to sign the intellectual property he had developed to White Nile?

(6)     Did Mandel breach his fiduciary duties to Thrasher by acting in concert with Williams and Layne to release all officers and employees of White Nile from their obligations under nondisclosure agreements with White Nile?

(7)    Did Mandel breach his fiduciary duties to Thrasher by acting with Williams and Layne to release all obligations that each of them had to White Nile in January 2007?

(8)    Did Mandel breach his fiduciary duties to Thrasher by acting with Williams and Layne to return to E. Layne approximately $200,000 of the money they had previously invested in White Nile?

(9)    Did Mandel individually or in conspiracy with Williams, and Layne breach his fiduciary duties to Thrasher by diverting funds in escrow for investment in White Nile with relevant search partners, LLC to Nexplore?

(10)   Did Mandel breach his fiduciary duties to Thrasher by forming Nexplore with Williams and Layne and becoming a majority owner, director and officer of Nexplore?

(11)   Did Mandel breach his fiduciary duties to Thrasher by competing with Thrasher or White Nile through Nexplore?

(12)   Did Mandel breach his fiduciary duties to Thrasher by providing access to Thrasher or White Nile's intellectual property/trade secrets to third-parties who were not acting for White Nile?

(13)   Did Mandel breach his fiduciary duties of candor to Thrasher?

(14)   Did Mandel breach his fiduciary duty of full disclosure by failing to disclose to Thrasher the formation of Nexplore?

(15)   Did Mandel breach his fiduciary duties to Thrasher by filing a bankruptcy petition for White Nile?

(16)   Did Mandel breach his fiduciary duties to Thrasher by borrowing

$60,000 from Lance Barron, a stockholder of Nexplore, to file the bankruptcy petition for White Nile and securing such loan with White Nile's intellectual property?

(17)   Did Mandel breach his fiduciary duties to Thrasher by filing a grievance against the first patent issued by the patent office to Thrasher or by causing Nexplore to file for a reexamination and subsequently an appeal against the second patent to be issued against Thrasher?

(18)   Did Mandel breach his fiduciary duties to White Nile by directing counsel hired to represent White Nile to act contrary to White Nile's interests in connection with: (a) the January 16, 2006 White Nile board resolution to release certain directors from certain of their obligations to White Nile; (b) the generation and execution of corporate documents of White Nile; (c) the decision to return Eddy Layne's investment in White Nile and step taken to effect that decision; (d) White Nile's interest in and the value of the intellectual property alleged in the White Nile lawsuits against Steve Thrasher or Jason Coleman; (e) the decision not to file utility patents which related back to the White Nile provisional patent applications filed Thrasher in 2005; (f) potential claims of White Nile against Nexplore, Mandel, Williams or Skinner Layne or Eddy Layne or any entity owned or controlled by them; (g) Thrasher's request for appointment of Receiver; (h) the October 17, 2007 and October 19, 2007 court proceeding in the White Nile litigation; (i) Thrasher's request for appointment of a Receiver; (j) the decision to have White Nile file for bankruptcy protection; (k) the Lance Barron security

interest in certain White Nile intellectual property; or (l) copyright filings in the name of White Nile?

(19)    Did Mandel breach his fiduciary duties to Thrasher by disclosing or disseminating his intellectual property?

(20)    Did Mandel breach his fiduciary duties to Thrasher by a lack of candor?

(21)    Did Mandel breach his fiduciary duties to Thrasher by failing to provide full disclosure with respect to the competition being provided by Nexplore?

(22)    Did Mandel's breach of fiduciary duty to Thrasher result in injury to Thrasher?

(23)    If so, in what amount?

(24)    Did Mandel's breach of fiduciary duty to Thrasher benefit or result in benefit to Mandel?

(24)    If so, in what amount?

(25)    Is Thrasher estopped from asserting these claims?

**b.    Issues of Law.**

1.    Was any purported joint venture subsumed by the incorporation of White Nile?

**3.    Breach of Contract Claims**

**a.    Nondisclosure, nonuse agreement with Thrasher**

(1)    Did Thrasher comply with his obligations under the nondisclosure, nonuse agreement that he and Mandel entered into effective April 25, 2005?

(2)    Did Mandel breach the nondisclosure, nonuse agreement by failing to

maintain the information transmitted by Thrasher to Mandel pursuant to that agreement in confidence?

(3)     Did Mandel breach the nondisclosure, nonuse agreement by directly or indirectly utilizing the confidential information obtained from Thrasher, without obtaining prior written consent of Thrasher, by:

      (i)      directly or indirectly utilizing the information in his business

      (ii)     manufacturing, marketing or selling a product that is based whole or in part on the confidential information; or

      (iii)    disclosing the confidential information to a third party, such as Nexplore or officers, directors, employees or agents of Nexplore?

(4)     What damages did Mandel's breach cause Thrasher?

(5)     Was the Non-Disclosure Agreement subsumed by the incorporation of White Nile and the entry of the parties into contractual relationships with White Nile?

**b.     Joint Venture with Thrasher**

(1)     Did Mandel and Thrasher enter into a joint venture agreement?

(2)     Did Mandel agree to contribute $300,000 in funds for the development of internet project?

(3)     Did Thrasher comply with his obligations under the joint venture agreement?

(4)     Did Mandel breach the joint venture agreement by failing to contribute $300,000 to the project?

(5)     What damages did Mandel's breach cause Thrasher?

(6)     Was any such joint venture subsumed by the incorporation of White Nile?

(7)     Is Thrasher estopped from asserting a joint venture due to his actions and participation in the formation of White Nile?

**c.     Mandel's consulting agreement with White Nile**

(1)     Did White Nile perform, tender performance or was excused from performing its contractual obligations under Mandel's consulting agreement?

(2)     Was Thrasher a third-party beneficiary of the confidentiality agreement and nondisclosure agreement in the consulting agreement?

    (i)     Did the contracting parties intend to secure a benefit for Thrasher?

    (ii)    Did the contracting parties enter into the contract directly for Thrasher's benefit?

3.      Was Coleman a third-party beneficiary of the confidentiality agreement and nondisclosure agreement in the consulting agreement?

    (1)     Did the contracting parties intend to secure a benefit for Coleman?

    (ii)    Did the contracting parties enter into the contract directly for Coleman's benefit?

4.      Did Mandel violate the confidentiality and nondisclosure agreement in

the consulting agreement by disclosing confidential information to others at any time or by using the confidential information for purposes other than the joint venture with Coleman or the benefit of White Nile?

5.      What damages did Mandel's breach cause White Nile?

6.      What damages did Mandel's breach cause Thrasher?

7.      What damages did Mandel's breach cause Coleman?

8.      Was Mandel excused from performance of the contract due to breaches and/or other actions by Thrasher?

9.      Is Thrasher prevented from seeking damages due to his breaches of his obligations?

**4.      Breach of Settlement Agreement.**

(1)      Was the settlement agreement dictated on the record on October 17 and October 19, 2007, a valid and enforceable contract?

(i)      Were the terms of the contract reasonably certain?

(ii)      Was there a meeting of the minds?

(iii)      Was the contract based on consideration.

(2)      Did Mandel violate the settlement agreement?

(3)      Did Mandel cause another party to the settlement agreement to violate the settlement agreement?

(4)      What damages did Mandel's breach of the settlement agreement cause Thrasher?

(5)      What damages did Mandel's breach of the settlement agreement cause Coleman?

(6)     Did the state court nullify the settlement agreement?

(7)     Are Claimants and White Nile judicially estopped from raising these claims due to the determination by the state court that the settlement agreement was not an enforceable contract?

**5.      Fraud/Fraud in the inducement/Negligent Misrepresentation.**

**a.      Fraud/Negligent Misrepresentation to Thrasher-Joint Venture Agreement**

(1)     Did Mandel represent to Thrasher that he had a certain level of pertinent expertise relevant to the internet project such as holding an EE degree, being an expert in database structure, having invented products that were recognized as products of the year, having connections with the Angel investment community?

(2)     Where these representations false?

(3)     Did Mandel know these representations were false when he made them or make the representations recklessly as a positive assertion without knowledge of their truth?

(4)     Did Mandel represent that he would contribute $300,000 in funds to the development of the internet project?

(5)     Did Mandel make such a promise with a current intent not to fulfill that promise?

(6)     Did Mandel make these representations with the intent that Thrasher act upon them?

(7)     Did Thrasher reasonably rely upon these representations?

(8)     Did the representations cause Thrasher injury?

(9)     In what amount was Thrasher injured?

(10)    Did Mandel make these representations to Thrasher in the course of Mandel's business or in the transaction in which Mandel had an interest?

(11)    Did Mandel supply false information for the guidance of Thrasher?

(12)    Did Mandel fail to exercise reasonable care or competence in obtaining or communicating the information?

(13)    Did Mandel's negligent misrepresentation proximately cause Thrasher's injury?

(14)    If so, how much was Thrasher injured?

**b.      Fraud/Negligent Misrepresentation to Thrasher-Formation of White Nile and Assignment of Intellectual Property**

(1)     Did Mandel represent to Thrasher that he had a certain level of pertinent expertise relevant to the internet project such as holding an EE degree, being an expert in database structure, having invented products that were recognized as products of the year, having connections with the Angel investment community?

(2)     Where these representations false?

(3)     Did Mandel know these representations were false when he made them or make the representations recklessly as a positive assertion without knowledge of their truth?

(4)     Did Mandel represent that he would contribute $300,000 in funds to the development of the internet project?

(5)     Did Mandel make such a promise with a current intent not to fulfill that promise?

(6)     Did Mandel represent to White Nile that he had obtained an investor in the Philippines who had placed $2 million in escrow to capitalize White Nile's development of the internet project invented by Thrasher?

(7)     Did Mandel represent to White Nile that there was a team of at least 20 experienced, highly qualified programmer/developers assembled in the Philippines including persons with PhDs, already working on programs to develop the backend of the internet project for White Nile?

(8)     Did Mandel make these representations with the intent that Thrasher act upon them?

(9)     Did Thrasher reasonably rely upon these representations?

(10)    Did the representations cause Thrasher injury?

(11)    In what amount was Thrasher injured?

(12)    Did Mandel make these representations to Thrasher in the course of Mandel's business or in the transaction in which Mandel had an interest?

(13)    Did Mandel supply false information for the guidance of Thrasher?

(14)    Did Mandel fail to exercise reasonable care or competence in obtaining or communicating the information?

(15)    Did Mandel's negligent misrepresentation proximately cause Thrasher's injury?

(16)    Were any such representations made by Mandel statements of fact or statements of opinion?

(17)    Did Thrasher have a duty to investigate any such representations, or did he in fact investigate and discovery they were false prior to incurring any

injury?

c.    **Representations to Coleman.**

(1)    Did Mandel represent to Coleman:

(i)    that White Nile was formed by an initial investment of $100,000 each by Mandel and Thrasher?;

(ii)    that Ed Carascoso had formally agreed to invest $2 million in development effort in Manilla?

(iii)    that Paul Williams and other financial advisors of White Nile have concurred that the "pre-dilution" model would likely be acceptable to investors?

(iv)    That White Nile already had a business plan?

(v)    That White Nile had pro-forma financial projections?

(vi)    That the former CMO of Pay Pal had agreed to work with White Nile?

(vii)    That the local firm that was hired to create system documents were being paid in cash?; and

(viii)    That Rod Martin, Rory Doherty and PaulWilliams were working full time for White Nile?

(2)    Were these representations false?

(3)    Did Mandel make these representation(s) knowing that the representation was false or make the representation(s) recklessly as a positive assertion without knowledge of their truth?

(4)    Did Mandel make the representation(s) with the intent that Coleman

act on it?

(5)    Did Coleman reasonably act on the representations?

(6)    Did the representations cause Coleman injury?

(7)    What is the amount of injury suffered by Coleman?

(8)    Did Mandel make these representations to Coleman in the course of Mandel's business or in the transaction in which Mandel had an interest?

(9)    Did Mandel supply false information for the guidance of Coleman?

(10)   Did Mandel fail to exercise reasonable care or competence in obtaining or communicating the information?

(11)   Did Mandel's negligent misrepresentation proximately cause Coleman's injury?

(12)   In what amount was Coleman injured?

(13)   Were any such representations made by Mandel statements of fact or statements of opinion?

(14)   Did Coleman have a duty to investigate any such representations, or did he in fact investigate and discovery they were false prior to incurring any injury?

d.    **Misrepresentations to White Nile.**

(1)    Did Mandel represent to White Nile that he had obtained an investor in the Philippines who had placed $2 million in escrow to capitalize White Nile's development of the internet project invented by Thrasher?

(2)    Did Mandel represent to White Nile that there was a team of at least 20 experienced, highly qualified programmer/developers assembled in the

Philippines including persons with PhDs, already working on programs to develop the backend of the internet project for White Nile?

(3) Were these representations false?

(4) At the time Mandel made these representations, did he know that they were false or make the representations recklessly as a positive assertion without knowledge of their truth?

(5) Did Mandel make the representations with the intent that White Nile act on it?

(6) Did White Nile reasonably rely on the representations?

(7) Did the representations cause White Nile injury?

(8) In what amount was White Nile injured?

(9) Did Mandel make the representations with the intent that White Nile act on it?

(10) Did White Nile reasonably rely on the representations?

(11) Did the representations cause White Nile injury?

(12) In what amount was White Nile injured?

(13) Did Mandel make these representations to White Nile in the course of Mandel's business or in the transaction in which Mandel had an interest?

(14) Did Mandel supply false information for the guidance of White Nile?

(15) Did Mandel fail to exercise reasonable care or competence in obtaining or communicating the information?

(16) Did Mandel's negligent misrepresentation proximately cause White Nile injury?

(17)    In what amount was White Nile injured?

(18)    Were any such representations made by Mandel statements of fact or statements of opinion?

(19)    Did White Nile have a duty to investigate any such representations, or did it in fact investigate and discovery they were false prior to incurring any injury?

**d.     Fraud/Fraudulent inducement/Negligent Misrepresentation Settlement Agreement.**

(1)    Did Mandel represent to Thrasher and Coleman directly or through Boyd that Eddy and Ellen Layne agreed to the settlement agreement and were obligated under the settlement agreement?

(2)    Was the representation false?

(3)    When the representation was made did Mandel know the representation was false, or make the representation recklessly as a positive assertion and without knowledge of his truth?

(4)    Did Mandel make the representation with the intent that Thrasher and Coleman act on it?

(5)    Did Thrasher and Coleman reasonably rely on the representation?

(6)    Did the representation cause Thrasher injury?

(7)    In what amount did Mandel's false representation damage Thrasher?

(8)    Did the representation cause Coleman injury?

(9)    In what amount did Mandel's false representation damage Coleman?

(10)    Did Mandel directly, or indirectly, through Boyd make such representations to Thrasher and Coleman in a transaction in which Mandel

had an interest?

(11)    Did Mandel supply the false information for the guidance of Thrasher and Coleman?

(12)    Did Mandel fail to exercise reasonable care or competence in maintaining or communicating the information?

(13)    Did Thrasher and Coleman justifiably rely on the representation?

(14)    Did Mandel's negligent misrepresentation proximately cause Thrasher's injury?

(15)    What amount of damages did Mandel's negligent misrepresentation proximately cause Thrasher?

(16)    Did Mandel's negligent misrepresentation proximately cause Coleman's injury?

(17)    What amount of damages did Mandel's negligent misrepresentation proximately cause Coleman?

(18)    Are Claimants barred from bring such claims on estoppel grounds and the law of the case based on the state court's rulings?

e.    **Declaratory judgment.**

**Issues of fact**

(1)    Did Mandel develop or arrange the development of software, at his expense, to include the functions specified to Meaningful Data Solutions in a timely manner pursuant to the statement of work attached to the Unanimous Consent in Lieu of Organizational Meeting of the Directors of White Nile Software, Inc.?

(2)     Did Mandel develop or arrange the development by October 15, 2005 "of software to include a working internet based interface that delivered Venn-diagram based result based on input results from other search engines and include additional data and statistical processing"?

(3)     Did Mandel develop or produce by December 31, 2005, software that was enabled to gather its own search results, apply a thesaurus and other analysis to these results (parsing) score the results and deliver these fine and filter results, both graphically and as a traditional listing of the results to the user using software over the internet and to provide an icon-associated search term interaction?

(4)     Should Mandel's stock in White Nile be rescinded for failure of consideration?

(5)     Was a statement of work ever attached to the organizational board consent for White Nile?

(6)     Is the statement of work attached to the version of such organizational board consent proffered by Claimant Thrasher authentic?

f.     **Conspiracy.**

(1)     Was Mandel, a member or a combination of two or more persons whose object was to misappropriate and use the intellectual property belonging to either White Nile, Thrasher or Coleman as a competitor of White Nile, or an attempt to deprive Thrasher of an opportunity to profit from his own inventions, or to avoid Thrasher's ownership interest in White Nile by aggressive and vexatious conduct against him, destroying White Nile or

forming a competing entity based upon intellectual property that Thrasher, Coleman and/or White Nile owned?

(2)     Did Mandel and one or more members of the group commit fraud to further the object or course of action?

(3)     Did one or more members of the group breach fiduciary duties in order to further the object or course of action?

  (4)     Did one or more members misappropriate trade secrets in order to further the object or course of action?

(5)     Did Thrasher suffer injury as a proximate result of the wrongful act(s) and if so, in what amount?

(6)     Did Coleman suffer injury as a proximate result of the wrongful act(s) and if so, in what amount?

(7)     Did White Nile suffer injury as a proximate result of the wrongful act(s) and if so, in what amount?

**g.     Exemplary Damages.**

(1)     Is there clear and convincing evidence that Thrasher suffered harm resulting from fraud other than constructive fraud committed by Mandel?

(2)     Is there clear and convincing evidence that Thrasher suffered harm resulting from malice, by Mandel (i.e., specific intent by Mandel to cause substantial injury or harm to Thrasher)?

(3)     What amount of exemplary damages should Thrasher be awarded against Mandel?

(1)     Is there clear and convincing evidence that Coleman  suffered harm

resulting from fraud other than constructive fraud committed by Mandel?

(2)     Is there clear and convincing evidence that Coleman suffered harm resulting from malice by Mandel (i.e., specific intent by Mandel to cause substantial injury or harm to Thrasher)?

(3)     What amount of exemplary damages should Coleman be awarded against Mandel?

(1)     Is there clear and convincing evidence that White Nile suffered harm resulting from fraud other than constructive fraud committed by Mandel?

(2)     Is there clear and convincing evidence that White Nile suffered harm resulting from malice by Mandel (i.e., specific intent by Mandel to cause substantial injury or harm to White Nile)?

(3)     What amount of exemplary damages should White Nile be awarded against Mandel?

**h.     Attorneys' fees.**

(1)     What is the reasonable and necessary amount of attorneys' fees that Thrasher should be awarded against Mandel with respect to the declaratory judgment regarding whether Mandel's ownership in his White Nile stock should be rescinded?

(2)     If Thrasher, Coleman or White Nile has prevailed under the Texas Theft Liability Act, what is the amount of court costs and reasonable and necessary attorneys' fees that should be awarded against Mandel to:

(i)     Thrasher;

(ii)    Coleman;

> (iii)    White Nile.

(3)    If Thrasher, Coleman and/or White Nile has prevailed on his or its breach of contract claim, how it should be awarded in reasonable and necessary attorneys' fees for work on that claim to:

> (i)    Thrasher;

> (ii)    Coleman;

> (iii)    White Nile.

## i.    Cost of Receiver.

(1)    Whether all the costs of the Receiver (the Receiver's fees and expenses) should be charged against Mandel.

(2)    Whether the amount of interim Receiver's costs already paid by Thrasher, that he is entitled to reimbursement from Mandel.

## j.    *Breach of Fiduciary Duty*

(1)    Did Claimant Thrasher breach his fiduciary duty of loyalty to White Nile?

(2)    Did Claimant Thrasher breach his fiduciary duty of obedience to White Nile?

(3)    Did Claimant Thrasher breach his fiduciary duty of care to White Nile?

(4)    Did White Nile suffer injury result of the wrongful act(s) and if so, in what amount?

(5)    Did Mandel suffer injury result of the wrongful act(s) and if so, in what amount?

(6)     Was Mandel or a protected party within in the scope of any fiduciary duty to White Nile?

(7)     Does Mandel have an individual claim based upon White Nile's rights?

k.      ***Tortious Interference with Prospective Business Relationships***

(1)     Was there a reasonable probability that White Nile would have entered into a business relationship(s) with one or more third persons?

(2)     Did Claimant Thrasher intentionally interfere with such relationship(s)?

(3)     Did Claimant Thrasher have knowledge of such relationship(s)?

(4)     Was Claimant Thrasher's conduct independently tortious or unlawful?

(5)     Did Claimant Thrasher's interference proximately cause White Nile injury?

(6)     Did White Nile suffer actual damage or loss on account thereon and if so, in what amount?

(7)     Could Thrasher tortiously interfere with prospective business relations of White Nile?

l.      ***Conversion and Civil Theft***

(1)     Did White Nile own, possess or have the right to immediate possession of certain personal property?

(2)     Did Claimant Thrasher wrongfully exercise dominion or control over such property?

(3)     Did White Nile suffer injury and if so, in what amount?

(4)     Did White Nile have possessory right to certain property?

(5)     Did Claimant Thrasher unlawfully appropriate such property by taking it without White Nile's effective consent?

(6)     Did Claimant Thrasher appropriate such property with the intent to deprive White Nile of such property?

(7)     Did White Nile sustain damages as a result of such theft and if so, in what amount?

**m.     *Breach of Contract***

(1)     Was the Consulting Agreement between Thrasher and White Nile a valid, enforceable contract?

(2)     Did White Nile perform, tender performance of, or was it excused from performing its contractual obligations under such contract?

(3)     Did Claimant Thrasher breach such Consulting Agreement?

(4)     Did Thrasher's breach(es) cause White Nile injury and if so, in what amount?

(5)     Was Thrasher excused from the obligation that White Nile claims he breached by the prior breach of the contract by White Nile?

(6)     Was the Assignment between Thrasher and White Nile a valid, enforceable contract?

(7)     Did White Nile perform, tender performance of, or was it excused from performing its contractual obligations under such contract?

(8)     Did Claimant Thrasher breach such Assignment?

(9)     Did Thrasher's breach(es) cause White Nile injury and if so, in what amount?

(10)    Was Thrasher excused from performing the obligations that White Nile claims?

(11)    Was the Consulting Agreement between Coleman and White Nile a valid, enforceable contract?

(12)    Did White Nile perform, tender performance of, or was it excused from performing its contractual obligations under such contract?

(13)    Did Claimant Coleman breach such Consulting Agreement?

(14)    Did Coleman's breach(es) cause White Nile injury and if so, in what amount?

(15)    Was Coleman excused from performing any obligations White Nile claims he breached?

(16)    Should any ambiguities in Claimant Thrasher's Consulting Agreement and Assignment with White Nile be resolved in favor of White Nile since Claimant Thrasher is both a party to such contracts and the attorney who drafted them on behalf of the counterparty—his client, White Nile?

### *n.     Legal Malpractice*

(1)     Did Claimant Thrasher fail to exercise the degree of care, skill, or diligence that an attorney of ordinary skill and knowledge commonly possesses in his performance of legal services for White Nile?

(2)     Did Claimant Thrasher breach a contractual duty to White Nile while serving as White Nile's legal counsel?

(3)     Did Claimant Thrasher obtain an improper benefit from representing White Nile as its legal counsel?

(4)     Did Claimant Thrasher, while serving as White Nile's legal counsel, engage in self-dealing, deception, and/or misrepresentations?

(5)     Did Claimant Thrasher, while serving as White Nile's legal counsel, fail to disclose information about his services known at the time of one or more transactions in order to induce White Nile into such transactions which White Nile would not otherwise have entered?

(6)     Did Claimant Thrasher, while serving as White Nile's legal counsel, engage in unconscionable actions or courses of action against White Nile?

(7)     Did Claimant Thrasher's one or more acts of legal malpractice cause White Nile injury and if so, in what amount?

*o.     Conspiracy*

(1)     Was Claimant Thrasher a member of a combination of two or more persons?

(2)     Was the object of the combination was to accomplish either an unlawful purpose or a lawful purpose by unlawful means?

(3)     Did the members have a meeting of the minds on the object or course of action?

(4)     Did one of the members commit an unlawful, overt act to further the object or course of action?

(5)     Did White Nile suffer injury as a proximate result of the wrongful act and if so, in what amount?

***p.***     ***Copyright Infringement***

(1)     Did White Nile own a valid copyright?

(2)     Did Claimant Thrasher commit actionable copying by of constituent elements of the work that are original?

(3)     Was White Nile injured by Claimant Thrasher's wrongful acts and if so, in what amount?

(4)     Did Claimant Coleman commit actionable copying by of constituent elements of the work that are original?

(5)     Was White Nile injured by Claimant Coleman's wrongful acts and if so, in what amount?

(6)     Does the White Nile copyright reflect the work product of Coleman?

(7)     Did Coleman's work product constitute a "work made for hire?"

(8)     Did Coleman assign his work product to White Nile?

(9)     Was Coleman excused from any obligation to assign his work product to White Nile by White Nile's failure to issue/grant warrants to him for his work?

(10)     Was Coleman the true owner of the work depicted in the White Nile copyright registration.

***q.***     ***Attorneys' fees.***

(1)     If Mandel or White Nile has prevailed under the Texas Theft Liability Act, what is the amount of court costs and reasonable and necessary attorneys' fees that should be awarded against Thrasher to:

(i)     Mandel;

(ii)     White Nile.

(2)     If Mandel and/or White Nile has prevailed on his or its breach of contract claim, how it should be awarded in reasonable and necessary attorneys' fees for work on that claim to:

(i)     Mandel;

(ii)    White Nile.

## G.    ESTIMATE OF LENGTH OF TRIAL

***Thrasher and Coleman now estimate that the trial will take*** 10 to 15 days[14.]

The Debtor contends that five days is sufficient for the trial of this proceeding, assuming that cooperation of the parties with this Court's Scheduling Order.

## H.    LIST OF ADDITIONAL MATTERS THAT MIGHT AID IN THE DISPOSITION OF THE CASE

The parties reserve the right to raise such issues during the course of the hearing.

## I.    JURY OR NON-JURY TRIAL

***Thrasher and Coleman assert that, a***s set forth above a jury trial has been timely requested with respect to certain triable issues of facts set forth herein. The Debtor contends that by invoking this Court's equitable jurisdiction with respect to their claims, the

---

14 The Court notes that the parties originally estimated that trial would take 5 days to try and this Court set the matter over for a 5 day trial.

Claimants have waived all rights to trial by jury with respect to factual matters which are necessary for this Court  to determine in determining the claims in this proceeding.

Approved as to form and substance:

Dated:       November 21, 2010

By:     /s/ Mitchell Madden
        Mitchell Madden
        MADDENSEWELL, LLP
        1755 Wittington Place, Suite 300
        Dallas, Texas 75234
        (972) 484-7780
        (972) 484-7743  facsimile
        Counsel for Steven Thrasher


By:     /s/ Elvin E. Smith, III
        Elvin E. Smith, III
        State Bar No. 00784995
        Law Offices of Elvin E. Smith, III PLLC
        307 Dartbrook
        Rockwall, Texas 75087
        Tel: (972) 722-2475
        Fax:
        Counsel for Jason Coleman


By:     /s/ I. Richard Levy
        I. Richard Levy
        I. Richard Levy, P.C.
        State Bar No. 12265020
        17304 Preston Road, Suite 800
        P.O. Box 796935
        Dallas, Texas 75379
        Tel: (214) 438-3753
        Fax: (214) 242-3754

        Christopher M. McNeill
        State Bar No. 24032852
        Block & Garden, LLP
        5949 Sherry Lane, Suite 900
        Dallas, Texas 75225
        Tel: (214) 866-0990
        Fax: (214) 866-0991

        Counsel for Edward Mandel

***The Joint Pre-Trial Order, as modified by the Court in italics, is hereby approved.***

Signed on 11/22/2010

*Brenda T. Rhoades*　　SR

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE