

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL, | § | Case No. 10-40219 |
| | § | (Chapter 11) |
| Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DEBTOR'S OBJECTIONS TO CLAIMS OF STEVEN THRASHER, JASON COLEMAN, AND WHITE NILE SOFTWARE, INC.

This case is before the Court on the objections of the debtor, Edward Mandel, to the claims of White Nile Software, Inc. ("White Nile"), Steven Thrasher, on his own behalf and derivatively on behalf of White Nile, and James Coleman. Coleman filed a claim against Mandel's estate in the amount of $25,000,000, Thrasher filed a claim in the amount of $56,000,000, and a receiver for White Nile filed a claim in the amount of $56,000,000. The Court exercises its core jurisdiction over this contested matter, *see* 28 U.S.C. §§ 157(b)(2)(B) and 1334, and makes the following findings of fact and conclusions of law, *see* FED. R. BANKR. P. 7052.

### I. SUMMARY

The trial of Mandel's objections to the claims of Thrasher, Coleman and White Nile was the lengthiest trial of any sort conducted by this Court to date. Mandel and Thrasher are former friends who hired Coleman to help them develop an internet search technology. They imagined their business, White Nile, could rival Google and make everyone connected with White Nile incredibly rich. Instead, Mandel and Thrasher fell out shortly after forming White Nile. Mandel formed a new company to develop internet search technology that appeared very familiar to Thrasher and Coleman. Mandel,

Thrasher, and Coleman have litigated with each other for years over whether Mandel stole the ideas of Thrasher and Coleman to form his new business.

Mandel (or those aligned with him) has filed complaints with the Texas Bar Associations and the U.S. Patent and Trademark Office ("USPTO") seeking to revoke licenses issued to Thrasher as well as an action alleging violations of the Racketeer Influenced and Corrupt Organizations Act, and a bankruptcy petition on behalf of White Nile.  None of these complaints and petitions bore any fruit.  In addition, the parties engaged in bitter litigation in state court in connection with claims asserted by and between Thrasher, Coleman, and Mandel, among others.  The state court eventually appointed a receiver for White Nile to mediate between Mandel, Thrasher and Coleman. A dispute subsequently erupted over Mandel's responsibility to pay approximately half of the receiver's fees.  Mandel, pleading poverty, filed this bankruptcy case.

## II. FINDINGS OF FACT

### A. Thrasher and Mandel Form White Nile

1.      Thrasher has an undergraduate degree in engineering.  He graduated from law school in 1997 and subsequently earned a master's degree in business administration. While in law school, he developed a friendship with Rod Martin.  Thrasher and Martin remained close friends after graduating from law school.

2.      Martin took a position as special counsel at a start-up company called PayPal.  Martin profited handsomely when EBay purchased PayPal in 2002.  Since leaving PayPal, Martin has been involved in the start-up of various companies.  At the time of trial, Martin was running a hedge fund that invested in technology companies, among other things.

2

3.      Thrasher specializes in intellectual property law.   Thrasher worked at several law firms before starting his own practice.

4.      Thrasher was an earnest young attorney working for a law firm in Dallas when he met Mandel in 2001.   Mandel was a charming young entrepreneur who was involved in a small start-up company called Positive Solutions.   Two years later, Positive Solutions hired Thrasher to write a patent application.   Thrasher and Mandel's working relationship developed into a friendly social relationship.

5.      Thrasher did not counsel Mandel as to any personal legal matters. Thrasher's expertise lies in intellectual property law, and he testified, credibly, that he is uncomfortable offering advice on matters outside of his expertise.

6.      Thrasher opened his own law practice shortly after meeting Mandel.   He has personally applied for more than ten patents since 2002.   The present dispute relates to one of Thrasher's ideas.   In particular, in or around May 2005, Thrasher conceived an idea for a new kind of search engine.   Mandel invited Thrasher to a golfing tournament in mid-May 2005, and Thrasher shared his idea with Mandel at the tournament.

7.      Mandel was excited about Thrasher's idea.   Mandel represented to Thrasher that he had expertise with the internet databases that would be used to store an index for a search engine.   He also represented to Thrasher that he was familiar with database search engines.

8.      On May 25, 2005, Mandel visited Thrasher at Thrasher's house.   They signed non-disclosure agreements, and Thrasher shared his idea more fully with Mandel. Mandel signed Thrasher's drawings during the meeting.   However, Mandel did not share any of his own ideas with Thrasher.   Mandel represented that he could support the project

3

financially, but not inventively, since any invention Mandel generated would be claimed by his then-current employer.

9.      Thrasher understood that Mandel had recently sold his interest in Positive Solutions for a profit and was looking for a new investment.

10.     Following his meeting with Mandel, Thrasher put together a provisional patent application.[1]  Thrasher submitted the application to the U.S. patent office on July 2, 2005, titled "System, Methods, and Devices for Searching Data Storage Systems and Devices."  Thrasher listed himself, and only himself, as the inventor on the application.

11.     At some point, Thrasher sought funding for his venture from a company called White Rock Capital.  White Rock Capital declined to provide funding at that time. White Rock Capital expressed interest in revisiting the discussion after Thrasher developed a prototype.

12.     On July 5, 2005, Thrasher and Mandel met for lunch.  Several of Mandel's business associates attended the meeting.  Mandel represented that he and his associates would develop a prototype for Thrasher's idea.  Mandel represented that he would pay for the work, which they anticipated would cost approximately $300,000.

13.     Mandel and Thrasher decided to start a company called White Nile to hold and develop Thrasher's invention.  Mandel testified at trial that he told Thrasher that he would front some of the company's start-up costs.

14.     Mandel caused articles of incorporation to be filed with the Texas Secretary of State on July 13, 2005.  Cathy Cleaveland, Mandel's personal attorney,

---

[1] Thrasher testified that provisional applications are used to create a priority date but are not substantively examined by the patent office.  Thrasher further testified that utility applications are more formal written documents, including drawings, that are examined for patentability.  Thrasher was required to file a non-provisional (or utility) patent application within one year of filing the corresponding provisional application if he wanted to retain the priority date. 35 U.S.C. § 119(e)

prepared and filed the articles, which named Thrasher and Mandel as directors of White Nile.   Thrasher was unaware that Mandel intended to incorporate White Nile and reviewed the documents after they were filed.

15.   In addition to the formation documents, Cathy Cleaveland prepared a form consulting agreement and a form employment agreement for White Nile's use.

16.   In August 2005, Thrasher obtained a trademark for White Nile.

17.   Thrasher signed a consulting agreement with White Nile dated August 1, 2005, that named him a co-founder, inventor, and chief executive officer of White Nile. Thrasher filed a second provisional patent application on August 29, 2005 titled "System, Methods, and Devices for Searching Data Storage Systems and Devices."  Thrasher listed himself, and only himself, as the inventor on the application.

18.   Mandel signed a consulting agreement with White Nile dated October 1, 2005, that named him a co-founder and president of White Nile.  Pursuant to article VIII of the consulting agreement, Mandel assigned to White Nile any "patentable ideas," among other things, produced pursuant to the services provided under the agreement.

19.   On or about October 10, 2005, Thrasher and Mandel signed a document entitled "Unanimous Consent in Lieu of Organizational Meeting of Directors of White Nile Software, Inc." (the "Unanimous Consent").   The Unanimous Consent elected Mandel as the president and treasurer of White Nile, and Thrasher as its chief executive officer and secretary.   The Unanimous Consent further provided that Thrasher and Mandel would each receive 26 million shares of White Nile in exchange for the following consideration: (a) Thrasher agreed to assign his then-existing provisional patent application as well as any future intellectual property to White Nile; and (b) Mandel

agreed, among other things, to develop White Nile's search engine at his expense by December 31, 2005.

20.     Thrasher and Mandel employed family members to help start up White Nile.  Mandel's wife was White Nile's bookkeeper, and Mandel used his home address for the business.  Thrasher's father and father-in-law signed consulting agreements with White Nile and agreed to provide services to the fledgling company.

21.     In or around September 2005, Mandel and Thrasher met with representatives of Meaningful Data Solutions ("MDS").  They agreed to negotiate an engagement agreement with MDS to help to develop software for the White Nile search engine.  MDS anticipated that the project would cost $216,500.  Mandel told Thrasher he would pay MDS.

22.     Mandel and Thrasher also met with an individual named Paul Williams.  Mandel and Williams led Thrasher to believe that Williams was a licensed broker/dealer at Hughes-Roth Capital Markets.  Thrasher understood that White Nile was retaining Hughes-Roth Capital Markets in order to secure the services of Williams.

23.     On September 26, 2005, Thrasher signed a document entitled "Assignment" whereby he assigned his intellectual property relating to certain search engine technology to White Nile.   The assignment provides in pertinent part: "Furthermore, should White Nile Software, Inc. fail to timely prosecute any such invention by failing to timely file appropriate responses to government entities, including the USPTO statutorily shortened response periods, all rights in the inventions or creations transferred to White Nile Software, Inc. are then void, and any rights remaining transfer back to me, and I may prosecute the applications other documentation needed, and this

agreement shall have no effect as to those items." Thrasher signed the document as the inventor, and Mandel signed the document as the corporate representative for White Nile.

24.     In early October 2005, Mandel and Thrasher agreed that Williams would be White Nile's interim chief financial officer, and they agreed to give Williams a small interest in White Nile. Thrasher and Mandel anticipated that Williams would write a business plan for White Nile and raise money from investors.

## B. White Nile Engages the Services of Coleman

25.     Thrasher and Mandel agreed to retain Jason Coleman to work on the graphic representation of what the search engine might look like. Coleman signed a consulting agreement with White Nile that described him as "chief creative officer" and a co-founder of the company. The consulting agreement anticipated that Coleman would produce a demonstrative version of Thrasher's idea for a search engine by October 15, 2005 and a prototype by November 15, 2005.

26.     The consulting agreement provided that Coleman would receive an annual salary of $133,000 and would report directly to Thrasher. In addition, the consulting agreement provided that Coleman would receive warrants for equity in White Nile if he completed the demonstration and prototype on schedule. Coleman agreed to defer his salary for the first several months while White Nile was seeking investors.

27.     The consulting agreement signed by Coleman was substantially similar to the agreement signed by Mandel. Like Mandel, Coleman assigned his work product, including patentable ideas, to White Nile in the consulting agreement.

28.     Coleman's first project was to create a program to demonstrate what White Nile's search engine would look like – that is, how queries would be made and

results displayed. Coleman gathered the information he needed through in-depth discussions with Thrasher and a review of Thrasher's patent applications. Mandel's sole contribution to the demonstrative program was to suggest a particular piece of music.

29.      Coleman timely delivered the demonstrative version of White Nile's search engine as required by his consulting agreement with White Nile.

30.      Coleman's next project was to create a prototype, that is, the basic framework that White Nile would need in order to create software. Coleman referred to his work on the prototype as the SAQQARA project. Thrasher testified that they used this name for the initial phase of White Nile's development, because Saqqara is the name of the first and oldest pyramid plateau in Egypt.

31.      According to Coleman, programs such as the one he was working on for White Nile are not monolithic blocks of computer code. Internet programs are modular and involve different applications working together. Programmers mix and match "shelf" components with custom components, linking everything together with application programming interfaces.

32.      Coleman kept Thrasher and Mandel informed of his progress on the SAQQARA project. He and Thrasher engaged in detailed discussions about the development of the prototype. Although Mandel had described himself to Coleman as a database expert, Mandel did not contribute to the development of the prototype in any substantial way.

33.      Coleman and Thrasher debated the best interface for White Nile's search engine. Coleman's particular expertise is in user interfaces, and he convinced Thrasher

8

to adopt some of his ideas.  They then worked together to develop and submit a patent application for "realtime visualization."

34.     Throughout October, November and December 2005, Coleman questioned Mandel and Thrasher about White Nile's business plan, funding, and structure.  In October 2005, Mandel assured Coleman that White Nile had a business plan and detailed financial projections.  Mandel also represented that he intended to pay MDS to create system documents and, when that fell through, to put the funds that would have been paid to MDS directly into White Nile.

35.     Coleman did not believe "White Nile" was a good domain name. Thrasher was fond of the name, which he had chosen, but he was willing to change White Nile's name -- so long as the new name was a good one.

36.     On December 13, 2005, Thrasher submitted a third provisional patent application to the USPTO titled "Real-Time Search Visualization."  Thrasher listed himself and Coleman as inventors on the application.

37.     Despite timely completing the work assigned to him, Coleman did not receive any shares of White Nile.

38.     Coleman testified at trial.  His testimony about his work for White Nile and the events leading up to White Nile's demise was highly credible.

### C. Mandel's Contacts in the Philippines

39.     Mandel was acquainted with a young man called Nikki Carrascoso, who lived in the Philippines.  Mandel represented to Thrasher that Nikki's father, Eduardo, had political connections that could allow White Nile to save money by developing its search engine in the Philippines.

40.     When White Nile was unable to reach an agreement with MDS, Mandel represented to Thrasher and Coleman that Eduardo could do the same work for less money in the Philippines.

41.     Mandel represented to Thrasher that Eduardo had agreed to invest in White Nile.  Mandel repeatedly represented to Thrasher that Eduardo had hired a team of individuals with PhDs to develop a prototype of White Nile's search engine in the Philippines.  In August 2005, Mandel sent Thrasher a message indicating that Eduardo was visiting from the Philippines and would be available to provide an update about the work he was doing for White Nile.

42.     In October 2005, Mandel told Thrasher that Eduardo had agreed to invest a total of $6 million in White Nile to develop the search engine.  Thrasher included this information in a written presentation for potential investors.  Thrasher distributed the presentation to Mandel, among others, and Mandel's only correction was to change the spelling of Eduardo's name.

43.     Mandel was handling the deal between White Nile and Eduardo, and Thrasher trusted Mandel completely at that time.

44.     Nikki Carrascoso went to work for White Nile in or around November 2005 and provided a copy of his resume to Thrasher.

45.     Mandel visited the Philippines in the fall of 2005.  He represented to Coleman that he had met with the developers working for White Nile.

### D. White Nile Engages Martin

46.     In August 2005, Thrasher and Mandel were still looking for investors to provide "seed money" to White Nile.  Thrasher contacted his friend, Rod Martin, around

10

this time.  Thrasher did not know whether Martin would personally invest in White Nile, but Thrasher hoped he would put them in contact with potential investors.

47.     Thrasher described his ideas to Martin and invited Martin and his wife to visit him in Dallas.  Martin visited Dallas on August 27, 2005, and met with Thrasher, Mandel, and Eduardo.  Thrasher brought copies of his provisional patents to the meeting.

48.     The provisional patents listed Thrasher, and only Thrasher, as the inventor.  Martin testified, credibly, that Mandel described Thrasher as the inventor during the meeting.  Martin's description of the meeting, and of Mandel's conduct during the meeting, was highly credible.

49.     Martin believed White Nile had the potential to be a very successful company and offered his assistance.  Thrasher and Mandel agreed that Martin would have a place on the board of directors as well as the board of advisors for White Nile.

50.     By October 25, 2005, Martin was beginning to gather other individuals to serve on the board of advisors for White Nile.  Martin also invited a young man named Skinner Layne to become involved in White Nile.  Martin thought highly of Skinner's potential, and Mandel befriended him.

51.     Skinner believed that White Nile would be a great investment for his parents, Eddie and Ellen Layne.  Martin testified, credibly, that he cautioned the Laynes about the risks of investing in a start-up company.  The Laynes nonetheless invested $300,000 in White Nile on or about December 7, 2005.  In exchange, they received 75,000 shares of White Nile.

### E. Thrasher, Mandel and Coleman Visit Manila

52.     Thrasher, Mandel and Coleman went to the Philippines on or around November 13, 2005.  Thrasher and Coleman were shocked to discover that no one had been working on White Nile's search engine.

53.     For his part, Eduardo was surprised to discover that Thrasher thought he had escrowed $1 million to invest in White Nile.  In fact, Eduardo had not invested any money in White Nile, did not plan to do so, and had not hired any developers.

54.     Thrasher and Mandel attempted to negotiate an agreement with Eduardo during their visit to the Philippines.  Eduardo expressed interest in providing services to White Nile in exchange for payments from White Nile in excess of $1 million.

55.     Thrasher, Mandel and Coleman hurriedly arranged interviews with applicants for the project.  Thrasher and Coleman discovered during the interviews that Mandel was not particularly knowledgeable about the type of database or programming necessary for Thrasher's search engine to work.

56.     Coleman, Thrasher and Mandel discussed changing White Nile's name during their visit.  They kicked around various possible domain names, including "Nexplore," but did not reach an agreement.

57.     Mandel was involved with another struggling start-up company, Synergistic Technologies, when he went to Manila.  Synergistic Technologies was contemplating locating a call center in Manila.  Mandel charged the cost of his hotel and half of his airfare to Synergistic Technologies.

58.     After returning to the United States, Thrasher received electronic messages from Bernadette Fuentes in which she attempted to re-negotiate the tentative,

oral agreement Thrasher thought they had reached with Eduardo.  They exchanged many messages but, ultimately, Eduardo declined to become involved with White Nile.

### F. Mandel Suggests Changing Directions

59.    On or around December 5, 2005, Mandel told Thrasher that he had a "great idea" for White Nile.  Mandel explained that he wanted to focus on social networking rather than a search engine, and he suggested changing the name of White Nile to reflect the new focus.

60.    In early December 2005, Mandel recruited Joseph Savard[2] to become the chief technology officer for White Nile.  Mandel negotiated an agreement with Savard and communicated the terms to Thrasher and Coleman, among others.  By December 20, 2005, Savard had an e-mail account with White Nile.

61.    Savard initially focused on identifying the equipment that White Nile needed to acquire.  After Mandel told him that he had acquired the domain name "MyCircle," Savard began conceptualizing how White Nile might integrate social networking concepts into its search engine.

### G. The Investor Meeting

62.    Williams conducted an investor meeting in Arkansas on December 15, 2005.  He used the demonstrative materials developed by Coleman to showcase White Nile's search engine to potential investors.

63.    The next day, December 16, 2005, Thrasher discovered that Williams was not actually licensed as a broker.  Thrasher was well aware of the legal repercussions of a

---

[2] Joseph Savard testified over several days during the trial.  His demeanor on the first day was hostile and flippant.  He appeared more cooperative and offered more complete testimony when he was recalled to the witness stand later in the trial.

misrepresentation about Williams' status to potential investors and took immediate action to address what he viewed as a disaster.

64.     Thrasher invited Martin, Skinner and Mandel, among others, to a birthday party at his home on December 17, 2005.  Martin testified that Mandel and Skinner approached him during the party for a private discussion.  Martin testified that they sat on either side of him and told him that Mandel would be a better chief executive officer than Thrasher.  They told Martin that they wanted to usher Thrasher into a more "appropriate" position at White Nile.  Martin's testimony about his conversation with Mandel and Skinner was highly credible.

65.     Martin immediately told Thrasher about the conversation.

66.     By December 17, 2005, it had become clear that there was still not a development team in place in the Philippines.  It had become equally clear that Mandel did not intend to contribute any of his own funds to White Nile.

**H. NeXplore Emerges**

67.     The next day, on December 18, 2005, Skinner reserved NeXplore.com as a domain name.

68.     At or around the same time, Mandel began denying that Martin was a member of White Nile's board of directors.  Mandel also began to accuse Thrasher of entering into agreements with family members and others without informing Mandel.

69.     In late December 2005, Mandel sent Savard to Thrasher's house to review White Nile's patents as well as documents relating to the SAQQARA project.

70.     According to Skinner, his role at White Nile had primarily consisted of attending a few meetings.  He testified in a deposition that he was unfamiliar with the

SAQQARA project and that he did not look at any of the attachments to the emails he received relating to the SAQQARA project.  He also testified, more generally, that he was unfamiliar with White Nile's intellectual property or the patent applications prepared by Thrasher.

71.     Savard testified that he did not accomplish much for White Nile because White Nile "blew up" shortly after his retention.  Mandel told Savard that Thrasher (who Savard barely knew) was crazy and had embezzled money from White Nile.

72.     Mandel recruited Savard to work for NeXplore at some point during late December or early January 2006.  NeXplore offered Savard the same job title and the same salary as White Nile.  Mandel also recruited Williams to work for NeXplore, where Williams would perform the same advisory role as he had at White Nile.

73.     In late December 2005, Thrasher submitted instructions to White Nile's bank to make a payment to his father, Lawayne, to reimburse him for hardware he had purchased for White Nile.  These instructions conflicted with instructions that Mandel submitted to the bank at around the same time directing the bank to place all of the funds in White Nile's account into a new account under Mandel's sole control.  As a consequence of these conflicting instructions, the bank froze the account.

74.     The funds in White Nile's bank account consisted of the Laynes' investment.  When Thrasher discovered that Mandel had taken or was attempting to take the Laynes' investment, he contacted Martin, who acted swiftly.  On the advice of counsel, Martin drew up a resolution of the board of directors dated January 5, 2006.  The resolution declared Mandel's actions to be ultra vires and fraudulent and directed the return of Laynes' investment to White Nile's bank account.

75.     Martin and Thrasher met Mandel at a coffee shop to discuss the situation. They had no idea that Mandel was forming a new company, NeXplore, or that he had recruited the Laynes to invest in NeXplore rather than White Nile.  They discovered much later that, within weeks of its formation, NeXplore received $197,000 from the Laynes and $286,500 from Arkansas Investment, LLC, which the Laynes formed after the December 15, 2005, White Nile presentation.

76.     On January 11, 2006, Mandel, Williams and Skinner signed corporate documentation purporting to remove Thrasher from his offices with White Nile.  Mandel, as the sole remaining director of White Nile, signed a document appointing Skinner to serve as a director of White Nile.   Mandel and Skinner then signed a document appointing Williams to serve as a director of White Nile.

77.     On January 12, 2006, Mandel entered into an agreement with a law firm regarding representation of the then-directors of White Nile (Mandel, Williams and Lane) against Thrasher and Martin.

78.     On or around January 16, 2006, Mandel, Williams and Skinner held a directors' meeting.  They did not inform Thrasher or Martin of the meeting.   At the meeting, Mandel, Williams and Skinner executed a document declaring that White Nile was no longer a going concern.  The document also purported to release everyone from the various, non-competition, non-disclosure and non-competition agreements they had signed with White Nile.   However, the document did not release White Nile or its shareholders from any obligations or liabilities relating to the rights of Thrasher and Coleman under their agreements with Mandel or White Nile – only Thrasher and Coleman could effect such a release.

16

79.     The document signed by Mandel, Williams and Skinner specifically provided that White Nile was not releasing Thrasher from the assignment of his intellectual property to White Nile.  Mandel did not, however, seek to preserve or protect White Nile's intellectual property.  Mandel did not demand the return of White Nile's intellectual property from Williams, Savard, Skinner, or anyone else.

80.     Mandel's actions caused the break-up of White Nile.  He recruited Skinner and attempted to recruit Martin to support his takeover of White Nile.  When Martin declined to support Mandel, Mandel convinced Skinner's parents to transfer their investment from White Nile to NeXplore.

81.     On January 17, 2006, Skinner submitted documents to the Texas Secretary of State that formed a new entity, NeXplore Technologies.  The formation documents named Skinner as the sole shareholder and sole director.  Mandel and Williams later became shareholders and directors, and Skinner's parents became investors.  Skinner testified in a deposition that Mandel made all of the decisions regarding NeXplore's operations.

82.     Williams created a business plan for NeXplore that was virtually identical to White Nile's business plan.

83.     On or around January 18, 2006, the shareholders of White Nile, including Thrasher (who was not yet aware of NeXplore), instructed the bank to unfreeze White Nile's account and transfer all of the funds to a new account.

84.     Savard testified that Mandel referred to NeXplore as just a name change. Savard admitted, however, that Mandel and NeXplore instructed him to hide from Thrasher that NeXplore was working on a search engine.  In February 2006, at Mandel's

direction, Savard began focusing on integrating a search engine into the social networking arena.

85.     In February 2006, Mandel caused White Nile to file Coleman's SAQQARA documentation for copyright protection.

86.     NeXplore, through later transactions, became a public company.  Mandel is now NeXplore's chief executive officer.   Williams and Skinner were officers of NeXplore until they resigned in June 2008.  They started a new company together, and Skinner moved to Chile, where he resided at the time of trial.

### I. Litigation Ensues

87.     In January and February 2006, Coleman approached Mandel and Thrasher to seek payment for his work for White Nile.  Thrasher agreed to mortgage his house to pay Coleman.  Mandel delayed responding to Coleman's request for payment.  Rather than respond, on February 4, 2006, Mandel caused White Nile to sue Coleman in Texas state court.  In addition, on April 5, 2006, Mandel caused White Nile to sue Thrasher in Texas state court.

88.     Coleman and Thrasher responded to the suits and asserted claims against Mandel and other third party defendants, including claims for breach of fiduciary duty, breach of contract, conversion, theft of corporate opportunities, and theft of trade secrets. NeXplore and Coleman intervened in the suit against Thrasher.

89.     After the filing of the lawsuit against Thrasher, each of the respective parties, including Mandel, has amended their claims, counterclaims, and cross-claims numerous times.

90.     During 2006, NeXplore was developing search engine technology. Mandel, who was then the chief executive officer of White Nile, took no action to protect White Nile's intellectual property from NeXplore or any other possible encroacher by filing timely utility or non-provisional patent applications.

91.     Thrasher filed two non-provisional (or utility) patent applications relating to White Nile's search engine.  Thrasher filed the first application referred to by the parties as the 299 patent, on June 30, 2006.  The 299 patent listed Thrasher as the sole inventor, and the patent office issued a patent on September 14, 2010.  Thrasher filed the second utility patent application, referred to by the parties as the 802 patent, on December 14, 2006.  The 802 patent listed Thrasher and Coleman as the inventors, and the patent office issued a patent to Thrasher and Coleman on November 25, 2008.

92.     Shortly after the filing of the 299 utility patent application, in September 2006, Williams filed a grievance against Thrasher with the Texas State Bar.  According to Skinner, the grievance was part of Mandel's strategy to cow Thrasher by threatening his livelihood.  Mandel's testimony that he did not participate in filing the grievance, or that he did not intend to threaten Thrasher's livelihood, was contradicted by the documentary evidence.

93.     Mandel's personal attorney, Cathy Cleaveland, assisted in preparing documents for the grievance proceeding against Thrasher.  Mandel also paid for lawyers at a second firm to prosecute the grievance.

94.     In addition to the complaint to the Texas State Bar, as part of Mandel's strategy, Layne filed a grievance against Martin with the Arkansas State Bar.  The relevant State Bars eventually dismissed the grievances filed by Mandel and Layne.

95.     On August 3, 2007, NeXplore filed a utility patent application entitled "System and Method to Provide a Search Advertisement Dragging System."   On September 6, 2007, NeXplore filed two utility patent applications, one titled "System and Method for Providing Focused Search Term Results" and the other titled "Folksonomy Weighted Search and Advertisement Placement System and Method."

96.     In the midst of the state court litigation, the parties reached a tentative settlement on October 17 and 19, 2007.  They announced the settlement in open court, but Mandel later withdrew from the agreement.  The purported settlement involved an agreed judgment in the amount of $900,000 against Mandel, Skinner, Skinner's parents, Williams, and Williams' affiliated entities.  Thrasher and Coleman agreed that they would not seek to enforce this judgment provided that they received payments from Mandel in the total amount of $450,000.  NeXplore agreed to make these payments. In exchange, Thrasher and Coleman agreed to license their patents to NeXplore for a "royalty fee" of two percent of NeXplore's gross revenue for five years, payable quarterly, with a minimum quarterly payment of $2,500.

97.     In January 2008, Mandel filed a complaint against Coleman and Thrasher, among others, alleging multiple causes of action under RICO.  The United States District Court for the Northern District of Texas granted the motion of Coleman and Thrasher to dismiss the case on August 14, 2008.

98.     On January 19, 2008, Thrasher filed an amended complaint in the ongoing state court litigation.  NeXplore removed the amended complaint to federal court.  The federal district court granted the motion of Thrasher and Coleman to remand the case back to state court in May 2008.

99.     In June 2008, White Nile borrowed $60,000 from a shareholder in contemplation of a chapter 11 bankruptcy case.  White Nile secured the loan with its intellectual property.  Mandel signed the relevant documents as the chief executive officer of White Nile.

100.     In July 2008, Mandel filed a bankruptcy petition for White Nile in the Northern District of Texas.  Mandel and NeXplore thereby obtained a stay of the state court litigation.  On September 16, 2008, the bankruptcy court granted Thrasher's motion to dismiss the petition.

101.     The parties continued litigating over the settlement, or near-settlement, in state court.  The state court eventually entered a summary judgment that the settlement agreement was unenforceable.

102.     On May 29, 2009, the state court entered an agreed order appointing a local attorney, Rosa Orenstein, as the receiver for White Nile.  On September 29, 2009, the state court entered an order approving Orenstein's designation of independent counsel and for payment of Orenstein's attorneys' fees.  The September 29th order provided that the fees of Orenstein's independent counsel would be paid 47.5% by Thrasher and 52.5% by Mandel.  Mandel, however, refused to pay his portion of independent counsel's fees and expenses, claiming that he lacked the funds to do so.

103.     In May 2009, Mandel filed a grievance against Thrasher with the USPTO with respect to the first provisional patent application filed by Thrasher.  Mandel contended that Thrasher had lied about the inventorship of the intellectual property.  In an affidavit submitted to the USPTO, Mandel claimed he was the inventor of all of White

Nile's intellectual property and that and that Thrasher was merely White Nile's general counsel.  The USPTO ultimately dismissed Mandel's complaint.

104.    Mandel tempered his claims before this Court.  He did not claim to have invented all of White Nile's intellectual property.  He testified, instead, that he was a co-inventor of all ideas.  Mandel's testimony directly conflicted with the testimony of Thrasher as well as the documentary evidence, such as Mandel's consulting agreement and the assignment by Thrasher of his intellectual property.  Although Mandel appears to have obtained some understanding of White Nile's intellectual property through participating in so much litigation about it, Mandel's testimony before this Court lacked depth, detail, and accuracy regarding the nature of White Nile's intellectual property in comparison to the testimony of Thrasher and Coleman.

105.    The Court finds and concludes that Mandel was not, in fact, an inventor or co-inventor of any of the intellectual property at issue.

### J. Mandel Files a Bankruptcy Petition

106.    Since 2006, NeXplore has paid Mandel a total of $2,726,926.61 in salary, commission and bonuses.  NeXplore has also paid or incurred approximately $750,000 in legal fees by or on behalf of Mandel.

107.    On January 25, 2010, Mandel filed a chapter 11 petition in this Court.  The state court was poised to sanction Mandel for his failure to pay Orenstein when he filed for bankruptcy.

108.    In his bankruptcy schedules, Mandel lists the value of his 33 million shares in NeXplore as "unknown."  No professional valuation exists for NeXplore, and it had not yet made a profit as of Mandel's bankruptcy filing.

109.    Orenstein appeared for White Nile in Mandel's bankruptcy case. Orenstein, Mandel, Thrasher and Coleman spent several months litigating with each other.  The Court conducted numerous hearings on motions filed by the parties.  As time passed, however, the Court began expressing concern about Orenstein's role in Mandel's bankruptcy case and, in particular, the absence of any right under the Bankruptcy Code for Orenstein to be paid from Mandel's bankruptcy estate for her ongoing work.[3]

110.    On November 3, 2010, the Court entered a scheduling order on the objections to the claims filed by Thrasher and Coleman.  The Court did not forbid Orenstein from participating in the claims allowance process as the receiver for White Nile, but excused her from any requirement to appear unless Thrasher agreed to pay her fees and expenses.  Thrasher did not agree to pay Orenstein, and Orenstein ceased participating in the litigation between Mandel, Thrasher and Coleman.

111.    Orenstein asserts that she incurred receiver fees, attorneys' fees, and costs since her appointment through March 15, 2011, in the total amount of $645,411.94. Orenstein and her attorneys have filed separate claims in Mandel's bankruptcy case. Those claims, and Mandel's objections to them, are not the subject of this trial.

112.    The parties submitted a lengthy and wide-ranging joint pretrial order, which the Court entered on November 22, 2010.  The pretrial order did not contain a statement of undisputed facts.  Rather, the pretrial order set forth the parties' legal contentions, disputed issues of fact, and disputed issues of law.

113.    The Court tried Mandel's objections to the claims of Thrasher, Coleman and White Nile on November 22 and 23, 2010; December 20 and 21, 2010; January 3, 5,

---

[3] Orenstein was not employed by Mandel's bankruptcy estate and, therefore, had no right to payment of her fees and expenses under § 330 of the Bankruptcy Code.

7, 14, 21 and 31, 2011; and February 16, 2011.  At the conclusion of trial, the Court invited the parties to submit their closing arguments in writing.  The Court specifically requested that the parties cite the evidence in the record that supports each of their claims.

114.    Thrasher, Coleman and Mandel subsequently filed closing statements.  In addition, Thrasher and Coleman filed proposed findings of fact, which contain citations to the exhibits introduced at trial and the testimony of the witnesses presented at trial.

115.    To the extent any finding of fact may be construed to be a conclusion of law, the Court adopts it as such.

### III. CONCLUSIONS OF LAW

1.    Thrasher, Coleman and White Nile timely filed proof of their claims against Mandel pursuant to § 501(a) of the Code.  Thrasher and Coleman attached copies of their state court complaints to their proof of claim forms.  White Nile attached an addendum referencing the claims asserted in its own state court complaint and Thrasher's derivative counterclaims.

2.    Mandel objects to the substance of the claims filed by Thrasher, Coleman and White Nile on numerous grounds.

3.    Mandel's objections to the claims of Thrasher, Coleman and White Nile create a contested matter under Bankruptcy Rule 9014.  *See* FED. R. BANKR. P. 3007.

4.    A claim filed pursuant § 501 enjoys *prima facie* validity.  *See* FED. R. BANKR. P. 3007(f).  *See also Wilson v. Huffman (In re Missionary Baptist Foundation of America, Inc.),* 712 F.2d 206, 212 (5th Cir. 1983).  To sustain an objection, a debtor must present sufficient evidence to overcome the claim's *prima facie* validity.  If the debtor produces such evidence, then the burden shifts to the claimant to establish the validity of

its claim by a preponderance of the evidence. *See In re O'Connor,* 153 F.3d 258, 260 (5th Cir. 1998). The claimant has the ultimate burden of proof. *In Re Fidelity Holding Co., Ltd.,* 837 F.2d 696, 698 (5th Cir. 1988).

5.      In their proofs of claim, Thrasher and Coleman assert numerous claims against Mandel arising under Texas law, namely, (i) theft or misappropriation of trade secrets; (ii) breach of contract, specifically, the nondisclosure agreements, the consulting agreement with Coleman, and the state court settlement; (iii) breach of fiduciary duty; (iv) fraud and fraudulent inducement; and (v) oppression of shareholder rights. Thrasher asserts claims on his own behalf and derivatively on behalf of White Nile. Thrasher and Coleman also request that this Court make findings regarding the ownership of the assets of White Nile (especially its intellectual property) as necessary to determine their claims. They seek to recover actual damages, attorneys' fees, and exemplary damages under Texas law.[4]

6.      Mandel asserts counterclaims against Thrasher on his own behalf and derivatively on behalf of White Nile. In particular, Mandel asserts counterclaims against Thrasher for (i) breach of fiduciary duty, (ii) tortious interference with White Nile's prospective business relationships; (iii) conversion and civil theft, (iv) breach of contract; (v) legal malpractice, (vi) civil conspiracy, and (vii) copyright infringement.

7.      Mandel also asserts counterclaims against Coleman on his own behalf and derivatively on behalf of White Nile. In particular, Mandel asserts claims for (i) breach of contract and (ii) copyright infringement.

8.      The Court will address each of these claims in turn.

---

[4] Coleman and Thrasher are not requesting an award from the Court with respect to their claims for injunctive relief and constructive trust.

9.      As an initial matter, however, the Court must address its jurisdiction in light of the Supreme Court's recent decision in *Stern v. Marshall,* -- S.Ct. --, 2011 WL 2472792 (2011).   The Supreme Court issued *Stern* after the trial in this case.   The Supreme Court's analysis in *Stern* limits this Court's constitutional authority to determine counterclaims to matters that must necessarily be decided in ruling on a creditor's proof of claim.   Several of the counterclaims asserted by Mandel fall outside of this new jurisdictional boundary.

10.      First, Mandel's counterclaims against Thrasher for legal malpractice and breach of contract relate to Thrasher's performance of his duties as general counsel for White Nile.   In light of *Stern*, the Court lacks the constitutional authority to decide these claims.   Second, the Court need not reach Mandel's claims against Coleman and Thrasher for copyright infringement in order to determine the allowability of the claims at issue and, therefore, the Court lacks the constitutional authority to decide that claim as well.

11.      Thrasher and Coleman run afoul of traditional notions of estoppel, finality and law of the case.   These notions prevent re-litigation of their claim against Mandel for breach of the state court settlement agreement.   *See Kaspar Wire Works, Inc. v. Leco Eng'g & Machine, Inc.,* 575 F.2d 530, 535-36 (5th Cir. 1978) (collateral estoppel, or "issue preclusion," "bars the relitigation of "issues actually adjudicated and essential to the judgment" in a prior litigation between the same parties."); *Daniels v. The Equitable Life Assurance Society of the U.S.,* 35 F.3d 210, 212 (5th Cir. 1994)). "the doctrine of issue preclusion "bars relitigation of any 'ultimate issue' of fact actually litigation and essential to the judgment in a prior suit, regardless of whether the second suit is based upon the same cause of action."); *Friend v. Provenza (In re Provenza)*, 316 B.R. 177, n.

236 (Bankr. E.D. La. 2003) (summarizing the law of the case doctrine).  As Mandel points out in his closing brief, the underlying state court previously determined, as a matter of law, the parties failed to form an enforceable settlement agreement.  Thrasher has not provided this Court with legal or procedural authority that would support a reversal of the state court's decision.

12.    The Court now turns to the remaining claims asserted by the parties.

### A. Inventorship of the Intellectual Property at Issue

13.    One of the core disputes in this adversary proceeding is who owns the patents Coleman and Thrasher applied for while working for White Nile.  Thrasher and Coleman each assert they own all of the equitable and legal title to the intellectual property and trade secrets at issue.  *See* 28 U.S.C. § 2201.  Mandel, despite the USPTO's rejection of his inventorship claim, asserts that he was a co-inventor and has an ownership interest in the intellectual property.

14.    To the extent Mandel has any interest in the intellectual property, his interest is property of the bankruptcy estate.  *See* 11 U.S.C. § 541(a).  This Court has jurisdiction to determine the extent of Mandel's interest, if any, in the 299 patent, the 802 patent, and the other intellectual property developed during White Nile's short life.  *See* 28 U.S.C. § 1334(e)(1).

15.    A patented invention may be the work of two or more joint inventors.  Because "[c]onception is the touchstone of inventorship," each joint inventor must generally contribute to the conception of the invention.  *Burroughs Wellcome Co. v. Barr Lab., Inc.,* 40 F.3d 1223, 1227-28 (Fed. Cir. 1994).  "Conception is the 'formation in the mind of the inventor, of a definite and permanent idea of the complete and operative

invention, as it is hereafter to be applied in practice.' " *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir. 1986) (quoting 1 ROBINSON ON PATENTS 532 (1890)). "To determine whether [a person] made a contribution to the conception of the subject matter of [a claim, the] court must determine what [the person's] contribution was and then whether that contribution's role appears in the claimed invention." *Ethicon, Inc. v. U.S. Surgical Corp. (Ethicon II)*, 135 F.3d 1456, 1461 (Fed. Cir. 1998).

16.     Mandel asserts that he contributed to the development of the 299 and 802 patents and, therefore, that he should have been listed as a co-inventor. The Court finds and concludes, however, that Mandel made no contribution to the ideas encapsulated in these patents. Mandel could not articulate a coherent explanation of 299 and 802 patents at trial and clearly did not have a firm and definite idea of the inventions. Further, one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention. *See Sewall v. Walters,* 21 F.3d 411, 416-17 (Fed. Cir. 1994); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,* 758 F.2d 613, 624 (Fed. Cir. 1985) ("An inventor 'may use the services, ideas and aid of others in the process of perfecting his invention without losing his right to a patent.'" (quoting *Hobbs v. U.S. Atomic Energy Comm'n.,* 451 F.2d 849, 864 (5th Cir. 1971))).

17.     Alternatively, Mandel asserts that White Nile owns the intellectual property developed by Coleman and Thrasher. With respect to Coleman, Mandel asserts that the consulting agreement he executed with White Nile resulted in an assignment of Coleman's interest in the intellectual property to White Nile. As discussed more fully below, however, White Nile breached its consulting agreement with Coleman by failing to pay him for all of his work, among other things. When one party to a contract commits

28

a material breach of that contract, the other party is discharged or excused from further performance under Texas law. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.,* 134 S.W.3d 195, 196 (Tex. 2004).

18.     With respect to Thrasher, Mandel asserts that White Nile has not released Thrasher from the terms of the assignment and, therefore, White Nile owns Thrasher's intellectual property.  The terms of the assignment, however, provided for a reversion to Thrasher under certain circumstances.  Under the terms of the assignment, Thrasher's interest in the intellectual property he assigned to White Nile reverted to him when White Nile failed to prosecute the provisional patent applications by filing timely non-provisional (utility) applications.  Thrasher was forced to file utility applications himself as the deadlines were expiring.

19.     The Court, therefore, concludes that Mandel has no ownership interest in the 299 patent, the 802 patent, or any other intellectual property or trade secrets they developed by Thrasher or Coleman during their tenure at White Nile.

**B. Ownership of the Intellectual Property at Issue[5]**

20.     Thrasher also seeks a declaratory judgment that Mandel's shares in White Nile failed for a lack of consideration.  Thrasher contends that Mandel did not provide all of the consideration required for the issuance of his shares of White Nile.

21.     Mandel denies Thrasher's allegations.  He contends that the fact that White Nile issued stock certificates to him is a binding admission that White Nile received all of the required consideration for the stock.  He also contends that the

---

[5] Thrasher and White Nile did not include this claim in their closing arguments.  They did not, however, expressly waive or abandon the claim, and the Court addresses it out of an abundance of caution.

statement of required consideration attached to the version of the Unanimous Consent introduced into evidence by Thrasher is forged or fraudulent.[6]

22.     Mandel failed to offer any credible evidence supporting his assertion that Thrasher has offered this Court a forged or fraudulent document.   The Unanimous Consent t references the attached statement of consideration.

23.     Moreover, Mandel has not provided any authority in support of his argument that the issuance of shares to him is a deemed admission that White Nile received all of the consideration required from Mandel.   The documentary evidence reflects that Mandel had not paid for his stock at the time of issuance and that his consideration was a promise of future performance.   Mandel did not tender the promised performance, namely, he did not develop White Nile's intellectual property at his own expense.

24.     Mandel was not a co-inventor of any of Thrasher's intellectual property, as previously discussed, and he did not execute any assignment of intellectual property or trade secrets in favor of White Nile as consideration for his interest in the company.

25.     The Court, therefore, concludes that Mandel's shares in White Nile fail for lack of consideration and that the White Nile stock is not property of this estate.

### C. Breach of Fiduciary Duty

26.     Thrasher, on his own behalf and on behalf of White Nile, asserts a breach of fiduciary duty claim against Mandel.[7]   Thrasher asserts that Mandel's conduct from and after December 2005 breached his duties of good faith, fairness, honesty, full

---

[6] Although Mandel contends that the statement of consideration is forged when Thrasher uses it against him, Mandel argues in the parties' joint pretrial order that Thrasher's shares should fail for lack of consideration if Thrasher failed to assign his intellectual property to White Nile.

[7] Coleman does not assert a breach of fiduciary duty claim against Mandel.

disclosure, and loyalty as well as his duty to refrain from competing with White Nile and his duty not to usurp White Nile's corporate opportunities.

27.     In order to prevail on a breach of fiduciary duty claim, a plaintiff must prove: (1) the existence of a fiduciary relationship between the plaintiff and the defendant; (2) a breach by the defendant of his or her fiduciary duty to the plaintiff; and (3) an injury to the plaintiff or benefit to the defendant as a result of the breach. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App. -- Houston [14th Dist.] 2008, pet. denied).  A plaintiff bears the burden of proving each element of his breach of fiduciary duty claim.  *See, e.g., Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 792 (Tex. App.--Dallas 2002, pet. denied).

28.     In this case, Thrasher alleges two sources of Mandel's fiduciary duty. First, Thrasher alleges that he and Mandel were joint venturers and, as such, Mandel owed him a fiduciary duty.  The purpose of the joint venture, according to Thrasher, was to develop and market his intellectual property.

29.     The Court, having considered the evidence and credible testimony, concludes that this alleged joint venture culminated in the formation of White Nile.  The Court, therefore, concludes that Thrasher has failed to establish a breach of fiduciary duty by Mandel based on a joint venture theory.

30.     Thrasher also asserts that Mandel breached his fiduciary duties as an officer of White Nile.  The parties agree that corporate officers and directors owe a fiduciary duty to the corporations they serve – in this case, White Nile.  *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 676 (Tex. 1963).  Thrasher accuses Mandel of breaching his fiduciary duties to White Nile based on his version of

events (*i.e.*, that Mandel took the intellectual property and trade secrets he had assigned to White Nile in order to start a competing company that Mandel would own and control).

31.     Mandel responds with a similar claim against Thrasher.  Mandel accuses Thrasher of breaching his fiduciary duties to White Nile based on his version of events (*i.e.*, that he is the inventor of White Nile's intellectual property, that White Nile became defunct due to Thrasher's antagonism toward Mandel, and that White Nile owns the intellectual property created by Mandel).  Mandel also asserts that he did not usurp White Nile's corporate opportunities because it had no such opportunities after Thrasher's actions rendered the company defunct.

32.     The Court does not agree with Mandel's version of events as a matter of fact.  As the Court has previously explained, Mandel did not invent or co-invent any of the intellectual property at issue.

33.     The preponderance of the evidence at trial established that Mandel and Thrasher became increasingly hostile after the trip to Manila in December 2005.  Thrasher no longer believed that Mandel had any intention of investing his own money in White Nile or that Mandel's vaunted connections would lead to any substantial investment by third parties in White Nile.

34.     As the antagonism emerged, alliances formed among White Nile's officers, employees and consultants.   Martin and Coleman agreed with Thrasher.  Skinner, who was young and only peripherally involved in White Nile, allied himself with Mandel.  Williams, who Mandel had brought into White Nile, also allied himself with Mandel, as did Savard (perhaps unwittingly).

35.    By the end of December 2005, Mandel had decided to part ways with the disillusioned Thrasher, Coleman and Martin.  This decision might not have led to litigation if Mandel had simply walked away from White Nile.  However, instead of walking away, Mandel used his allies to orchestrate a takeover so that he could obtain access to White Nile's investors, intellectual property and trade secrets.

36.    Mandel attempts to minimize his conduct by asserting that White Nile was defunct when he formed NeXplore.  However, even if White Nile had ceased to operate, Mandel's conduct violated his fiduciary duties to White Nile as well as White Nile's creditors and shareholders.  Rather than seek to preserve White Nile's assets, Mandel transferred the Laynes' investments to NeXplore, recruited some of White Nile's key employees and consultants, copyrighted the SAQQARA documents created by Coleman, and attempted to take White Nile's intellectual property for the benefit of his new company.  These actions made it impossible for White Nile to pay its creditors, such as Coleman, or even to liquidate.

37.    The directors and officers of a corporation owe a general fiduciary duty of fairness to shareholders in actions which affect the shareholders directly.  *See Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 533–34 (5th Cir. 2004); *Newby v. Enron Corp.*, 188 F. Supp. 2d 684 (S.D. Tex. 2002).  In addition, officers and directors of an insolvent corporation owe a fiduciary duty to creditors to assure that creditors get their fair share of the corporation's assets.  *See Fagan v. La Gloria Oil and Gas Co.,* 494 S.W.2d 624, 628 (Tex. App.—Houston [14th Dist.] 1973, no writ).  Thrasher and Coleman have established, by a preponderance of the evidence, that Mandel breached his fiduciary

duties to White Nile as well as his fiduciary duties to Thrasher (as a shareholder of White Nile) and Coleman (as a creditor of White Nile) through the following specific conduct:

    a.   Failing to timely prosecute White Nile's patent rights;

    b.   Failing to enforce the nondisclosure agreements executed by Williams, Skinner Layne, and Eddie Layne;

    c.   Releasing all officers and employees of White Nile from their obligations under the nondisclosure agreements;

    d.   Transferring the money invested in White Nile to NeXplore;

    e.   Competing with White Nile through NeXplore;

    f.   Disclosing or disseminating White Nile's intellectual property and trade secrets to third parties who were not acting for White Nile; and

    g.   Failing to disclose to other officers and shareholders the formation of NeXplore.

38.    Thrasher asserts, on behalf of White Nile, that White Nile is entitled to an award against Mandel for its actual damages as well as an award of any profit or benefit that Mandel received as a result of his breaches of fiduciary duty. Thrasher does not seek to establish a precise amount of damages. Rather, in his closing brief, he argues that the damages for breach of fiduciary overlap the damages White Nile seeks for Mandel's misappropriation of intellectual property and trade secrets.

### D. Fraud/Fraudulent Inducement

39.    Thrasher and Coleman each assert fraud claims against Mandel. Coleman accuses Mandel of making false statements in order to induce him to enter into a

34

consulting agreement with White Nile. Thrasher asserts that Mandel fraudulently induced him to participate in a joint venture and the creation of White Nile in order to convert or misappropriate Thrasher's intellectual property. Thrasher, on behalf of White Nile, also asserts that Mandel fraudulently misrepresented the existence of an investor and developers in the Philippines.

40.    Under Texas law, to establish fraud, a plaintiff must prove that (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the defendant made the representation with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury. *E.g., Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex. 1998).

41.    A contractual promise made with no intention of performing may give rise to an action for fraudulent inducement. *Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 304 (Tex. 2006). A promise of future performance also may form the basis of a fraud claim if the promise was made with no intention of performing at the time the promise was made. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex. 1998).

42.    Here, Thrasher asserts Mandel misrepresented material facts to him, such as his intent to invest $300,000 of his own funds in White Nile to develop its intellectual property, in order to induce Thrasher to go into business with him. Thrasher asserts that this representation was false when made and that Mandel had no intention of contributing

funds to White Nile.  Indeed, the preponderance of the evidence establishes that Mandel never intended to risk his own money on White Nile.

43.     Thrasher, on behalf of White Nile, asserts that Mandel fraudulently represented that he had recruited an investor in the Philippines who had placed at least $1 million in escrow and that there was a team of highly qualified individuals working to develop White Nile's intellectual property.  Thrasher asserts that White Nile relied on these representations by dropping its negotiations with MDS to develop the "back end" of White Nile's search engine.  Thrasher further asserts that White Nile relied on Mandel's representations by giving Mandel full access to the intellectual property and trade secrets being developed by Coleman and Thrasher.

44.     Coleman asserts that Mandel made numerous false and inaccurate representations to him in order to induce him to become a consultant for White Nile. Coleman asserts Mandel falsely represented that (1) White Nile was formed by an initial investment of $100,000 each by Mandel and Thrasher; (2) Eduardo had formally agreed to invest at least $1 million in development efforts and that he had a development team in place in Manila; (3) White Nile had a business plan; (4) White Nile had pro forma financial projections; (5) the local firm that White Nile was hiring to create system documents was being paid by Mandel in cash; and (5) Martin and Williams were working full-time for White Nile.

45.     Mandel denies that he made any false statements to Thrasher, Coleman or White Nile.  He contends, alternatively, that if he did make any false statements, Thrasher, Coleman and White Nile did not reasonably and justifiably rely upon them.

46.     The Court finds and concludes that Mandel, in fact, made the alleged representations to Thrasher, Coleman and White Nile.  The Court further finds these representations were false and that Mandel knew they were false when he made them.

47.     Mandel made the alleged false representations with the intent that Thrasher, Coleman and White Nile act and rely upon them.  Thrasher reasonably relied on Mandel's representations by entering into business with him and agreeing that Mandel would hold an equity interest in White Nile equal to his own.  Coleman reasonably relied on Mandel's representations by becoming a consultant for White Nile, executing a consulting agreement, agreeing to defer his compensation, and completing the initial scope of work called for by the consulting agreement.  White Nile reasonably relied upon Mandel's representations by dropping the negotiations with MDS and providing Mandel with full access to the trade secrets and intellectual property that Thrasher and Coleman were developing.

48.     Thrasher, Coleman and White Nile were injured by Mandel's false statements and misrepresentations.  Thrasher lost control of his intellectual property and was forced to watch from the sidelines as Mandel formed a new, apparently profitable company that appeared to be marketing a search engine using Thrasher's ideas.  White Nile, likewise, was unable to develop its search engine.  In addition, Coleman still has not been paid in full for his work, and he has not received the equity interest in White Nile that he was promised in his consulting agreement.

49.     Thrasher, Coleman and White Nile seek an award in an amount that would prevent Mandel's unjust enrichment as well as exemplary damages.  Thrasher, Coleman and White Nile have not specified an amount that would prevent Mandel's unjust

enrichment. Rather, they seem to argue in their closing brief that their damages for fraud overlap the damages they seek for Mandel's misappropriation of intellectual property and trade secrets.

## E. Breach of Contract

50.     Thrasher claims that Mandel's actions breached the non-disclosure agreements Mandel signed with Thrasher. Thrasher asserts that Mandel violated the nondisclosure agreements by disclosing confidential intellectual property developed by Thrasher or developed from Thrasher's ideas to NeXplore and its agents or employees. Thrasher, on behalf of White Nile, also asserts a claim against Mandel for breach of his non-disclosure agreement with White Nile. In addition, Coleman and Thrasher assert that they are third-party beneficiaries of Mandel's nondisclosure agreement with White Nile.

51.     Mandel denies that any breach of contract occurred. He also challenges the standing of Thrasher and Coleman as third party beneficiaries.

52.     To establish a breach of contract, Thrasher and Coleman must establish following essential elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *See B & W Supply, Inc. v. Beckman,* 305 S.W.3d 10, 16 (Tex. App. -- Houston [1st Dist.] 2009, pet. denied).

53.     Here, two valid non-disclosure agreements exist – one between Thrasher and Mandel, and one between White Nile and Mandel.

54.     With respect to the standing of Thrasher and Coleman as beneficiaries of the agreement between Mandel and White Nile, a third-party beneficiary contract cannot be created by implication. *MCI Telecomm. Corp. v. Tex. Util. Elec. Co.,* 995 S.W.2d

647, 651 (Tex. 1999).   A third-party beneficiary will not be recognized unless that intention is clearly written or evidenced in the contract.   *Id.*   Thus, "[t]he fact that a person is directly affected by the parties' conduct, or that he 'may have a substantial interest' in a contract's enforcement, does not make him a third party beneficiary."   *Loyd v. ECO Res., Inc.,* 956 S.W.2d 110, 134 (Tex. App. -- Houston [14th Dist.] 1997, no writ).   The law presumes parties contract for themselves unless it "clearly appears" that they intended a third party to benefit from the contract.   *MCI Telecomm.,* 995 S.W.2d at 651.   "If there is any reasonable doubt as to intent to confer a direct benefit, the third-party beneficiary claim must fail."   *MJR Corp. v. B & B Vending Co.,* 760 S.W.2d 4, 11 (Tex. App. -- Dallas 1988, writ denied).

55.     In this case, Thrasher and Coleman were not stated beneficiaries of Mandel's non-disclosure agreement with White Nile.   Although Mandel's breach of that agreement clearly affected them, the Court does not find any clear intent to confer a direct benefit on Thrasher or Coleman by way of Mandel's non-disclosure agreement with White Nile.   The Court, therefore, cannot construe Thrasher or Mandel to be third party beneficiaries of Mandel's non-disclosure agreement with White Nile.

56.     With respect to the direct claims of Thrasher and White Nile for Mandel's breach of his respective non-disclosure agreements with them, Thrasher and White Nile provided Mandel with full access to Thrasher's intellectual property pursuant to these agreements.   Mandel disclosed intellectual property containing or developed from the ideas of Thrasher to NeXplore or its employees or agents.   In doing so, Mandel breached his promises to Thrasher and White Nile.   Mandel's conduct significantly reduced the

value of White Nile, and Thrasher suffered actual damages as a result of this loss in value as well as the ensuing litigation over ownership and inventorship.

57.    Thrasher and White Nile have not specified an amount of actual damages or an amount that would prevent Mandel's unjust enrichment.  Rather, they argue in their closing brief that their damages for breach of contract overlap the damages they seek for Mandel's misappropriation of intellectual property and trade secrets.

## F. Conspiracy

58.    Thrasher asserts that Mandel conspired with Williams, Skinner and Skinner's parents to misappropriate and use Thrasher's intellectual property at NeXplore, in order to deprive Thrasher of the opportunity to profit from his own inventions, and to destroy the value of Thrasher's interest in White Nile.  Coleman likewise asserts that Mandel conspired with Williams, Skinner and Skinner's parents to misappropriate trade secrets and confidential property he owns.  White Nile asserts that Mandel conspired with Williams, Skinner and Skinner's parents to wrongfully oust Thrasher, to prevent White Nile's development of its intellectual property, to facilitate NeXplore's exploitation of White Nile's intellectual property, and to use White Nile as a litigation tool.

59.    A defendant's liability for conspiracy depends on "participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable."  *See Tilton v. Marshall,* 925 S.W.2d 672, 681 (Tex. 1996).

60.    A civil conspiracy is a combination by two or more people to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means.  *See Goldstein v. Mortenson,* 113 S.W.3d 769, 778 (Tex. App.-Austin 2003, no pet.).  A conspiracy requires a preconceived plan and unity of design and purpose.  *Id.*  "The

required elements of a civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005); *Boales v. Brighton Builders, Inc.,* 29 S.W.3d 159, 164 (Tex. App. -- Houston [14th Dist.] 2000, pet. denied). In addition, civil conspiracy requires specific intent to agree to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *A.H. Belo Corp. v. Corcoran,* 52 S.W.3d 375, 384 (Tex. App. -- Houston [1st Dist.] 2001, pet denied) (citing *Juhl v. Airington,* 936 S.W.2d 640, 644 (Tex. 1996)).

61.     For specific intent to exist in a civil conspiracy claim, the parties must be aware of the harm or wrongful conduct at the beginning of the agreement among them and intend to cause that harm through illegal means. *San Antonio Credit Union v. O' Connor,* 115 S.W.3d 82, 91 (Tex. App. -- San Antonio 2003, pet. denied).

62.     Proof of a civil conspiracy may be, and usually must be, made by circumstantial evidence. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.,* 435 S.W.2d 854, 858 (Tex. 1969).

63.     Here, Thrasher presented evidence of a combination of two or more persons, namely, Mandel, Williams and the Laynes. The evidence produced by Thrasher, and the reasonable inferences that can be drawn from the evidence, establish a conspiracy by Mandel, Williams and the Laynes to misappropriate White Nile's intellectual property and trade secrets by starting up NeXplore, transferring White Nile's cash and investment opportunities to NeXplore, taking control of the intellectual property and trade secrets developed by Thrasher, and using White Nile's intellectual property as at least a starting

point to design internet search engine technology for NeXplore.  The evidence produced by Coleman likewise establishes that Mandel also conspired with Williams and the Laynes to misappropriate Coleman's trade secrets and intellectual property for NeXplore's benefit.

64.     While it is true there was no direct evidence Mandel, Williams, and the Laynes got together and agreed to take advantage of Thrasher, Coleman and White Nile, they were fully aware of exactly what they were doing.  They understood that their conduct was wrongful and in breach of their legal and contractual obligations to White Nile and Thrasher.  Indeed, they expressly released themselves from their obligations under the non-disclosure, non-competition and consulting agreements they had signed with White Nile, Thrasher and Coleman.

65.     The actions of Mandel and his co-conspirators were in breach of their duties to White Nile.  Their actions were intentional and not simply negligent.  Moreover, Mandel's involvement was not merely collateral.  *Laxson v. Giddons,* 48 S.W.3d 408, 410 (Tex. App. -- Waco 2001, pet. denied).  Mandel was the ringleader, and his co-conspirators were enthusiastic participants in his circus.

66.     Coleman and Thrasher do not set out a precise amount of damages they seek for their conspiracy claims.  Rather, they argue in their closing brief that their damages for conspiracy overlap the damages they seek for Mandel's misappropriation of intellectual property and trade secrets.

### G. Shareholder Oppression

67.     Thrasher also complains that White Nile has mistreated him as a shareholder and that Mandel, who orchestrated White Nile's oppressive conduct, may be

held liable him.[8]  Thrasher specifically asserts that the same conduct that constitutes a breach of fiduciary duty, as discussed above, also constitutes shareholder oppression.

68.    There is no set standard for determining whether shareholder oppression has occurred.  *Davis v. Sheerin,* 754 S.W.2d 375, 382 (Tex. App. -- Houston [1st Dist.] 1988, writ denied).  Rather, a court must examine the facts as a whole and determine whether the corporation's conduct has deprived a minority shareholder of the shareholder's reasonable expectations as an equity holder of the corporation.  *Id.* at 382–83.  The corporation's conduct must not be protected by the business judgment rule.  *Id.*  However, "[c]ourts take an especially broad view of the application of oppressive conduct to a closely-held corporation, where oppression may more easily be found."  *Davis,* 754 S.W.2d at 381.

69.    In *Davis,* for example, the majority shareholders conspired to deprive the minority shareholder of his stock and breached their fiduciary duty by wrongfully withholding dividends and wasting corporate funds on personal attorney's fees.  754 S.W.2d at 382.

70.    Here, the Court finds and concludes that Mandel's breaches of fiduciary duty and usurpation of White Nile's business opportunities also constitute acts of shareholder oppression.  In addition, his conduct with respect to the formation and operation of NeXplore, the failure to prosecute White Nile's intellectual property, the use of litigation in an attempt to prevent Thrasher from reclaiming his intellectual property, and NeXplore's development of similar intellectual property, all constitute oppressive conduct.  Mandel's conduct transformed White Nile into little more than an empty shell.

_____

[8] In the parties' joint pre-trial order, Thrasher generally asserted a shareholder oppression claim against Mandel.  He did not include a detailed discussion of this claim in the order.  Thrasher's closing arguments, in contrast, discuss his shareholder oppression claim at length.

71.     As damages, Thrasher asserts that he is entitled to the benefits or profits enjoyed by Mandel as a result of his conduct.  Thrasher does not set out a precise amount benefits or profits, but appears to argue that, as with his other claims, his damages for shareholder oppression overlap the damages he seeks for Mandel's misappropriation of intellectual property and trade secrets.

## H. Misappropriation or Theft of Trade Secrets

72.     The Court now turns to the claims of Thrasher, Coleman and White Nile for misappropriation or theft of trade secrets by Mandel.

73.     Under the Texas Theft Liability Act, "theft" means "unlawfully appropriating property or unlawfully obtaining services as described by Section ... 31.05 ... [of the] Penal Code."  TEX. CIV. PRAC. & REM. CODE § 134.002(2).  Section 31.05 of the Penal Code is titled "Theft of Trade Secrets," and states "[a] person commits an offense if, without the owner's effective consent, he knowingly: (1) steals a trade secret; (2) makes a copy of an article representing a trade secret; or (3) communicates or transmits a trade secret."  TEX. PENAL CODE § 31.05(b).  The Texas Penal Code defines "trade secret" as "the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes."  TEX. PENAL CODE § 31.05(a)(4); *See* TEX. CIV. PRAC. & REM. CODE § 134.002(2) (incorporating definitions from the Penal Code).

74.     Misappropriation of trade secrets is also a common-law tort cause of action.  *Trilogy Software, Inc. v. Callidus Software, Inc.,* 143 S.W.3d 452, 463 (Tex. App. -- Austin 2004, pet. denied).   Under Texas law, a plaintiff can recover for

misappropriation of trade secrets by establishing (1) existence of a trade secret, (2) breach of a confidential relationship or improper discovery of a trade secret, (3) use of the trade secret without the plaintiff's authorization, and (4) resulting damages. *See Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 366-67 (Tex. App. -- Dallas 2009, pet. denied). The appropriate measure of damages in such cases is a "reasonable royalty." *Univ. Computing Co. v. Lykes-Youngstown Corp.,* 504 F.2d 518, 536 (5th Cir. 1974). "This does not mean a simple percentage of actual profits; instead, the trier of fact ... must determine 'the actual value of what has been appropriated.' " *Metallurgical Indus. Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1208 (5th Cir. 1986) (quoting *Vitro Corp. v. Hall Chem. Co.,* 292 F.2d 678, 683 (6th Cir. 1961) and citing *Univ. Computing Co.,* 504 F.2d at 537).

### 1. Existence of a Trade Secret

75.    In this case, Mandel contends that Thrasher, Coleman and White Nile never possessed any trade secrets. Although patents have issued for one of Thrasher's ideas as well as for one of the ideas Thrasher and Coleman developed together, Mandel asserts that none of their ideas qualify as trade secrets because they were based on everyday knowledge or were merely accumulations based on information in the public domain.

76.    A trade secret may consist of any formula, pattern, device, or compilation of information used in one's business that provides an opportunity to obtain an advantage over competitors who do not know or use it. *Computer Assocs. Int' l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex. 1996). Items such as customer lists, pricing information, client information, contacts, market strategies, blueprints, and drawings have all been

shown to be trade secrets. *Am. Precision Vibrator Co. v. Nat'l Air Vibrator Co.,* 764 S.W.2d 274, 276-79 (Tex. App. -- Houston [1st Dist.] 1988, no writ); *Tex. Integrated Conveyor Sys., Inc.,* 300 S.W.3d at 367; *Rugen v. Interactive Bus. Sys., Inc.,* 864 S.W.2d 548, 552 (Tex. App. -- Dallas 1993, no writ). Use of a trade secret means commercial use, by which a person seeks to profit from the use of the secret. *Global Water Group, Inc. v. Atchley,* 244 S.W.3d 924, 930 (Tex. App. -- Houston [1st Dist.] 2008, pet. denied); *Atl. Richfield Co. v. Misty Prods., Inc.,* 820 S.W.2d 414, 422 (Tex. App. -- Houston [14th Dist.] 1991, writ denied).

77.    In his post-trial brief, Mandel argues that White Nile's alleged trade secrets were, in fact, public knowledge. His argument is based on the undisputed fact that Thrasher and Coleman used materials from the public domain to create White Nile's search engine. Mandel has not provided this Court with authority to support his argument that the use of materials within the public domain means that White Nile's technology was not a trade secret.

78.    Dr. Nicholas Lawrence, an expert in search engine technologies, testified that the intellectual property developed by Thrasher and Coleman combined several common elements in a novel and inventive way. To use a familiar analogy -- sugar, milk and eggs are not unique, but a recipe with these ingredients can create a unique, award-winning cake.

79.    Mandel also argues that Thrasher failed to establish that he kept White Nile's intellectual property secret. "It is axiomatic that the core element of a trade secret must be that it remain a secret." *Schalk v. State,* 823 S.W.2d 633, 640 (Tex. Crim. App. 1991). However, "absolute secrecy is not required"-- rather, a substantial element of

secrecy must exist. *Id.* (citing *Q–Co Indus., Inc. v. Hoffman,* 625 F.Supp. 608 (S.D.N.Y. 1985)). A substantial element of secrecy exists when "'except by use of improper means, there would be difficulty in acquiring the information.'" *Hoffman,* 625 F.Supp. at 617 (quoting *A.H. Emery Co. v. Marcan Prods. Corp.,* 389 F.2d 11, 16 (2nd Cir. 1968))

80.     In this case, Mandel seeks to support his argument by pointing out that the trial record does not contain copies of nondisclosure agreements for every person who may have heard about some aspect of the technology White Nile was seeking to develop. Mandel asserts that Thrasher was careful at the beginning to obtain such agreements from everyone, but then he got sloppy.   The Court, however, finds that the preponderance of the evidence establishes that Thrasher made every reasonable effort to maintain confidentiality and secrecy.   The Court further finds that the preponderance of the evidence establishes that it would have been difficult to acquire information about White Nile's intellectual property except by improper acts.

### 2. Breach of a Confidential Relationship and Use of Trade Secret Without Authorization

81.     Improper means of acquiring trade secrets include theft, fraud, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or under the circumstances.  *Astoria Indus. of Iowa, Inc. v. SNF, Inc.,* 223 S.W.3d 616, 636 (Tex. App. -- Fort Worth 2007, pet. denied).

82.     As this Court has previously discussed, Mandel acquired White Nile's trade secrets through his position as an officer of White Nile.  He betrayed his position of trust, breached his contracts with Thrasher and White Nile, and breached his fiduciary duty to White Nile, by knowingly communicating White Nile's trade secrets to NeXplore.  Furthermore, he stifled the objections that Thrasher and Martin raised on

behalf of White Nile by orchestrating Thrasher's removal as an officer of White Nile, among other things.

83.     With respect to the required element of actual use or disclosure of the trade secret, use of the trade secret means commercial use by which the offending party seeks to profit from the use of the secret.  *See Metallurgical Indus. Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1205 (5th Cir. 1986); *Atlantic Richfield Co. v. Misty Products, Inc.,* 820 S.W.2d 414, 422 (Tex. App. -- Hous. [14th Dist.] 1991, writ denied).  Evidence of a similar product may give rise to an inference of actual use under certain circumstances. *See Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 285 F.3d 1353, 1361 (Fed. Cir. 2002).

84.     Here, NeXplore, like White Nile, developed search engine technology. They used many of the same employees and consultants and had a similar business plan. Savard, for example, had the same role in development at NeXplore as he enjoyed at White Nile.  Mandel even joked with Savard that the only thing that was changing was the name of the company.

85.     Mandel ensured that NeXplore's employees had access to White Nile's intellectual property, including its patent applications and the SAQQARA documents. Mandel thereby sought to profit from White Nile's trade secrets while, at the same time, denying any profit to White Nile's shareholders.  In addition, on the issue of similarity, Dr. Kiumarse Zamanian testified, credibly, that the concepts behind the White Nile and NeXplore search engines were very similar.

*3. Entitlement to Damages*

86.     In their closing statement, Thrasher and Coleman advance a "lost asset" theory of damages.  In *Schonfeld v. Hilliard,* 218 F.3d 164 (2d Cir. 2000), the Second Circuit determined that the plaintiff could recover, as consequential damages, the value of the asset (in that case, broadcast contracts) it lost because of the defendant's breach of contract.   In *Schonfeld,* the court determined the market value of the lost asset by considering what a hypothetical buyer would pay for the chance to earn future profits. The best evidence of this value is an actual sale of the asset or, as in *Schonfeld*, evidence of a recent arms-length, negotiated offer to purchase the asset.

87.     Although White Nile never achieved profitability, Thrasher and Coleman contend that White Nile had a fair market value of $56 million based on an analysis by their expert, Brad Taylor.  Taylor estimated the market value of numerous, successful start-up companies in the same general industry as White Nile for which he could find valuations in the December 2005 and January 2006 timeframe.  The Court, however, is not persuaded by Taylor's analysis or his expert report.  Taylor's calculations of market value fail to adequately account for the extremely high failure rate of companies like White Nile.

88.     Dr. Gilbert F. Amelio also testified for Thrasher and Coleman on the issue of valuation.  Prior to the emergence of hostilities between Thrasher and Mandel, Martin told Amelio about White Nile as part of his efforts to generate interest in the company. At trial, Amelio testified that he saw potential in White Nile, and Thrasher and Coleman urge this Court to place great weight in his testimony that White Nile eventually might have been worth as much as $56 million.

89.     Amelio did *not* testify that White Nile was actually worth $56 million. Moreover, his testimony in support of Taylor's valuation of White Nile was offset by his practical experience with companies like White Nile.  Amelio recognized that White Nile would have required a significant financial investment to develop.  He also recognized that at least 80% of companies like White Nile fail to become profitable and that White Nile's potential would not be bankable for years – if ever.  Amelio testified that he did not perform a formal due diligence review on White Nile, and he was not sure whether he would have invested in the company.

90.     The evidence of NeXplore's fair market value is, at best, fuzzy.  Taylor testified about obtaining value information from NeXplore's own website – information that NeXplore subsequently removed.  In his bankruptcy schedules, Mandel listed the value of his 33 million restricted shares in NeXplore as "unknown."

91.     The fact that Mandel has received the total sum of $2,726,926 in salary from NeXplore and that NeXplore has paid or incurred $725,789 in attorneys' fees and costs on behalf of Mandel is not necessarily an indication of value.  Indeed, such actions conceivably could have eroded NeXplore's value to investors.

92.     In the alternative, Thrasher and Coleman argue that this Court should use the $300,000 investment made by the Laynes in exchange for 75,000 shares of White Nile as evidence that White Nile had a market value of $219 million in December 2005. However, the Laynes received false information about Eduardo's investment in White Nile at the investor meeting in Arkansas, and their subsequent decision that 75,000 shares of White Nile was worth $300,000 is not credible evidence of the fair market value of

White Nile.  The value of White Nile had not been tested by the market when the Laynes

agreed to invest in the company.

93.    The Court, for all of the foregoing reasons, concludes that a "lost asset"

theory is not helpful for determining damages based on the facts of this case.

94.    Thrasher and Coleman alternatively argue for damages based on profits or

benefits to Mandel, NeXplore, and Mandel's co-conspirators.   As stated by the Fifth

Circuit,

> If the defendant enjoyed actual profits, a type of restitutionary remedy can
> be afforded the plaintiff -- either recovering the full total of defendant's
> profits or some apportioned amount designed to correspond to the actual
> contribution the plaintiff's trade secret made to the defendant's
> commercial success.  Because the primary concern in most cases is to
> measure the value to the defendant of what he actually obtained from the
> plaintiff, the proper measure is to calculate what the parties would have
> agreed to as a fair price for licensing the defendant to put the trade secret
> to the use the defendant intended at the time the misappropriation took
> place.

*Univ. Computing Co.,* 504 F.2d at 538-39.

95.    In calculating what a fair licensing price would have been had the parties

agreed, a court should consider such factors as the resulting and foreseeable changes in

the parties' competitive posture; prices past purchasers or licensees may have paid; the

total value of the secret to the plaintiff, including the plaintiff's development costs and the

importance of the secret to the plaintiff's business; the nature and extent of the use the

defendant intended for the secret; and whatever other unique factors in the particular case

might have been affected by the parties' agreement, such as the ready availability of

alternative processes.   *Metallurgical Indus. Inc.,* 790 F.2d at 1208 (citing *Univ.*

*Computing Co.,* 504 F.2d at 540).  "Estimation of damages, however, should not be based

on sheer speculation." *Id.*   If too few facts exist to permit the trier of fact to calculate

proper damages, then a reasonable remedy in law is unavailable.   *Id.*

96.     Here, NeXplore has never made a profit.   Indeed, the market value of

NeXplore appears to be on a sharply downward trajectory.   NeXplore's shares were

trading between $4.25 a share and $1.25 a share on the "Pink Sheets" exchange in the

second quarter of 2007.   By August 2010, a thin volume of less than 5,000 of NeXplore's

shares per day were trading at only $0.30 per share.   Setting aside the restrictions of

Mandel's shares, and ignoring the lack of demand for a large volume of those shares,

Mandel would receive only $9.9 million for all of his 33 million shares in NeXplore at a

price of $0.30 per share.

97.     The Court finds and concludes that Thrasher and Coleman were damaged

by the conduct of Mandel, and that Thrasher and Coleman should prevail on their claims

for misappropriation or theft of their trade secrets.

98.     In cases where damages should be awarded, but it is difficult to determine

the precise sum, Texas law generally leaves the determination of the amount to be

awarded to the discretion of the trier of facts.   *See* 28 TEX.JUR. Damages § 14, *Effect of

Uncertainty as to Amount of Damages* (collecting Texas authority).   The Court, having

considered all of the testimony and documentary evidence at trial, finds and concludes

that the preponderance of the evidence establishes that Thrasher should prevail on his

claims against Mandel for breach of contract, fraud, conspiracy, and shareholder

oppression.   Thrasher is hereby awarded compensatory damages in the total amount of

$1,000,000 for these claims.   Thrasher's compensatory damages for misappropriation or

theft of trade secrets are coextensive with, and included in, this sum.

99.     The Court further finds that the preponderance of the evidence establishes that Coleman should prevail on his claims for fraud, breach of contract, and conspiracy. Coleman is hereby awarded compensatory damages in the total amount of $400,000 for these claims.  Thrasher's compensatory damages for misappropriation or theft of trade secrets are coextensive with, and included in, this sum.

100.    Finally, the Court finds that Thrasher, on behalf of White Nile, should prevail on his claims for breach of contract, breach of fiduciary duty, and fraud.  White Nile is hereby awarded compensatory damages in the amount of $300,000.

### I. Attorneys' Fees and Costs[9]

101.    Thrasher and Coleman seek to recover their attorneys' fees pursuant to the Texas Civil Practice & Remedies Code §§ 38.001 and 134.005.[10]   Section 38.001 provides for the recovery of attorney's fees by a prevailing party on a breach of contract claim.  Section 134.005(b) provides for the recovery of attorneys' fees by a party who prevails in a suit under the Texas Theft Liability Act.

102.    In this case, as previously discussed, Thrasher and Coleman have established a claim for breach of contract by Mandel as well as a claim for theft of trade secrets under Texas law.

---

[9] In his closing argument, Thrasher combines the request for attorneys' fees with a request that the Court allocate all of the fees and costs incurred by White Nile's receiver to Mandel.  Thrasher's closing brief does not include any substantive discussion or any authority in support of this request.  Moreover, Orenstein's entitlement to recover fees from Mandel is the subject of a separate, pending dispute.

[10] In their closing brief, Thrasher and Coleman allege that they are entitled to their attorneys' fees based on bad faith litigation by Mandel.  This claim was not in the parties' joint pre-trial order, nor was it litigated at trial.  Thrasher and Colman also allege in their brief that they are entitled to recover their attorneys' fees because Mandel's wrongful conduct involved them in this litigation.  The claimants cite *Turner v. Turner*, 285 S.W.2d 230, 234 (Tex. 1964) in support of their argument, wherein the Texas Supreme Court stated in passing that a defendant may be liable for a plaintiff's attorneys fees incurred in a prior action if the defendant's tortious conduct embroiled the plaintiff in the prior action.  The Texas Supreme Court's analysis in *Turner* does not support an award of fees in the present case.

103.     Thrasher and Coleman concede that they are not entitled to their attorneys' fees for fraud or misappropriation of trade secrets.  Under Texas law, however, where a case involves claims for which attorneys' fees are recoverable and claims for which they are not recoverable (as is the case here) when legal services that advance both recoverable and unrecoverable claims are so intertwined the attorneys' fees need not be segregated.  *Tony Gullo Motors I, L.P., v. Chapa*, 212 S.W.3d 299 (Tex. 2007).

104.     Thrasher and Coleman assert that they have incurred the total sum of $2,267,793.70 in attorneys' fees and $255,898.48 in costs.  They contend that 90% of this amount relates to their theft of trade secrets claim, which is duplicative (at least in part) of their claim for attorneys' fees and costs based on breach of contract.  Thus, they are seeking to recover 90% of their attorneys' fees and out-of-pocket expenses totaling $2,141,014.33 and $230,390.53, respectively.

105.     Under Texas law, an award of fees is mandatory if a party has recovered on a breach of contract claim or theft of trade secret claim. *See* TEX. CIV. PRAC. REM. CODE ANN. § 134.005(b) ("Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees."); *Mathis v. Exxon Corp.,* 302 F.3d 448, 462 (5th Cir. 2002) (discussing breach of contract).  The amount of reasonable fees, however, is discretionary.  *Mathias*, 302 F.3d at 462.

106.     The Texas Supreme Court has outlined eight relevant factors for courts to consider when determining the reasonableness of an attorneys' fee award:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
> (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;

    (5) the time limitations imposed by the client or by the circumstances;

    (6) the nature and length of the professional relationship with the client;

    (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

    (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex. 1997).

107.    The Court has reviewed the documents submitted by counsel relating to their fees and costs.  The Court, having considered all of the relevant factors, concludes that Thrasher and Coleman are entitled to an award of their attorneys' fees in the total amount of $1,500,000 ($795,000 for the Law Offices of Mitchell Madden and $705,000 for Elvin E. Smith) plus costs in the total amount of $255,989.48 ($232,308 for the Law Offices of Mitchell Madden and $23,681.48 for Elvin E. Smith).

### J. Exemplary Damages

108.    Last, Thrasher and Coleman contend they are entitled to exemplary damages.  Exemplary damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct.  *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 16 (Tex. 1994).  A mere showing that the act is wrong or unlawful is not sufficient to support an award of exemplary damages. *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 454 (Tex. 1996).  Rather, exemplary damages may only be awarded where there is proof by clear and convincing evidence of fraud, malice, or gross negligence.  Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a).  At trial, Thrasher and Coleman argued that Mandel acted with malice.

109.    Malice involves acting with ill will, spite, evil motive, or purpose to injure or harm. *Southwestern Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 628 (Tex. 2004); *Cont'l Coffee Prods.,* 937 S.W.2d at 452.  Thus, to establish that Mandel acted with malice,

Thrasher and Coleman had to prove a specific intent by Mandel to cause substantial injury or harm to them. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7). Moreover, Thrasher and Coleman had to show that Mandel's conduct involved an objective extreme risk of harm and that Mandel had a subjective "actual awareness" of an extreme risk created by its conduct. *See Transp. Ins. Co.,* 879 S.W.2d at 21; *Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss,* 202 S.W.3d 427, 447 (Tex. App. -- Texarkana 2006, no pet.). That harm must be extraordinary such as death, grievous physical injury, or financial ruin. *Kinder Morgan,* 202 S.W.3d at 447.

110.    Here, Mandel had ill feelings toward Thrasher and expressed those feelings to others, even going so far as to imply to some of White Nile's consultants and employees that Thrasher was crazy and out of control.

111.    Mandel specifically intended to take control of White Nile's intellectual property and use it to start up his own business. Mandel's actions were clearly improper, but it is not clear that he fully appreciated his responsibility to White Nile, White Nile's other shareholders, and White Nile's creditors in the context of winding up White Nile's affairs. He appears to have believed that White Nile's property became his property when White Nile ceased to function. The Court concludes, based on the preponderance of the evidence, Mandel did not act with the requisite malice.

112.    As to Coleman, the evidence also does not establish any specific malice. Mandel simply did not want to pay Coleman for his work for White Nile or for any use of Coleman's intellectual property.

113.    The Court, therefore, concludes that the claimants are not entitled to an award of exemplary damages.

114.   To the extent any conclusion of law is determined to be a finding of fact, the Court hereby adopts it as such.

Signed on 9/30/2011

_Brenda T. Rhoades_   MD

HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE