

EOD
09/30/2015

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL, | § | CASE NO. 10-40219 |
| | § | (Chapter 7) |
| DEBTOR. | § | |

## MEMORANDUM OPINION AND ORDER ON REMAND

This matter involves a dispute over the allowablility of the proofs of claim filed by Steven Thrasher and Jason Coleman in this bankruptcy case. The claimants alleged the total amount of their claims exceeds $80 million based on various causes of action arising out of a failed business venture. The debtor, Edward Mandel, objected that the Court should disallow the claims in their entirety.

Following a lengthy trial, this Court concluded that the claimants had established some of their causes of action against Mandel, including breach of contract, fraud, breach of fiduciary duty, and misappropriation of trade secrets. The claimants had not attempted to establish damages for each of their causes of action at trial but, instead, argued that their damages for misappropriation of trade secrets subsumed most of their other damages. On September 30, 2011, this Court entered an order awarding $1,000,000 to Thrasher and $400,000 to Coleman as compensatory damages as well as $1,500,000 in attorneys' fees.

Mandel and the claimants appealed this Court's decision. While their appeals were pending, on June 28, 2012, this Court appointed a chapter 11 trustee for Mandel's bankruptcy estate. The chapter 11 trustee requested approval of a settlement agreement allowing the claims of Thrasher and Coleman against the bankruptcy estate in the amounts

1

set forth in the September 30th order. The Court entered an order approving the settlement agreement on November 6, 2013. On December 19, 2014, the Court entered an order granting Mandel's motion to convert his case to a chapter 7 case.

The district court affirmed this Court's decision regarding Mandel's objections to the claims filed by Thrasher and Coleman. This matter is on remand from the Fifth Circuit, *In re Mandel*, 578 Fed. Appx. 376 (5th Cir. 2014). The Fifth Circuit found it clear from the trial record that "Thrasher and Coleman did suffer some damage." The Fifth Circuit, however, remanded the issue of compensatory damages for Thrasher and Coleman in order to allow this Court to "either conduct an additional evidentiary hearing on the issue of damages or explain its award of damages on the basis of the evidence in the present record." *Id.* at 391.

The amount of the claims of Thrasher and Coleman has been settled with the estate. A ruling on the issue of compensatory damages will not aid in its administration. Mandel, however, seeks a ruling on remand on the amount of the compensatory damages awarded to Thrasher and Coleman.[1] The amount of compensatory damages may be relevant in the event the Court denies Mandel a discharge (11 U.S.C. § 727) or finds his debts to the claimants non-dischargeable in bankruptcy (11 U.S.C. § 523).

## FINDINGS OF FACT

The Court incorporates the background section of the Fifth Circuit's decision as well as this Court's prior findings of fact as confirmed by the Fifth Circuit. To provide context,

---

[1] White Nile Software, Inc. also filed a claim against Mandel. The Court tried White Nile's claim along with the claims of Thrasher and Coleman. Following the conclusion of trial, the Court awarded compensatory damages in the total sum $300,000 to Thrasher, on behalf of White Nile, for breach contract, breach of fiduciary duty and fraud. This award is not mentioned in the portion of the Fifth Circuit's opinion that vacates the separate awards of compensatory damages to Thrasher and Coleman. In addition, on remand, the parties have not presented arguments relating to the compensatory damages awarded to Thrasher on behalf of White Nile.

certain relevant facts are repeated below, together with additional facts – gleaned from the evidence admitted at trial – pertinent to this memorandum opinion.

This litigation arises out of the failure of White Nile Software, Inc. Thrasher, an intellectual property attorney, conceived of what he believed to be a new type of search engine that would use icons to create and display searches of all of the information available on the internet. He shared the idea with Mandel in the summer of 2005. Mandel agreed to finance a prototype, which they anticipated would cost $300,000 to produce. Mandel and Thrasher formed White Nile to develop Thrasher's invention.

Mandel and Thrasher arbitrarily assigned a value of $100 million to White Nile as they were discussing the formation documents prepared by Mandel's legal counsel. They believed Thrasher's ideas would dominate the search engine market. Thrasher believed he could patent at least 300 ideas for White Nile, and he anticipated all of these patents would provide a huge income stream for the company. Thrasher and Mandel also planned for White Nile to make money through "per click" advertising (like Google) as well as through a propriety, yet-to-be-developed form of advertising that would allow advertisers to target the particular characteristics of the individuals using White Nile's search engine. They projected White Nile would make billions of dollars within less than a handful of years.

At some point, Thrasher sought funding from a company called White Rock Capital. White Rock Capital declined to make an investment. White Rock Capital expressed interest in revisiting the discussion after Thrasher developed a prototype of his search engine.

In or around September 2005, Mandel and Thrasher met with representatives of Meaningful Data Solutions ("MDS"). They agreed to negotiate an engagement agreement

for MDS to help develop White Nile's search engine. MDS anticipated the project would cost $216,500, and Mandel told Thrasher he would pay MDS.

Thrasher reached out to another friend, Coleman, to help him develop his idea for a new search engine. Thrasher had known Coleman for several years. They met in 1999 when Thrasher worked as legal counsel on a patent Coleman had invented. Thrasher contacted Coleman in September 2005 about White Nile.

In October 2005, Coleman executed a consulting agreement with White Nile. The agreement provided Coleman would be responsible for developing a "demo" by October 15, 2005, a "prototype" by November 15, 2005, and an "alpha" version of the search engine by January 2006, among other things. Coleman assigned his work product, including patentable ideas, to White Nile as part of the consulting agreement.

The term of Coleman's consulting agreement was three years, beginning on October 1, 2005 and ending on October 1, 2008. The consulting agreement provided Coleman would receive an annual salary of $133,000 as well as warrants, when exercised, equaling at most 0.5% of the equity of White Nile if he met his contractual obligations.[2] The consulting agreement provided Coleman would begin receiving an annual salary no later than 60 days after White Nile received $5 million in funding. With respect to termination, the consulting agreement provided Coleman "shall not be dismissed during the term of this contract except for cause, which shall consist [of] gross misconduct or a recurring failure to meet his responsibilities under this contract."

---

[2] The consulting agreement contained other provisions for the purchase of warrants in lieu of salary.

4

Coleman began working full-time for White Nile in October 2005. He worked closely with Thrasher to develop the user interface for a search engine. Coleman prepared a demonstration of what White Nile's search engine would look like when it became operational, and he began working the basic framework White Nile would need in order to create software. He referred to his work on a prototype as the SAQQARA project. In addition, he and Thrasher co-invented a patent, referred to by the parties as the 802 patent, during this time.

At trial, Coleman explained that, to him, a prototype was an interactive piece of software that demonstrates the way in which an application will work. The demonstrative version of the search engine created by Coleman – or "prototype" -- allowed users to type in a word or phrase. It produced a Venn diagram that graphically represented the search terms. It also created placeholder text that simulated search results. The "prototype" developed by Coleman could not search the internet to produce real search results.

After negotiations with MDS fell through, Mandel represented to Thrasher and Coleman that he had secured a team of professional developers through a contact in the Philippines. Mandel also represented to Thrasher and Coleman that Eduardo Carrascoso had agreed to invest $6 million in White Nile and that Carrascoso had placed $1 million in escrow. Thrasher and Coleman did not establish that they relied on these misrepresentations to their detriment. However, in late October 2005, Thrasher prepared materials to share with potential investors that described the investments-to-date in White Nile, including a $6 million investment by Carrascoso. Mandel reviewed the materials and corrected the spelling of Carrascoso's name.

In mid-November 2005, Thrasher, Mandel and Coleman travelled to the Philippines to meet the developers Mandel had assured them were working on developing software for White Nile's search engine in a compound outside of Manila. There were no developers. Thrasher and Mandel initiated negotiations with Nikki Carrascoso and his father, Eduardo, about working on the search engine in exchange for expenses plus equity in White Nile.

Eduardo Carrascoso placed no value on a possible equity interest in White Nile and, instead, requested higher cash payments. Eduardo expressed an interest in providing services to White Nile in exchange for cash payments in excess of $1 million. Thrasher became very concerned that potential investors would perceive these negotiations as meaning the shares of White Nile had no real value. Eduardo terminated negotiations on November 27, 2005.

By mid-December, the relationship between Mandel and Thrasher was disintegrating. Thrasher was frustrated at the lack of progress in developing his idea for a search engine. He was worried that other companies were developing similar ideas and might bring them to the market before White Nile. He shared his concerns with Mandel and Coleman.

Mandel wanted to take a different direction with the company that emphasized social media. He also wanted to rename the company to help with marketing it to investors. During the trip to the Philippines, Mandel, Thrasher and Coleman discussed the name "NeXplore," among other possibilities. Thrasher was open to a new name for White Nile so long as it was a good one.

Mandel began maneuvering to isolate Thrasher from White Nile's employees and investors as well as to remove Thrasher from his role as an officer of White Nile. However,

Mandel did not really understand what Thrasher and Coleman had been doing or the intellectual property they had been developing for White Nile. Mandel sent Joseph Savard, the chief technology officer he had recruited for White Nile, to Thrasher's home to review White Nile's patents and projects.

Savard appreciated the quality of the work Coleman had done on the user interface for White Nile's search engine. However, in Savard's opinion, Coleman had not created a prototype for a search engine -- and certainly not a working prototype. Savard and Coleman agreed that what Coleman referred to as a "prototype" for White Nile's search engine did not involve production code and was not ready for production or testing.

When he began working for White Nile, Coleman agreed to defer his compensation for two or three months (at his discretion) in order to decrease cash pressure on the company. In late November, at a time when Mandel was representing that White Nile had secured investments in excess of $5 million, Coleman requested to be paid half of what he was entitled to under his consulting agreement for one month's work. He received $5,541.67 from White Nile in December 2005.

By late-December, Mandel was accusing Thrasher of misconduct with respect to White Nile. Thrasher responded to Mandel's aggressive communications by suggesting a "cooling off" period that would allow them to work out their differences. Mandel rejected Thrasher's suggestion. Mandel continued his efforts to recruit certain of White Nile's employees, such as Savard, to join NeXplore Technologies, Inc.

NeXplore formed in December 2005. Its owners and board of directors consisted of Mandel, Skinner Layne, and Paul Williams. Skinner was a recent college graduate who

Thrasher's friend, Rod Martin, had previously invited to join White Nile. Thrasher and Mandel had previously engaged Williams to work for White Nile in an advisory role; Mandel had represented to Thrasher that Williams was a licensed broker/dealer who could help White Nile recruit investors and raise funds. Prior to his recruitment by Mandel to join NeXplore, Williams had helped Mandel and Thrasher begin developing a business plan for White Nile.

In January 2006, Mandel took control of White Nile's bank account. The account held $197,000 – which was the remaining balance of the $300,000 investment made by Skinner's parents in White Nile. After Mandel took control of the account, the Laynes immediately re-invested the funds in NeXplore.

Mandel joked that the only difference between NeXplore and White Nile was a change in name. Indeed, the weight of the expert testimony supported the conclusion that White Nile's and NeXplore's concepts were very similar. NeXplore even used a Venn-diagram image of intersecting circles on its website. Mandel and Williams developed an almost identical business plan for NeXplore. In its business plan, NeXplore boasted that it would re-define the search experience. NeXplore described its search as featuring a visually engaging, user-friendly, multi-media interface. However, at some point before October 2007, NeXplore decided not to create its own search engine from scratch but, instead, to use an existing search engine such as Google or Yahoo.

During January and February 2006, Coleman attempted to negotiate a settlement with Thrasher and Mandel regarding the amounts he believed he was owed for the work he had performed for White Nile. Coleman requested a cash payment of $38,791.66. Thrasher

8

agreed to take out a second mortgage on his home to pay half of this amount. Mandel did not offer to make any payment to Coleman but, instead, caused White Nile to sue him for allegedly breaching his consulting agreement and allegedly attempting to extort money from White Nile.

Mandel, Coleman and Thrasher have been embroiled in litigation relating to White Nile since early 2006. In late 2006, Coleman began working on the 802 patent again by refining and extending its inventions, among other things. The patent office subsequently issued a patent to Thrasher and Coleman, which NeXplore unsuccessfully challenged.

Mandel, Skinner, and Skinner's father, Eddy, among others, marketed NeXplore to potential investors during 2006 and early 2007. NeXplore held informational meetings in Arkansas at which Skinner would tell potential investors about NeXplore's proposed business. Skinner would explain that NeXplore envisioned selling publicly traded stock after executing a reverse merger with another company whose stock was already on the stock exchange. Skinner's father, Eddy, and other managing partners of LLCs that were investing in NeXplore stock were at these meetings ready to sell LLC membership units to prospective investors. On June 21, 2007, the State of Arkansas Securities Department issued a Cease and Desist Order that detailed the investment scheme and the funds raised by NeXplore.

Although Mandel and others raised approximately $2.5 million for NeXplore during 2006 and early 2007,[3] NeXplore was less successful at developing a usable product. Savard

---

[3] According to a Form 8-K that NeXplore filed with the U.S. Securities and Exchange Commission on March 30, 2007, NeXplore had raised approximately $2.5 million from investors and borrowed $150,000 on a line of credit through March 13, 2007.

was unable to create software that would create a "social computing platform" as envisioned by Mandel. Mandel and the programmers also disagreed about advertising and an appropriate advertising platform.

The relationship between Savard and Mandel deteriorated, and Savard left NeXplore in November 2006. The relationship between Skinner and Mandel also deteriorated, and Skinner left NeXplore in or around October 2007. NeXplore had abandoned any attempt to create its own search engine by the time Skinner left NeXplore in October 2007.[4]

In October 2007, the parties in the state court litigation (who included Mandel, Thrasher and Coleman) appeared in open court and announced a tentative settlement. Mandel's new company, NeXplore, proposed to fund the settlement. Thrasher and Coleman would receive $450,000 paid in installments or, if the payments were not made, an agreed judgment of $900,000. The settlement also provided for a royalty fee of two percent of NeXplore's gross revenue for five years in return for agreement to license their patents to NeXplore.

Mandel knew NeXplore did not have the ability to fund the tentative settlement. After they announced the general terms of the settlement to the state court, Mandel, Thrasher and Coleman disagreed about how to define the "White Nile intellectual property" that would be licensed to NeXplore.

Mandel refused to proceed with documenting the settlement agreement. Thrasher and Coleman sought to enforce it by, among other things, asserting claims against Mandel for breaching the agreement. In May and June 2009, the state court issued summary

---

[4] According to NeXplore's unaudited financial statements dating from 2009 and 2010, it raised tens of millions of dollars after abandoning its effort to create its own search engine.

10

judgment orders ruling, as a matter of law, no enforceable settlement agreement was formed as a result of the announcement on the state court record in October 2007.

NeXplore funded the state court litigation against Thrasher, Coleman and others as well as a variety of other lawsuits, including a suit against Savard in 2007 and a suit against Williams in 2008. NeXplore had not achieved profitability or developed a marketable product by the time of the trial in this Court. However, NeXplore appears to have continued to operate and market itself to potential investors in the years leading up to trial. Mandel received total compensation (salary, commission, and bonuses) from NeXplore of $2,726,926.61 through 2009. In addition, NeXplore paid or incurred $725,789 in attorney's fees and costs on behalf of Mandel.

## DISCUSSION

Following remand, the Court invited the parties to submit briefing regarding the compensatory damages issue before the Court. The claimants re-urge the damages theories they presented at trial. Mandel argues that this Court should award zero damages, because the claimants failed to prove their case at trial. In addition, Mandel asks this Court to vacate the attorney's fees it awarded to the claimants on the grounds that the Fifth Circuit did not explicitly affirm the award and it would be inconsistent to award attorney's fees where there are no damages.

On appeal, Mandel challenged the award of attorneys' fees to Coleman. The Fifth Circuit expressly rejected Mandel's challenge in its opinion. The only issue vacated and remanded to this Court is the award of compensatory damages of $1,000,000 to Thrasher

and $400,000 Coleman. This Court, therefore, declines to vacate the award of attorney's fees.

There is no question on remand that Thrasher and Coleman suffered damages as a result of the wrongful conduct of Mandel. The question is how to calculate an award of compensatory damages. The trial record in this case is extensive, the parties extensively addressed damages at trial, they presented numerous expert witnesses, and no additional evidence regarding damages is necessary on remand. The trial record on damages is sufficient.

Turning to the trial record, Thrasher and Coleman filed proofs of claim using Official Form 10. Thrasher's proof of claim listed an unsecured debt in an amount not less than $56 million owed by Mandel. Coleman's proof of claim listed an unsecured debt in an amount not less than $25,000,000 owed by Mandel. Their proofs of claim attached and relied upon the operative pleadings from the state court litigation.

A proof of claim executed and filed in accordance with the requirements of Bankruptcy Rule 3001 and Official Form 10 constitutes "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3002(f). Once filed, a proof of claim "is deemed allowed" unless a party in interest objects. *See* 11 U.S.C. §502(a). In this case, Mandel objected to the allowance of their claims against his bankruptcy estate. The claimants bore the same burden of proof respecting their claims as they would bear outside of bankruptcy. *Raleigh v. Ill. Dep't of Revenue,* 530 U.S. 15, 26 (2000); *In re Promedco of Los Cruces,* 275 B.R. 499, 503 (Bankr. N.D. Tex. 2002).

Thrasher and Coleman asserted a number of causes of action against Mandel in support of their proofs of claim. Following trial, the Court concluded that Thrasher had established claims against Mandel for breach of contract, fraud, conspiracy, shareholder oppression and misappropriation of trade secrets. The Court concluded Coleman had established claims against Mandel for fraudulent inducement, conspiracy, and misappropriation of trade secrets.

In his closing arguments, Thrasher sought an award of $300,000 for Mandel's fraud. In particular, Mandel fraudulently misrepresented that he would invest $300,000 in White Nile in order to induce Thrasher to do business with him. This Court finds and concludes that Thrasher's damages arising from Mandel's fraudulent misrepresentation were, in fact, $300,000 based on the credible evidence admitted at trial.

Shareholder oppression cannot be a source of compensatory damages (as discussed by the Fifth Circuit). With respect to the remainder of his claims, Thrasher argued that his actual damages overlapped with, and were subsumed by, the damages arising from Mandel's misappropriation of trade secrets. The bulk of Thrasher's damages argument at trial was how to measure the damages, if any, arising from Mandel's misappropriation. Thrasher primarily relied on the testimony of his expert, Brad Taylor, to support an award of $56 million (or more).

As noted by the Fifth Circuit:

Damages in misappropriation cases can take several forms: the value of plaintiff's lost profits; the defendant's actual profits from the use of the secret; the value that a reasonably prudent investor would have paid for the trade secret; the development costs the defendant avoided incurring through misappropriation; and a reasonable royalty.

13

*Wellogix, Inc. v. Accenture, L.L.P*, 716 F.3d 867, 879 (5th Cir. 2013) (quoting *Bohnsack v. Varco, L.P.*, 668 F.3d 262, 280 (5th Cir. 2012). In this case, the nature of the misappropriation made it difficult to prove the amount of damages with certainty. Such uncertainty does not preclude the recovery of compensatory damages. Nonetheless, Thrasher and Coleman were required to establish the extent of their damages as a matter of just and reasonable inference. *See Wellogix, Inc. v. Accenture, L.L.P*, 716 F.3d 867, 839 (5th Cir. 2013).

White Nile and NeXplore never made a profit. White Nile only had one investor – the Laynes. Inasmuch as the Laynes were the parents of an employee, Skinner, their investment was not an arms-length transaction. Further, the Laynes had received inaccurate information about White Nile when they invested, and Mandel returned the Laynes' money to them when he took over White Nile. White Rock Capital refused to invest in White Nile in its early developmental stage. Eduardo Carrascoso also refused to invest in White Nile and placed no value on an equity interest in White Nile.

With respect to development costs, Thrasher estimated White Nile would require investments of between $6 million and $12 million to bring a usable product to market. Carrascoso requested more than $1 million to begin developing Thrasher's idea for a search engine. The development never occurred. At the time Mandel misappropriated White Nile's trade secrets, the search engine had not been developed beyond the alleged "prototype" stage. Neither White Nile nor NeXplore developed a usable product that could be brought to market. Under these circumstances, the avoidance of development costs by Mandel through misappropriation cannot be an appropriate measure of damages.

Thrasher and Coleman argued in closing that some evidence of a reasonable royalty can be found in the settlement agreement announced in state court. In state court, Thrasher, Coleman and Mandel announced that they had reached an agreement to a judgment of $900,000 in favor of Thrasher and Coleman. They announced that Thrasher and Coleman would not seek to enforce this judgment provided they received cash payments in the total amount of $450,000. In addition to cash payments, the parties agreed to a "royalty fee" of two percent of NeXplore's gross revenue for five years, payable quarterly, with a minimum quarterly payment of $2,500. Although NeXplore never created a product that could have generated revenue, the announced settlement agreement suggests an appropriate damages award would be $1,010,000, consisting of the $900,000 agreed judgment, a royalty fee of $30,000 for three years of minimum quarterly payments of $2,500 per quarter, and a royalty fee of $80,000 arising from a two-year license Mandel testified NeXplore signed in October 2010.[5]

In their closing arguments, Thrasher and Coleman also advanced a "lost asset" theory of recovery. They argued that White Nile had a fair market value of $56 million based on Mr. Taylor's expert testimony. They further argued they had lost the value of this asset as a result of Mandel's conduct.

In reaching his conclusion of value, Taylor selected 34 comparable companies focused on similar technology and business characteristics ranging in value from $1 million to $344 million. Taylor's report included the value of some of the largest internet search companies, including Google, Yahoo, and Ask Jeeves. While Mr. Taylor used these

---

[5] As previously discussed, the parties ultimately did not consummate the announced settlement agreement.

companies to run statistical models, he did not adjust for risks specific to White Nile.[6] As Vanessa Fox testified at trial, many internet companies fail – even companies with significantly more expertise and venture capital than White Nile.[7] The claimants' own expert, Dr. Gilbert Amelio, testified that even when companies succeed in attracting investments from venture capitalists, in his experience, approximately 80% of those companies will fail.

Significantly, the quality of White Nile's executive team was not a factor included in Taylor's analysis. Dr. Amelio testified that this information would have been important to a decision to invest in White Nile. All companies are people companies, according to Dr. Amelio, and they succeed only if their executive team is capable of transforming an idea into a viable business. White Nile's executive team did not have this ability.

Value, particularly in start-up companies, is dynamic. As Dr. Amelio testified, it changes with how efficient the company is at executing its business plan. Thrasher also recognized that value can change as competitors bring their own products to market.

In this case, even before the misappropriation occurred, White Nile was having difficulty raising the funds necessary for development costs in sufficient time to beat competitors. White Nile's dysfunctional executive team meant it was never a highly valuable company. Its value declined precipitously as the relationship between Mandel and Thrasher

---

[6] Taylor prepared his expert report in May 2009 in support of Thrasher and Coleman's claims in the state court litigation. He supplemented his report on October 22, 2010, which was shortly before trial began in this Court. In his supplemental report, Taylor stated that he believed White Nile's value was substantially higher than $56 million based on Dr. Amelio's expert report as well as the issuance of patents to Thrasher and Coleman. Dr. Amelio, however, had relied upon Mr. Taylor's expert report in reaching his conclusions about the value of White Nile.

[7] One of the internet companies referenced by Taylor in his expert report had failed by the time of trial, according to the testimony of Ms. Fox. Ms. Fox also testified, credibly, that the Venn diagram display of search results envisioned by Thrasher was not astonishingly unique and had been discussed in relevant literature for a number of years.

deteriorated, litigation ensued, and time passed. Dr. Amelio testified, credibly, that a nascent company engaged in litigation is not attractive to venture capitalists. Taking into account the significant rate of failures, the dysfunctional executive team, the lack of a functional product, NeXplore's abandonment of its efforts to create its own search engine, and the lack of profits by White Nile and NeXplore, it appears that White Nile's value is closest to the lowest valued company on Taylor's list of companies, which is $1 million.[8]

Thrasher and Coleman also argue an alternate theory of damages based on the benefit Mandel received from his misappropriation, namely, a 55% interest in NeXplore.[9] According to the claimants' expert, Brad Taylor, the market capitalization of NeXplore was $47.17 million at the high end and $1.67 million at the low end – thus indicating a value range of $25.9 million to $920,000 for the value of Mandel's 55% interest. White Nile was a nascent search market company with no financing, no usable product, no customers, no profit, and a dysfunctional executive team who engaged in litigation over control of White Nile and its intellectual property. This Court, therefore, again looks to the low end of the market capitalization spectrum for NeXplore in calculating damages for misappropriation, which is $920,000.

In determining damages, the Court also considered the amount of investments NeXplore secured using ideas and materials very similar to those prepared for White Nile. Setting aside the fact that NeXplore's recruitment of investors during 2006 and 2007

---

[8] This value is remarkably similar to the damages arrived at using the settlement announced by the parties in state court.

[9] Although Thrasher and Coleman complain about the salary and other benefits Mandel received from NeXplore, the trial record did not establish that Mandel received his salary or benefits on account of misappropriation. Indeed, Mandel worked for NeXplore for a number of years – even after NeXplore abandoned any attempt to create a search engine of its own.

17

violated applicable laws, NeXplore raised approximately $2.5 million from investors before abandoning its attempt to create its own search engine. This would indicate a value of $1,375,000 attributable to Mandel's 55% interest in NeXplore.

The Court, considering all of the evidence presented at trial, concludes that Thrasher incurred damages as a result of Mandel's misappropriation in the amount of $1 million. Thrasher's damages for misappropriation are co-extensive with and subsume the damages he incurred on account of his other compensable claims against Mandel.

With respect to Coleman, an appropriate measure of damages is not based on the value of White Nile, but on what Coleman would have received under the consulting agreement for the services he rendered, including developing the SAQQARA project and the 802 patent. In contrast to Thrasher, Coleman's interest in White Nile was primarily as a paid consultant, and his arguments for damages in the pre-trial order and in closing referenced his expectations under the consulting agreement. If matters had proceeded as initially planned under the consulting agreement, his intellectual property would have remained assigned to White Nile.

Coleman's consulting agreement, as previously discussed, provided Coleman would receive a salary of $133,000 for three years, with a possibility of an extension of the consulting agreement to future years, plus warrants for an approximately 0.5% equity interest in White Nile. Based on the Court's valuation of White Nile, the value of a 0.5% an equity interest in White Nile is approximately equal to the amount White Nile paid Coleman. Coleman's damages for misappropriation are subsumed by and co-extensive with his fraudulent inducement damages. Thus, considering all of the evidence admitted at trial, the

Court determines that Coleman incurred damages in the amount of $400,000 as a result of Mandel's misappropriation and fraudulent inducement.

## CONCLUSION

For all the foregoing reasons, the Court awards $1,000,000 in compensatory damages to Thrasher for misappropriation, of which $300,000 is also attributable to fraud. Thrasher's damages for breach of contract, breach of fiduciary duty and conspiracy are likewise subsumed in the damage award for misappropriation. The Court awards $400,000 to Coleman for his claims for fraud, conspiracy, and misappropriation of trade secrets. Notably, in addition to the compensatory damages awarded here, the claimants' interest in their intellectual property has reverted to them for the reasons described in the Court's prior findings of fact and conclusions of law.[10] Mandel's request to vacate the Court's prior award of attorney's fees is denied.

**SO ORDERED.**

Signed on 09/30/2015

*Brenda T. Rhoades*  SD
HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[10] Any cause of action Thrasher and Coleman may have against NeXplore for the use of their intellectual property are preserved and not before this Court. NeXplore is not a party to this proceeding. This Court would lack jurisdiction to resolve a dispute between Thrasher, Coleman and NeXplore in any event.