
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EDWARD MANDEL, | § | CASE NO. 10-40219 |
| | § | (Chapter 7) |
| DEBTOR. | § | |

# MEMORANDUM OPINION AND ORDER
# ON CLAIMANTS' MOTION FOR RECONSIDERATION

This matter is before the Court on remand from the Fifth Circuit. Steven Thrasher, White Nile Software, Inc., and Jason Coleman[1] seek reconsideration of this Court's memorandum opinion and order on remand pursuant to Federal Rule of Bankruptcy Procedure 9023. In its remand opinion, this Court issued supplemental findings and conclusions with respect to the compensatory damages previously awarded to Thrasher and Coleman. The claimants argue that this Court erred in failing to issue supplemental findings and conclusions with respect to the compensatory damages previously awarded to White Nile. They acknowledge that the Fifth Circuit did not discuss White Nile's damages but, in their request for reconsideration, assert that the Fifth Circuit broadly vacated and remanded the award of compensatory damages as to all three claimants, including White Nile.[2]

Bankruptcy Rule 9023 adopts and applies Federal Rule of Civil Procedure 59 to bankruptcy cases and proceedings. Motions to alter or amend a judgment under Rule 59(e)

---

[1] The motion is also brought by MaddenSewell LLP and the Law Offices of Mitch Madden as partial assignees from Thrasher.

[2] Mandel initially opposed White Nile's motion for reconsideration on the grounds that this Court lacked jurisdiction to decide it in light of the parties' pending appeals of the memorandum opinion and order on remand. The district court disagreed with Mandel's argument. The district court has abated the appeals pending this Court's ruling on White Nile's motion for reconsideration.

"serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *Waltman v. Int'l Paper Co.,* 875 F.2d 468, 473 (5th Cir. 1989) (citations omitted). A court should not grant a Rule 59(e) motion unless there is: (1) an intervening change in controlling law; (2) new evidence not previously available; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *See, e.g., Schiller v. Physicians Resource Grp., Inc.,* 342 F.3d 563, 567 (5th Cir. 2003); *Russ v. Int'l Paper Co.,* 943 F.2d 589, 593 (5th Cir. 1991). Altering, amending, or reconsidering a judgment is an extraordinary measure, which courts should use sparingly. *See Southern Constructors Grp., Inc. v. Dynalectric Co.,* 2 F.3d 606, 611 (5th Cir. 1993) (noting that the standards applicable to Rule 59(e) favor the denial of motions to alter or amend a judgment).

In this case, the claimants' base their motion for reconsideration on what they believe to be clear error by this Court in failing to address White Nile's compensatory damages on remand. This Court is convinced that the Fifth Circuit affirmed the compensatory damage award to White Nile in the amount of $300,000 and is unconvinced that the Fifth Circuit intended for it to re-examine the compensatory damages previously awarded to White Nile. However, in order to avoid the cost, delay, and frustration to the parties of ping-ponging between courts, in the event this Court did err in its reading of the Fifth Circuit's opinion, this Court will address White Nile's compensatory damages.

## FINDINGS OF FACT

The Court incorporates the background section of the Fifth Circuit's decision. The Court also incorporates its prior findings of fact as confirmed by the Fifth Circuit and the supplemental findings and conclusions contained in its memorandum opinion and order on

2

remand. To provide context, certain relevant facts are repeated below, together with additional facts – gleaned from the evidence admitted at trial – pertinent to this memorandum opinion.

This litigation arises out of the failure of White Nile Software, Inc. Thrasher, an intellectual property attorney, conceived of what he believed to be a new type of search engine that would use Venn diagrams to display the results of searches of all of the information available on the internet. He shared the idea with Mandel in the summer of 2005. Mandel and Thrasher formed White Nile to develop and hold Thrasher's invention.

Mandel and Thrasher anticipated that what they referred to as a prototype of Thrasher's search engine would cost $300,000 to produce. Mandel promised to contribute $300,000 to White Nile in exchange for shares in the company. However, Mandel did not invest $300,000 in White Nile.

Thrasher was the chief executive officer and secretary for White Nile. Mandel was the president and treasurer. They each signed consulting agreements that described White Nile as having been organized to conduct business "in the field of internet searches, providing search results, local data searching and result, file organization systems including operating systems, delivering advertising and related activities."

White Nile hired Coleman in October 2005 to work on a graphic representation of what Thrasher's search engine would look like when complete. Coleman's consulting agreement with White Nile described him as its chief creative officer. Over the next several weeks, Coleman developed what he called a "prototype" to demonstrate how White Nile's

3

search engine would work once developed. His "prototype" could not search the internet to produce real search results.

In November 2005, Joseph Savard was recruited to serve as White Nile's chief technology officer. Savard met with Mandel and Thrasher several times during November and December 2005. As Savard informed Mandel and Thrasher, creating a new search engine to rival existing search engines like Google would be an enormous, and enormously expensive, task. Moreover, White Nile's timeline for creating a working prototype of a search engine was impossible to meet. The timeline for effecting White Nile's business plan was untenable.

Thrasher and Coleman worked together to develop technology for White Nile's search engine. Thrasher submitted two provisional patent applications during 2005 in which he was listed as the inventor. Thrasher filed a third provisional patent application on December 13, 2005 in which he and Coleman were listed as inventors.

In the consulting agreements Coleman and Thrasher executed with White Nile, they agreed to assign their inventions, including patentable ideas, to White Nile. Thrasher also executed a separate assignment agreement that required White Nile to timely prosecute the provisional patent applications. If White Nile failed to do so, Thrasher's assignment agreement provided that "all rights in the inventions or creations transferred to White Nile Software, Inc. are then void, and any rights remaining transfer back to me."

Early on, it became apparent that Mandel and Thrasher disagreed on the direction and business strategy of White Nile. Thrasher wanted to focus on creating a unique search engine while Mandel wanted to focus on creating a social networking platform. Tensions

4

between Mandel and Thrasher escalated as they competed to control the direction of White Nile. Although White Nile obtained a $300,000 investment on December 7, 2005, from the parents of one of its employees, it effectively ceased operations within weeks as Mandel maneuvered to "squeeze out" Thrasher.

While he was an officer of White Nile, Mandel began forming what would become NeXplore Corporation for the purpose of pursuing the direction and business model that he had presented to Thrasher and that Thrasher had rejected. Skinner Layne (whose parents had provided the sole investment in White Nile) reserved NeXplore.com as a domain name in December 2005. Mandel began recruiting several of White Nile's employees and consultants to join his new company, including Savard and Skinner, during December 2005. Mandel told Savard that NeXplore was just a name change. He also instructed Savard not to tell Thrasher or anyone outside of NeXplore that NeXplore intended to develop search engine technology.

Thrasher initially was unaware that Mandel was forming NeXplore. Mandel sent Savard to Thrasher's home to meet with Thrasher and review White Nile's patents and projects. Their meeting focused on generalities. Savard testified, credibly, that he never saw an algorithm or any source code for White Nile's search engine.

In January 2006, Mandel took control of the $197,000 remaining in White Nile's bank account and returned the funds to Skinner's parents. Skinner's parents, in turn, re-invested the funds in NeXplore. In February 2006, Skinner's parents invested an additional $286,500 in NeXplore through a company they had formed. Skinner's parents never intended to invest additional funds in White Nile.

5

Savard liked Mandel's social networking concept, and he was enthusiastic about integrating a social networking platform with a search engine. NeXplore did not have the funds to build the infrastructure that would be necessary to create a new search engine. Savard testified, credibly, that he used an existing search engine and that he did not develop a unique search engine for NeXplore.

NeXplore filed and prosecuted a number of patent applications. However, White Nile, under Mandel's control, failed to timely prosecute the provisional patent applications filed by Thrasher. Therefore, the intellectual property that Thrasher had assigned to White Nile reverted to him.

NeXplore successfully raised millions of dollars during 2006 and 2007, attracting investors with descriptions of search engine technology and an interface similar to the technology and interface envisioned by White Nile. At least some of its fundraising violated applicable laws. On June 21, 2007, the State of Arkansas Securities Department entered a Cease and Desist Order against Mandel, Skinner, Skinner's parents, and others.

NeXplore became a publicly traded company, registered with the Securities and Exchange Commission ("SEC"), in March 2007. In 2007 and 2008, NeXplore issued a series of press releases that describe, among other things, management changes, efforts to market itself as a search destination, the launch of an advertising platform, the launch of a public beta version of its search destination, and user growth. The last quarterly report NeXplore filed with the SEC was for the period ended September 30, 2007. NeXplore's quarterly report for that period does not include any plan to build the infrastructure for a new search engine as part of NeXplore's operations.

NeXplore paid Mandel an increasingly generous salary from 2006 through 2009. Despite raising millions of dollars, and the generous salary paid to Mandel, NeXplore never made a profit. NeXplore terminated its registration with the SEC in early 2008. By August 2010, a thin volume of NeXplore's shares were trading on the "Pink Sheets" exchange at $.30 per share. In his bankruptcy schedules, Mandel listed the value of his shares in NeXplore as "unknown."

Mandel, Skinner, Williams, Thrasher, Coleman, and White Nile have been engaged in litigation in various forums since 2006. Mandel filed this personal bankruptcy on January 25, 2010. Thrasher, Coleman, and White Nile each filed claims against his bankruptcy estate. The claimants alleged the total amount of Mandel's debt to them exceeded $80 million on the petition date based on various unliquidated causes of action arising out of White Nile's collapse. White Nile's proof of claim listed an unliquidated debt in an amount not less than $56,000,000 owed to it by Mandel.

Mandel objected to the allowance of their claims. His objection initiated a contested matter, *see* FED. R. BANKR. P. 9014, which this Court tried over several weeks. In addition, Thrasher, on his own behalf and on behalf of White Nile, initiated a separate adversary proceeding during the claims objection trial. *See* FED. R. BANKR. P. 7001 *et seq.* Thrasher and White Nile sought to impose a constructive trust on Mandel's shares in White Nile and NeXplore, among other things, in the adversary proceeding.[3]

---

[3] On September 9, 2013, this Court issued a summary judgment denying the request for a constructive trust in the separate adversary proceeding. Thrasher's request for the imposition of a constructive trust was untimely. Moreover, as the Court explained in its decision, "even if Thrasher had timely asserted a claim for the imposition of a constructive trust, Thrasher has failed to show that he can trace the intellectual property he developed for White Nile to the estate's interest in the shares of NeXplore…."

7

Vanessa Fox appeared at trial as an expert on search engine optimization. She reviewed documents from White Nile and NeXplore as well as NeXplore's website and White Nile's so-called prototype. She concluded, in a nutshell, that the technologies described in the documents were based on "naïve assumptions of how search worked." In her opinion, neither company offered a novel or unique technology that would "make a big impact in the search phase." Furthermore, in her opinion, White Nile did not have the type of expertise that would be necessary to develop a robust search engine.

At the time Fox reviewed NeXplore's website, NeXplore appeared to be using a meta-search engine. NeXplore obtained results from existing search engines, like Yahoo, and displayed them. In contrast to NeXplore, White Nile did not have a website or any technology for her to review – Fox described Coleman's "prototype" as more of a commercial. Fox was not aware of any algorithms produced by White Nile for developing a search engine.

Two of the claimants' experts, Brad Taylor and Dr. Gilbert Amelio, testified that the quality of a start-up company's executive team is an important factor in determining whether to invest in that company. All companies are people companies, according to Dr. Amelio, and they succeed only if their executive team is capable of transforming an idea into a viable business. Dr. Amelio did not conduct due diligence on White Nile prior to his testimony, and he was not sure whether he would have invested in the company.

In their closing argument, the claimants asserted that "NeXplore was nothing but White Nile without Thrasher, Coleman and Martin." The claimants asserted that Mandel diverted White Nile's sole investors, the Laynes, and all of the subsequent investors, to

NeXplore. The claimants presented various theories of damages that would remedy their claims. As damages for Mandel's breach of fiduciary duty, theft, misappropriation of trade secrets, and shareholder oppression, the claimants requested, among other things, an award in the amount of the salary and attorney's fees paid to or on Mandel's behalf by NeXplore as well as the value of Mandel's shares in NeXplore.

White Nile's preferred remedy – and the focus of the damages portion of closing argument – was an award of compensatory damages in the amount of the value of White Nile and its intellectual property. The claimants discussed the evidence in support of various valuation methods. These methods included calculating a value for White Nile based on the value of NeXplore. In the portion of closing arguments addressing the value of Mandel's shares in NeXplore, the claimants relied upon documentary evidence indicating that Mandel received benefits in the form of salary, commission and bonuses totaling $2,726,926.61 from NeXplore and that he also benefited from NeXplore's payment of $725,789 in attorneys' fees relating to the litigation with Thrasher and Coleman.[4] In the same section of their closing arguments, the claimants discussed the evidence regarding the investments by Skinner's parents in NeXplore at or around the time of NeXplore's formation.

The Court issued its findings of fact and conclusions of law regarding the debtor's objections to the claims of Thrasher, Coleman and White Nile on September 30, 2011.[5] The

---

[4] Mandel's testimony about the salary and other benefits he received from NeXplore was vague. The claimants relied on documentary evidence, including Mandel's tax returns and spreadsheets produced by NeXplore, to calculate Mandel's salary and litigation expenses during this period.

[5] An appeal and cross-appeal followed. More than five months later, while the appeals were pending, Thrasher and his attorneys (as partial assignees of Thrasher's claim) filed a motion seeking reconsideration based on what they described as new evidence. This Court dismissed the motion for lack of jurisdiction. Thrasher and his attorneys appealed the dismissal. The Eastern District Court held that the appellants waived their arguments on appeal by failing

Court concluded that Mandel's shares in White Nile failed for lack of consideration, because Mandel failed to invest $300,000 in the company. This Court further concluded that Thrasher, on behalf of White Nile, had established claims against Mandel for breach of his non-disclosure agreement with White Nile, breach of his fiduciary duty to White Nile, and fraud. This Court awarded White Nile the total sum of $300,000 in compensatory damages.

On remand, this Court issued supplemental findings and conclusions with respect to the compensatory damages previously awarded to Thrasher and Coleman. This Court did not address the compensatory damages previously awarded to White Nile. White Nile seeks reconsideration of this Court's opinion and requests that the Court also consider, on remand, White Nile's compensatory damages.

## CONCLUSIONS OF LAW

In the motion for reconsideration, White Nile seeks to increase its compensatory damages to at least $483,500. This sum consists of the $197,000 transferred from White Nile's bank account to NeXplore (with the Laynes' permission) and the $286,500 subsequently invested in NeXplore by the Laynes. White Nile asserts that an increase in damages to $483,500 is compelled by this Court's prior conclusion that Mandel conspired to misappropriate White Nile's investment opportunities.

In addition, White Nile argues that this Court erred by failing to award it compensatory damages in the amount of the salary and other benefits Mandel received from NeXplore from 2006 through 2009. White Nile's argument appears to be premised on the theory that this Court previously found that NeXplore was really just White Nile without

---

to present them, first, to this Court, and the Eastern District Court dismissed the appeal. *See MaddenSewell, LLP, et al. v. Mandel*, 498 B.R. 727 (E.D. Tex. 2013).

10

Thrasher, Coleman, and Martin. Alternatively, White Nile argues that Mandel should be required to account for and yield to White Nile any profit he made "as a result of his breach of fiduciary duty." White Nile argues that Texas courts require fiduciaries who breach their fiduciary duties "to disgorge the profits they obtained by way of such breach."

### A.
### Disgorgement of the Salary Mandel Received from "White Nile"

An employing corporation may recover the compensation paid to an officer during the period in which he was breaching his or her fiduciary duty to the corporation. *See generally* 3 FLETCHER CYC. CORP. § 856 *Officers and Directors Engaging in Competing Businesses* ("If the officer breaches his or her fiduciary duty to the corporation, the corporation as the employer may recover the total compensation paid to the officer during the period that the breach occurred.") (collecting authority). Equitable forfeiture is distinguishable from an award of actual damages in that it serves a separate function of protecting fiduciary relationships. *ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 874 (Tex. 2010). For example, in *In Matter of Bennett*, 989 F.2d 779 (5th Cir. 1993), opinion amended on reh'g, 1993 WL 268299 (5th Cir. 1993), a managing partner forfeited his right to compensation from the partnership as result of his fiduciary breaches to that partnership. Similarly, in *Anderson v. Griffith*, 501 S.W.2d 695, 702 (Tex. Civ. App. – Fort Worth, 1973), *writ refused NRE* (Mar. 13, 1974), a real estate agent breached his fiduciary duty to his client and forfeited his right to compensation from his client for his services as agent.

Here, Mandel did not receive a salary from White Nile. White Nile is not seeking to recover payments it made to Mandel during the time he was breaching his fiduciary duty, but to recover any compensation Mandel received from NeXplore. White Nile appears to argue

11

that "law of the case" compels this Court to conclude that NeXplore is really just White Nile with another name and, therefore, White Nile can recover the salary and other benefits Mandel received from NeXplore.

White Nile's argument appears to be based on this Court's finding that Mandel told Savard that NeXplore was just a name change. This Court never found that Mandel's statement was true. The claimants did not request this Court to pierce NeXplore's corporate veil, and this Court has not done so. As a matter of fact, in all of its relevant opinions and orders, this Court has respected NeXplore as a distinct entity – an entity that was not a party to Mandel's objections to the claims of White Nile, Thrasher, and Coleman.[6]

**B**.
**Disgorgement of the Salary Mandel Received from NeXplore**

Alternatively, White Nile argues that the amount of the salary and benefits Mandel received from NeXplore should be used as the appropriate measure of damages. This Court previously found and concluded that Mandel breached his fiduciary duty to White Nile by transferring the money the Laynes invested in White Nile to NeXplore and by forming NeXplore to develop search engine technology similar to the technology developed and patented by Thrasher and Coleman, among other things. Thus, White Nile argues that Texas law requires Mandel to account to it for any profits or benefits he received as a result of his breaches of fiduciary duty and to disgorge those profits to White Nile.

All of the cases cited by White Nile require a nexus between the breach and the financial benefit or profit. In this case, however, White Nile failed to establish a causal

---

[6] The claimants may bring whatever causes of action they have against NeXplore for its use, if any, of their intellectual property in a court of appropriate jurisdiction.

connection between the salary and other benefits Mandel received from NeXplore and Mandel's breaches of fiduciary duty to White Nile. Thrasher's interest in the intellectual property he assigned to White Nile reverted to him according to the terms of the assignment. Coleman's interest in the intellectual property he developed for White Nile also reverted to him. As the Fifth Circuit discussed in its opinion, the consulting agreement in which Coleman assigned his intellectual property to White Nile was fraudulently induced by Mandel and, therefore, is void.

It does not appear that NeXplore actually developed the intellectual property that belonged to Thrasher and Coleman. Based on the credible evidence at trial, the salary and other benefits Mandel received from NeXplore from 2006 through 2009 were not paid on account of, or as a proximate result of, his breaches of fiduciary duty to White Nile. The Court, therefore, concludes that White Nile failed to establish grounds for disgorgement.

Many of the cases cited by White Nile, such as *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567 (Tex. 1963), appear to rely on the corporate opportunity doctrine.[7] The "corporate opportunity" doctrine applies "where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity." *Dyer v. Shafer, Gilliand, Davis, McCollum & Ashley, Inc.,* 779 S.W.2d 474, 478 (Tex. Civ. App. – El Paso 1989, writ denied). "When a corporate officer or director diverts a corporate opportunity to himself, he breaches his fiduciary duty of loyalty to the

---

[7] White Nile also relies upon *Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999), for the proposition that they are entitled to an award in the amount of Mandel's salary from NeXplore. *Burrow* involved a lawyer's breach of fiduciary duty to his client and a request for forfeiture of the attorney's fees. Mandel is not an attorney who received a fee from the claimants. The claimants have not shown that the equitable remedy of fee forfeiture applies under the circumstances of this case. Further, under Texas law, directors and officers are not strictly trustees, and their duties and liabilities are not necessarily identical with those of other fiduciaries. *See Tenison v. Patton*, 67 S.W. 92, 94 (Tex. 1902).

corporation." *Id.* In cases involving lost corporate opportunities, courts measuring damages seek to ascertain the reasonable value for the opportunity lost to the corporation and any benefits the fiduciary personally acquired as a result of the deprivation. *See United Teacher's Associates Ins. Co. v. MacKeen & Bailey, Inc.*, 847 F. Supp. 521, 539 (W.D. Tex. 1994) *aff'd in part, rev'd in part sub nom. United Teacher's Associates Ins. Co. v. MacKeen & Bailey Inc.*, 99 F.3d 645 (5th Cir. 1996).

Here, Mandel openly discussed with Thrasher and Coleman the direction he wanted to take White Nile. White Nile's executive team could not agree. Thus, White Nile was presented with the opportunity to re-focus and create a social media platform as part of its search engine technology, but White Nile declined. Moreover, White Nile did not have a tenable business plan for creating the unique search engine with the functionality envisioned by Thrasher and Coleman.

Mandel breached his duty of loyalty to White Nile by diverting the remaining $197,000 of the investment made by Skinner's parents. Mandel thereby deprived White Nile of investment opportunities with respect to those funds. However, with the exception of the $197,000 transferred from White Nile's bank account, White Nile failed to show that it had a legitimate expectation in the investments received by NeXplore or that White Nile would have received the investments but for Mandel's breaches of his fiduciary duty.

White Nile did not establish that Skinner's parents would have invested additional funds with it. White Nile also did not establish that any of the other investors Skinner and his father helped to recruit to invest in NeXplore would have invested in White Nile. The Court, therefore, concludes that White Nile is not entitled to an award of damages measured

14

by the Laynes' investment of $286,500 in NeXplore or any of the other investments in NeXplore.

## CONCLUSION

As the Court previously stated, the Fifth Circuit does not appear to have vacated and remanded the award of compensatory damages to White Nile. The Court, therefore, denies the motion for reconsideration. In the event the Court's reading of the Fifth Circuit's opinion is incorrect, for the reasons set forth in this memorandum opinion, the Court would increase the award to White Nile by $197,000 for a total award of $497,000 in compensatory damages.

**SO ORDERED**.

Signed on 3/23/2016

*Brenda T. Rhoades*      SR
HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE